**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILINOIS
Eastern Division**

| | |
|---|---|
| **SIGNAL FINANCIAL HOLDINGS LLC and** )<br>**SIGNAL FUNDING LLC** )<br>**both Delaware limited liability companies,** )<br> )<br>**Plaintiffs,** )<br> )<br>**v.** )<br> )<br>**LOOKING GLASS FINANCIAL LLC,** )<br>**a Delaware limited liability company, and** )<br>**FARVA JAFRI, an individual,** )<br> )<br>**Defendants.** ) | **Case No. _____**<br><br>**JURY DEMANDED** |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

SIGNAL FINANCIAL HOLDINGS LLC ("SFH") and SIGNAL FUNDING ('Signal")

(together "Plaintiffs") complain of Defendants LOOKING GLASS FINANCIAL LLC ("Looking

Glass") and FARVA JAFRI an individual, as follows:

**INTRODUCTION**

1.      Plaintiffs bring this action under the Defend Trade Secrets Act of 2016 ("DTSA"),

18 U.S.C. 1830, *et seq.*, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. 1030, *et seq.*,

and the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq.*, on account of Defendants' theft and

misuse of Plaintiffs' trade secrets and the theft and misuse of confidential computer files

containing those secrets by Defendant Jafri in excess of her authority as part of her resignation and

departure from the employ of Plaintiff Signal and her misuse of those trade secrets in her own

recently established business–Looking Glass–that directly competes with Plaintiffs.

2.      The trade secrets that are the subject of this action are extremely sensitive financial,

marketing, and investment data of Plaintiffs used in the course of Signal's business of pre-

settlement litigation funding, a business Plaintiffs operate throughout the United States in interstate commerce, both to structure their business, develop and implement business plans, and make presentations to investors and potential investors, among other business purposes.

3.     Additional confidential trade secret information was stolen relating to opportunities and ongoing SFH transactions in the business of medical receivable funding.  SFH operates several businesses in this market segment throughout the United States in interstate commerce.  These trade secrets included highly sensitive financial data, client information, and information regarding key people involved in potential joint ventures, all of which was shared with SFH under non-disclosure agreements and was maintained in a secure fashion.

4.     Defendant Jafri was formerly an officer and employee of Signal who in the course of, or soon after, resigning from Signal on September 28, 2017, improperly accessed computers and network drives maintained by SFH, Signal, and their parent company 777 Partners LLC, and transferred to her personal email account the trade secrets described below. As part of that illicit conduct, Defendant Jafri organized defendant Looking Glass to directly compete with Plaintiffs in the litigation funding business, and utilized the trade secrets she stole in business presentations designed to further Looking Glass' entry into that business and for other purposes unknown to Plaintiffs.

## JURISDICTION AND VENUE

5.     Plaintiffs bring this action under federal question jurisdiction of this Court pursuant to 18 U.S.C. 1331, under the specific grant of jurisdiction of the DTSA in 18 U.S.C. 1836(c), and under 28 U.S.C. 1367(a) providing for supplemental jurisdiction over state law claims.

6. Venue is proper in this District under 18 U.S.C. 1391(b)(1) & (2) because Defendant Looking Glass operates within in this District where a substantial part of the events and omissions giving rise to these claims occurred.

## THE PARTIES

**Plaintiffs.**

7. Plaintiff Signal Financial Holdings, a Delaware limited liability company, is engaged in interstate commerce in the businesses as the owner and operator of multiple businesses in pre-settlement funding and medical receivables. Signal Financial Holdings' principal place of business is at 1855 Griffin Road, Suite B354 Dania Beach 33004.

8. Plaintiff Signal, also a Delaware limited liability company, is engaged in interstate commerce in the business of pre-settlement legal funding (sometimes called lawsuit funding or litigation funding). Signal's principal place of business is at 1855 Griffin Road, Suite B354 Dania Beach, FL 33004.

**Defendants.**

9. Defendant Looking Glass is also a Delaware limited liability company, organized in Delaware on or about October 12, 2017 by Defendant Jafri. Looking Glass is registered in Illinois as a foreign entity and its Illinois Registered Agent is Jonathan P. Friedland, 30 N. LaSalle St., Ste 3000, Chicago, IL 60602, a partner in the law firm of Sugar Felsenthal Grais & Hammer LLP, which, on that date was retained as legal counsel by Signal and whose attorneys, including Mr. Friedland, were performing extensive legal work on its behalf, including preparing Plaintiffs' "Information security policy, [and] written information security program."

10. The Application to Register in Illinois as a foreign LLC, apparently signed by Defendant Jafri, lists her as the Manager of Looking Glass and states that its principal office is

3

located at 50 Evergreen Row, Armonk, NY 10504, which, on information and belief from Westchester County, NY land records, Plaintiffs allege is the home of Defendant Jafri's parents or other relatives.

11.     Defendant Favra Jafri is an individual who was employed by Plaintiffs as Chief Operating Officer (COO).  She holds a J.D. and M.B.A. from the University of Illinois at Urbana-Champaign, a Masters of Public Health from the Keck School of Medicine at the University of Southern California and a B.A. from New York University.  Her last known address is 3451 NE 1st Ave, Apt M602, Miami, FL 33137.

12.     Prior to and during her employment by Plaintiffs, she repeatedly represented orally and in writing that she was an attorney admitted to the practice of law in some jurisdiction. She repeatedly signed emails and other communications stating that she was Plaintiffs' "General Counsel."

13.     Plaintiffs' investigation has revealed, however, that this is likely not true and, therefore on information and belief, *i.e.* information obtained from the lawyer admissions office of the State of Alaska, Plaintiffs allege that in fact she is not licensed as an attorney at law in any U.S. state or jurisdiction, although Plaintiffs have confirmed that she was awarded an J.D. by the College of Law of the University of Illinois on May 16, 2015.

## FACTUAL BACKGROUND

14.     Plaintiff Signal is engaged in the business of pre-settlement legal funding (sometimes called lawsuit funding or litigation funding). It provides funding to victims of accidents and other legal harms who have been denied payments or settlements by the responsible parties or insurers, and who have therefore filed lawsuits to redress their rights and recover damages but who, due to injury, sickness or other disabilities do not have the means to support

themselves or pay for the medical and other professional services that they require until the lawsuits are resolved. In essence, Plaintiff Signal purchases the rights to a portion of any recovery such a victim might in the future receive and makes non-refundable, non-recourse payments to those victims.

15.     In July of 2016, Defendant Jafri was hired by Signal as its Vice President of Operations. Jafri soon after assumed the title of Chief Operating Officer ("COO"), and undertook those duties subject to the supervision of officers of Signal.

16.     In the performance of her duties, Defendant Jafri worked primarily from Illinois, where, until recently, Signal's main offices were located before they were moved to Florida. A few months before her resignation she also moved to Miami and worked from Plaintiffs' offices there.

17.     During her tenure at Signal, Defendant Jafri was provided with access to a wide variety of Signal's confidential and proprietary trade secrets, including but not limited to investor profiles, funding models, projected settlements, underwriting standards and procedures, contracting and lien purchase documents, executive summaries, and descriptions of the companies' methods of operation, lists of purchased receivables, logs of original claims, portfolios of payouts, employee agreements, and lists of contact information for employees and specialized vendors with which Plaintiffs utilized or transacted business.

18.     In August 2016, Defendant Jafri drafted or participated in the drafting of, and Plaintiffs promulgated and published, a comprehensive Employee Handbook that, among the usual provisions, contained stringent confidentiality provisions applicable to all employees, including Jafri, including the following provision in a Section entitled "Confidentiality:"

**Confidentiality**

Throughout your employment with Signal, you will have access to confidential

information. Confidential information includes information acquired in the course of one's work and not otherwise available to persons or companies outside the organization, which may include, but is not limited to: client information, equipment, documents, inventions, innovations, facilities, plans, sales/marketing/financial data, forms, and all other proprietary information that belong to Signal, our clients, and/or any partners. All such confidential information remains the sole property of Signal, our clients, and/or partners and should not be shared with other parties. If you have any question as to whether you should share information with someone, ask your manager. A failure to maintain confidentiality can result in disciplinary action, up to and including termination of employment.

19.     That Confidentiality section also contains strict restrictions about the return and non-use of confidential information after an employee's employment terminated, as follows:

Should your employment with Signal terminate for any reason, employees shall promptly surrender, without retaining copies (paper or electronic), all tangible things (including electronic files and information) that are or contain confidential information as described above. Failure to meet these obligations may result in legal action.

20.     Beginning in summer of 2017, Jafri was also awarded the opportunity to complete assignments as an investment associate of Signal's ultimate parent company 777 Partners LLC, where she was granted access to large amounts of confidential information and trade secrets regarding the broader corporate strategy of organizing a new entity, eventually organized in June 2017 as Signal Financial Holdings LLC, a Delaware limited liability company, for the purpose of acquiring and operating businesses in other market segments. This information included, but was not limited to, financial models, portfolio performance data, client information, lists of potential acquisitions or joint venture partners, privileged and confidential drafts of legal documents for debt facilities, and strategic plans for corporate growth.

21.     Defendant Jafri performed her duties from July 2016 to late May 2017, when she began to systematically subvert the executives in charge of Signal and then SFH, act in contradiction to specific instructions, and exercise authority over corporate decisions that she hid from superiors. As those actions came to light in the late summer of 2017, her behavior became

erratic and bizarre. She stopped communicating to supervisors, intentionally misrepresented her whereabouts and what work she was undertaking, had intermittent absences that interfered with Plaintiffs' operations, and refused without explanation to attend at least one meeting that was called to review and correct her performance, which was critical to the successful continuation of Plaintiffs' business.

22.     On September 28th, 2017, while Plaintiffs were preparing to terminate Defendant Jafri's employment, she abruptly submitted her resignation effective immediately leaving Plaintiff Signal without a COO.

23.     To accommodate both their interests and Jafri's departure, Plaintiffs proposed that they enter into a "Transition Agreement," whereby Defendant Jafri would continue in a limited role, while Plaintiffs attempted to find a replacement and while her responsibilities and functions were reassigned to other of Plaintiffs' employees.

24.     On October 4th, 2017, Plaintiffs' sent Defendant Jafri the proposed Transition Agreement and asked for her input.  Instead of responding, however, Jafri ceased communications with Plaintiffs' personnel and failed to respond to their urgent inquiries about the status of her actions. However, Jafri continued to exercise limited control she still had over certain bank accounts and information technology assets, without authorization from SFH or Signal.

25.     On the morning of October 7, 2017, a human resources director serving Plaintiffs sent an electronic mail communication to Defendant Jafri stating that because a number of questions had arisen regarding her conduct both pre- and post-resignation, the Transition Agreement was being rescinded.  Jafri was asked to come to an in-person meeting in Miami on Wednesday October 11, 2017 to resolve these questions and discuss the possibility of reinstating some from of the Transition Agreement offer if a cooperative arrangement was agreed upon.

26.     In the afternoon of October 7, 2017, unbeknownst to Plaintiffs, Defendant Jafri accessed at Signal corporate email account and forwarded numerous documents containing confidential and proprietary trade secret information to her personal email account: farvastra@gmail.com.

27.     After transmitting these documents to her personal email account, Jafri finally responded to a LinkedIn Inmail message sent by a human resource director serving Plaintiffs, stating that Jafri no longer had any time available to be of assistance to SFH or Signal in her transition away from the company and that she was consumed with work on a prior "start-up" company she had founded in Chicago.

28.     Five weeks later, Plaintiffs discovered that Jafri had formed a competing entity also to be involved in the business of litigation funding.

29.     In fact, on October 12th, 2017, there was filed in the Office of the Secretary of State of Delaware a Certificate of Formation of an entity known as Looking Glass Funding LLC. That Certificated was signed by one 'Stuart Rathje," which, on information and belief from the website of the law firm Sugar Felsenthal Grais & Hammer LLP, Plaintiffs allege was a paralegal at that firm.

30.     Thereafter, on October 19, 2017, there was filed in the Office of the Secretary of State of Illinois, registration on behalf said Looking Glass Funding LLC, to obtain authorization as a foreign entity to transact business in Illinois. That filing disclosed that the Manager of Looking Glass Financial LLC was Defendant Jafri, and stated that the registered agent was one Jonathan P. Friedland, 30 N. LaSalle St., Ste 3000, Chicago, IL 60602, a partner in the law firm of Sugar Felsenthal Grais & Hammer LLP, which, on that date was retained by and acting as legal counsel

for Signal, and whose attorneys, including Mr. Friedland, were performing extensive legal work on Signal's behalf.

31.     That filing also stated that Looking Glass' principal office is located at 50 Evergreen Row, Armonk, NY 10504. On information and belief from Westchester County, NY land records, Plaintiffs allege that this is the home of Defendant Jafri's parents or other relatives because those records show that the owners of record are Agha and Masoomeh Jafri.

32.     Upon the discovery of these actions by Jafri or some of them, Plaintiffs began an investigation of the circumstances of Defendant Jafri's departure, including her use of the company email, and discovered that on October 7, 2017, she had entered the company computer servers, copied numerous files containing Plaintiffs' most sensitive financial and other information, and emailed those files to her personal email farvastra@gmail.com.

33.     Defendant Jafri committed those improper acts without any authorization and in excess of her authorization as an officer of Plaintiffs, and in violation of Signal policies, as detailed in the operative August 2016 employee handbook.

34.     The files Defendant Jafri emailed to herself included are as follows (in general description): investor profiles, funding models, projected settlements, underwriting standards and procedures, contracting and lien purchase documents, executive summaries, and descriptions of the companies' methods of operation, lists of purchased receivables, logs of original claims, portfolios of payouts, employee agreements, and lists of contact information for employees and specialized vendors with which Plaintiffs utilized or transacted business.[1]

---

[1] To preserve the confidentiality of these materials, Plaintiffs describe them only generally in this Complaint with the expectation of filing them under seal at the appropriate time pursuant to this Court's Local Rules and procedures.

35.    Much of this information was proprietary to Plaintiffs, and a great deal was sophisticated and complicated compilations and summaries of market data prepared by Plaintiffs' experienced and skilled financial staff and analysts, and therefore not known outside of Signal.

36.    Signal undertook extensive efforts to safeguard the secrecy of those files and the information contained therein. Access to the files Jafri took was limited to certain employees on a need to know basis, stored on a network drive controlled by Signal's ownership group and known as the "Executive Drive," to which access was severely limited to the ownership group's investment and legal teams, the supervising executives overseeing Signal as a portfolio company, and a select small group of Signal operating executives, all of whom were subject to Signal's Confidentiality restrictions in the Employee Manual quoted in part above.

37.    The files and information contained therein were extremely valuable to Signal and to its competitors because it demonstrated both how Signal conducted its business, and provided a detailed roadmap for its competitors to do the same without the necessary complex and expensive ramp-up to develop such a sophisticated level of financial analysis.

38.    Plaintiffs invested enormous time, effort and expense to produce these files and the information contained therein, an effort that took months and consumed the full-time efforts of highly skilled and experienced investment professionals for weeks at a time. The value of this work and these information and files exceeds several tens of thousands of dollars.

39.    This information is so sophisticated that it would be extremely difficult for others to acquire or develop in its highly accurate form.

40.    Two of the computer files that Defendant Jafri stole were Microsoft PowerPoint "slide decks" that contained the most confidential financial, marketing, and investor information. Both slide decks were marked "Confidential," but in any event, Defendant Jafri was well aware

from her education, experience, and role at Plaintiffs that the slide decks and the other files she stole contained the most sensitive and confidential information and constituted Plaintiffs' trade secrets.

41.     The slide decks contained extensive amounts of Plaintiffs' trade secret information, including, in particular, proprietary information regarding disability receivables, a potential market for Plaintiffs, and industry specific financial models created by Plaintiffs.

42.     The slide decks were prepared by one of Plaintiffs' investment principals, working full-time over 2-3 weeks. That professional holds an MBA from Duke University and has over a decade of Wall Street investment experience. His work involved complicated calculations and modeling that were then embedded in the slides.

43.     Another of the files Jafri emailed to herself was an EXCEL spreadsheet that was a financial model of projected operations prepared for the use in making a presentation to a large international investment firm that was investigating investing in or joint venturing with Plaintiffs.

44.     The preparation of that model file was a difficult and time-consuming task performed in-house by two or three investment professionals based on highly proprietary and secret calculations and formulas. The preparation of that model took nearly a month of full time work to build.

45.     Plaintiffs' slide deck and model spreadsheet were shared only with a very select and sophisticated persons and entities as part of Plaintiffs' investment marketing efforts. Those entities and persons were deeply experienced in investment matters, and always agreed to execute and abide by strict Nondisclosure Agreements (NDA), that provided in part as follows:

> **Use and Disclosure of Confidential Information**. The Receiving Party hereby agrees (a) to use the Confidential Information only for the purposes of evaluating, negotiating, consummating or administering the Transaction and (b) not to disclose Confidential Information to any person other than (i) those of its Representatives

who the Receiving Party reasonably deems need to know such Confidential Information to assist in its evaluation, negotiation, consummation or administration of the Transaction, provided that the Receiving Party shall inform such Representatives of the confidential nature of the Confidential Information and instruct them to treat the Confidential Information confidentially, (ii) as consented to by the Disclosing Party in writing (including in the form of an email), (iii) pursuant to Law and in accordance with the terms set forth in Section 3 of this Agreement, or (iv) as otherwise provided herein. The Receiving Party shall be responsible for any breach of the confidentiality or non-use provisions herein by any of its Representatives. The Receiving Party agrees to protect, and direct its Representatives to protect, the Confidential Information using the same degree of care it uses to protect its own most valuable confidential information, but in no event using less care than a reasonable person would use to protect its most valuable proprietary and confidential information.

46.     Additional files that Jafri emailed to herself were "Underwriting Guidelines" prepared for various potential deals.  These Guidelines are a roadmap of the criteria and process by which Plaintiffs evaluate the acceptance of various financing transactions, and are confidential to the highest degree because they disclose Plaintiffs' confidential business methods in considering and accepting transactions that are at the heart of their business–pre-judgment settlement funding.

47.     Subsequently, on November 13th, 2017, Plaintiffs were provided with copies of a slide deck utilized in some sort of presentation by Defendant Jafri or someone else unknown to Plaintiffs on behalf of Defendant Looking Glass. That slide deck was obviously an altered version of one of the slide decks to which Defendant Jafri had access to during her employment at Plaintiffs. This is demonstrated by the identical slide deck pages with Signal's name blacked out and Looking Glass's name inserted. In fact, on one of the pages, the name of Signal was not obliterated.

48.     The remaining files that Jafri stole were "deal documents," that is information and files exchanged between Plaintiffs and related entities of three other companies that Plaintiffs were investigating to acquire, primarily financial, administrative, and underwriting information. Two of those transactions have closed and the companies involved are now part of the Signal family of

entities. The third transaction is still pending, and so Defendants have in their possession extremely sensitive and confidential financial, underwriting and other information about a transaction that Plaintiffs are still attempting to complete. The harm from their theft and possession of this material is incalculable.

49.     During the period that Defendant Jafri was committing these acts, three individuals–Michael Olsen, Michael Walker, and Pamela Kalfen–were officers and employees of Plaintiff. Olsen was Plaintiffs' Chief Marketing Officer (CMO); Walker was its Chief Technology Officer (CTO), and Kalfen was its Chief Underwriter.

50.     All three appear in the Looking Glass slide deck presentation, with detailed description of their backgrounds, experience, and expected roles. Olsen is listed as Looking Glass' "prospective CMO/President;" Walker is listed as its "prospective CTO/COO;" Kalfen is listed as its "prospective Chief Underwriter."

51.     Without process of Court, Plaintiffs do not know and cannot discover whether the three were knowing participants in Defendant Jafri's improper actions. Nevertheless, the inclusion of the three in this marketing deck establishes Defendants' intention to create a venture competitive with Plaintiff Signal using not only its trade secret information, but also its management staff.

52.     Based on these discoveries, Signal has terminated the employment of all three.

53.     This misuse of Plaintiffs' trade secrets by Defendant Jafri on behalf of Defendant Looking Glass was entirely unauthorized and improper, and constitutes a theft and misappropriation of Plaintiffs' trade secrets.

54.     Plaintiffs were and are the owners of all of this information, documents and files stolen by Defendant Jafri and used to promote her competitive entity, Defendant Looking Glass.

55. Any and all of the information, documents and files stolen by Defendant Jafri and then used to promote her competitive entity, were Plaintiffs' confidential and sensitive trade secrets.

56. Plaintiffs took extensive and reasonable steps to ensure that those materials remained confidential, including the following: labeling on the materials of its confidential nature, limited exposure to non-employee personnel, and access limited to specific, company personnel in a protected online "hard drive."

57. Defendants' theft of this information, documents and files has caused Plaintiffs damage in excess of $5,000, in that they are required to seek legal assistance to protect their trade secrets, forced to conduct a complicated and expensive forensic computer analysis and investigation, and are now suffering competitive damage in that Looking Glass is attempting to steal business from them by using their own trade secret information.

58. Plaintiffs cannot quantify the precise monetary losses that might continue to be suffered due to the loss of goodwill, the loss of sales and the unfair economic advantages that Looking Glass Jafri has gained or is likely to gain.

59. The loss of business that Jafri threatens to cause and the profits lost with such business are unquantifiable and the mere difficulty of pinning down what business has been or will be lost makes Plaintiffs' injury irreparable.

60. Furthermore, Looking Glass' emergence as a competitor is sufficient to establish irreparable harm by reason of the threat of the continuation of such losses to Plaintiffs' legitimate business interests are sufficient to show irreparable harm. Looking Glass and Jafri are now current and ongoing competitors, creating ongoing competition with Signal, making it difficult to identify or predict which customers Signal has or will lose.

61.     Finally, Plaintiffs' potential loss of a competitive position is an intangible but real damage not readily measurable, and is a harm that cannot be adequately remedied in law.

62.     By this proceeding, Plaintiffs seek the protection of the Court to stop the ongoing illegal conduct and compensate them for their losses.

## COUNT ONE

## VIOLATION OF THE DEFENSE OF TRADE SECRETS ACT – 18 U.S.C. 1830, *et seq.*

63.     Plaintiffs re-allege and incorporate herein all of the allegations set forth in paragraphs 1 through 62 above and the allegations of the other Count(s) herein.

64.     By means of the acts, practices, omissions and conduct alleged above, Defendants and each of them have committed violations of 18 U.S.C. 1832 of the DTSA, in that they

(a) with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—

(1) stole, or without authorization appropriated, took, carried away, or concealed, or by fraud, artifice, or deception obtained such information;

(2) without authorization copied, duplicated, sketched, drew, downloaded, uploaded, altered, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, and conveyed such information;

(3) received, possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

(4) attempted to commit those acts described in paragraphs (1) through (3); and

(5) conspires with one or more other persons to commit such acts and did commit an act to effect the object of that conspiracy.

65.     Section 18 U.S.C. 1836(b)(1) & (3)(A) provides Plaintiffs with an appropriate civil remedy against Defendants for their wrongdoing, including the grant of injunctive relief both prohibiting continued misuse of the trade secrets and requiring protective measures.

66.     Section 18 U.S.C. 1836(3)(B) provides for the damages for actual loss caused by the misappropriation of the trade secret; and damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret.

67.     Section 18 U.S.C. 1836(c) grants this Court jurisdiction over such claim.

WHEREFORE, Plaintiffs respectfully request the Court to enter the following relief in its favor and against Defendants:

A.      That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining Defendants from using or disclosing any information that they improperly obtained;

B.      That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining Defendants or any other person acting with or for them from contacting any clients or other persons and transmitting any of the information Jafri accessed, transferred or downloaded in violation of the DTSA;

C.      That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered enjoining and restraining Defendants from misappropriating and using the confidential and/or proprietary information alleged herein;

D.      That a mandatory injunction order be issued requiring the Defendants to return to Plaintiffs any and all written materials, including copies thereof, and/or computer disks, diskettes, databases and/or other retrievable data (whether encoded, taped, code electronically, electromagnetically, or otherwise) which reflect, refer or relate to the confidential and/or proprietary information, and any copies thereof that may be in their possession, or to which they may have access;

E.      That a mandatory injunction order be issued requiring the Defendants to permit Plaintiffs to collect a forensic image of the Defendants computers, emails accounts, social media accounts, laptop computers, cloud-based storage areas, portable or handheld devices including portable phones and iPhones, and any other electronic storage media they use that contains or may contain electronic information relating to the confidential and/or proprietary information of Plaintiffs;

F.      That following the imaging described above, that the Defendants be ordered to permanently delete all Plaintiffs' confidential and/or proprietary information from

computers, computer hard drives, USB drives, CDs/DVDs, or any other type of digital storage device described herein; and

G.  That the Court grant additional relief to Plaintiffs, including (i) an accounting of monies obtained through the Defendants wrongful acts, (ii) disgorgement of the monies obtained through their wrongful acts, (iii) lost profits incurred by Plaintiffs as a result of Defendants wrongful acts, (iv) compensatory damages, (v) punitive damages, (vi) attorneys' fees, (vii) costs, including those costs incurred in the forensic imaging and investigation of computer systems, and (viii) such other and further relief as this Court may deem appropriate.

## COUNT TWO

### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT - 18 U.S.C. 1030, *et seq.*

68.  Plaintiffs re-allege and incorporate herein all of the allegations set forth in paragraphs 1 through 62 above and the allegations of the other Count(s) herein.

69.  Plaintiffs use their computers, including the desktops and laptops that it had provided for use by the Defendant Jafri, in interstate and foreign commerce.

70.  Defendant Jafri was at no time authorized to access those computers for the purpose of transferring information, documents or files belonging to Plaintiffs that were and are stored on Plaintiffs' computers.

71.  Plaintiffs' computers are protected computers within the meaning of the CFAA. 18 U.S.C. § 1030(e)(2)(B).

72.  Defendant Jafri knowingly and intentionally, without authorization and/or by exceeding her authorized access, in violation of their fiduciary duties of good faith and loyalty and with the intent to defraud, destroyed, deleted, transferred, copied, downloaded, uploaded, and/or deleted Plaintiffs' confidential and proprietary information and other trade secrets in violation of 18 U.S.C. 1030(a)(2), (a)(4), and (a)(5)(A)-(C).

73.  As a direct and proximate result of Defendant Jafri's unlawful taking of Plaintiffs' confidential and/or proprietary information and other wrongful conduct, Plaintiffs each has suffered

damages in an amount yet to be determined, but in excess of $5,000, and Defendants Jafri, and Looking Glass have been unjustly enriched by her theft of these files and information by the possession and misuse of these files and information in presentations to unknown persons by Defendant Jafri or others unknown at this time to Plaintiffs.

74.     Furthermore, the Defendants will continue to use such unlawfully gained information to benefit themselves unless the Court prevents them from using and disseminating such information in the future.

75.     Plaintiffs have been forced to retain an external computer forensic consultant to conduct a damage assessment, including but not limited to the assessment and attempted retrieval of permanently deleted, erased, impaired or altered files, programs, usage history and other data. The costs of such forensic work also will likely exceed $5,000.

76.     Defendant Jafri transferred such information outside of Plaintiffs' control for her own possession and the possession and use of Looking Glass, an entity she surreptitiously established during and as part of her course of conduct of misappropriating and obtaining valuable confidential and proprietary information belonging to Plaintiffs.

77.     Thereafter, Looking Glass, acting through Jafri, or others unknown to Plaintiffs utilized that information for promotional or solicitation purposes, or other purposes unknown to Plaintiffs.

78.     Defendants' conduct constitutes a violation of the CFAA.

79.     Defendants conduct has caused and continues to cause Plaintiffs substantial and immediate irreparable harm, including the actual and potential loss of client relationships and goodwill and confidential and proprietary information. Unless enjoined, Defendants will continue to cause further such irreparable harm.

WHEREFORE, Plaintiffs respectfully request the Court to enter the following relief in its

favor and against Defendants:

A.    That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining Defendants from using or disclosing any information that they improperly obtained;

B.    That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining Defendants or any other person acting with or for them from contacting any clients or other persons and transmitting any of the information Jafri accessed, transferred or downloaded in violation of the CFAA;

C.    That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered enjoining and restraining Defendants from misappropriating and using the confidential and/or proprietary information alleged herein;

D.    That a mandatory injunction order be issued requiring the Defendants to return to Plaintiffs any and all written materials, including copies thereof, and/or computer disks, diskettes, databases and/or other retrievable data (whether encoded, taped, code electronically, electromagnetically, or otherwise) which reflect, refer or relate to the confidential and/or proprietary information, and any copies thereof that may be in his possession, or to which they may have access;

E.    That a mandatory injunction order be issued requiring the Defendants to permit Plaintiffs to collect a forensic image of the Defendants computers, emails accounts, social media accounts, laptop computers, cloud-based storage areas, portable or handheld devices including portable phones and iPhones, and any other electronic storage media they use that contains or may contain electronic information relating to the confidential and/or proprietary information of Plaintiffs;

F.    That following the imaging described above, that the Defendants be ordered to permanently delete all Plaintiffs' confidential and/or proprietary information from computers, computer hard drives, USB drives, CDs/DVDs, or any other type of digital storage device described herein; and

G.    That the Court grant additional relief to Plaintiffs, including (i) an accounting of monies obtained through the Defendants wrongful acts, (ii) disgorgement of the monies obtained through their wrongful acts, (iii) lost profits incurred by Plaintiffs as a result of Defendants wrongful acts, (iv) compensatory damages, (v) punitive damages, (vi) attorneys' fees, (vii) costs, including those costs incurred in the forensic imaging and investigation of computer systems, and (viii) such other and further relief as this Court may deem appropriate.

## COUNT THREE

## VIOLATION OF THE ILLINOIS TRADE SECRETS ACT - 765 ILCS 1065/1, *et seq.*

80. Plaintiffs re-allege and incorporate herein all of the allegations set forth in paragraphs 1 through 62 above and the allegations of the other Count(s) herein.

81. At all relevant times herein, there existed as part of the laws of the State of Illinois the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq.* ("ITSA"). Among other things, section 3 of the ITSA provides for the enjoinder of either actual or threatened misappropriation of trade secrets. See 765 ILCS 1065/3.

82. Section 2(d) of the ITSA defines a "trade secret" as:

[I]nformation, including but not limited to, technical or non-technical data, a formula, pattern compilation, program, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure and use, and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality. 765 ILCS 1065/2(d).

83. The data that Plaintiffs maintained and that was stolen, copied and misappropriated by Defendant Jafri included sensitive and confidential investment and financial data about the business operations of Plaintiff, including proprietary financial and operations information, competitive market analysis compiled using the expertise of Plaintiffs' officers and employees, target client profiles, investor profiles and investment return potentials, among other things.

84. That data and those files and information constitute trade secrets under the ITSA, whose actual and threatened misappropriation may be enjoined.

85. Plaintiffs took affirmative steps to keep its confidential and proprietary information secret, including internal and external security measures. Plaintiffs' employees, including

especially Jafri, Olsen, Walker and Kalfen were and are aware of the highly confidential and secret nature of the confidential and proprietary information.

86.     Despite the statutory obligations to maintain the confidentiality of such trade secrets, the Defendants maliciously misappropriated such trade secrets in violation of the ITSA.

87.     Sections 2 and 3 of the ITSA allow for an injunction to be issued enjoining the actual or threatened misappropriation of trade secrets.

88.     Plaintiffs have no adequate remedy at law to protect against the illegal misappropriation and use of its trade secrets by Defendants. Injunctive relief is therefore necessary and appropriate to restrain the illegal misappropriation and use of such information.

89.     Unless Defendants are restrained and enjoined from using the subject confidential, proprietary and trade secret information, Plaintiffs will suffer immediate and irreparable injury in that the Defendants will continue to have access and the ability to make use of Plaintiffs' trade secrets.

90.     As a direct and proximate result of Defendants' misappropriation of Plaintiffs' trade secrets, Plaintiffs have suffered damages in an amount yet to be determined, and the Defendants have been unjustly enriched through their use of such information. Therefore, pursuant to section 4 of the ITSA, Plaintiffs are entitled to recover damages.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A.      Granting a temporary restraining order, and thereafter a preliminary and permanent injunction barring the Defendants from utilizing any of Plaintiffs' trade secrets;

B.      That a mandatory injunction order be issued requiring the Defendants to return to Plaintiffs any and all written materials, including copies thereof, and/or computer disks, diskettes, databases, portable or handheld devices including portable phones and their iPhones, and/or other retrievable data (whether encoded, taped, code electronically, electromagnetically, or

otherwise) which reflect, refer or relate to the confidential and/or proprietary information, and any copies thereof that may be in his possession, or to which they may have access;

C.      Awarding compensatory damages for Plaintiffs' actual losses and damages and Defendants' unjust enrichment, as provided for under 765 ILCS 1065/4;

D.      Awarding exemplary damages, costs and reasonable attorneys' fees; and

E.      Awarding such other and further relief this Court deems to be just and appropriate.


## JURY DEMAND

Plaintiffs demand a jury on all issues so triable.

* * * *

Date: December 7, 2017                          Respectfully submitted,

                                                 /s/ Constantine John  Gekas
                                                Constantine John Gekas
                                                 CJG@gekaslaw.com
                                                GEKAS LAW LTD.
                                                33 North LaSalle Street STE 2220
                                                Chicago, Illinois 60602
                                                Tel: (312) 726-4501
                                                Fax: (312) 726-4505

                                                *Attorney for Plaintiffs*

## <u>CERTIFICATION</u>

Under penalties as provided by law pursuant to 28 U.S.C. §1746, the undersigned certifies under penalty of perjury that the foregoing is true and correct, except as to matter therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he/she verily believes the same to be true.

Dated: _____December 7, 2016_____

_____

Title: ____Chief Executive Officer_____