IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SIGNAL FINANCIAL HOLDINGS LLC, and SIGNAL FUNDING LLC, both Delaware limited liability companies, <br><br> Plaintiffs, <br><br> v. <br><br> LOOKING GLASS FINANCIAL LLC, a Delaware limited liability company, and FARVA JAFRI, and individual, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 17 C 8816 <br><br> Judge Joan H. Lefkow |

## ORDER AND OPINION[1]

The court held an evidentiary hearing regarding Signal Financial Holdings LLC and Signal Funding LLC's (together, Signal) preliminary injunction, during which the parties presented testimony and documentary evidence as well as final arguments to the court. Based on the evidence received, including the testimony of witnesses and the exhibits introduced by the parties and the arguments of counsel, the court enters the following findings of fact and conclusions of law under Rules 52(a) and 65(d) of the Federal Rules of Civil Procedure. These findings are preliminary in nature and are not binding as the case progresses. *Michigan* v. *U.S. Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011)

## FINDINGS OF FACT

Litigation funding, also called pre-settlement funding or legal funding, involves lending money to a plaintiff against the potential value of a verdict or settlement. Signal, a subsidiary of 777 Partners, is a member of the industry that focuses on bodily injury claims resulting from motor vehicle accidents, the majority of which end in settlement. Established on July 1, 2016, it

---

[1] The court's jurisdiction rests on 28 U.S.C. § 1331. Venue is proper in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391.

originally had only two employees: Gary Chodes, then acting Chief Executive Officer (CEO), and Farva Jafri, who was hired on July 25, 2016. Throughout her time at Signal, Jafri was a member of the executive team working under several titles, including chief operating officer, chief financial officer, chief information security officer, executive vice-president of operations, and general counsel.

To attract potential investors and raise capital, Signal creates Power Point presentations, known as "slide decks," to present in a compelling manner its specific business model and explain why it is an attractive investment. Jafri, Chodes, and Juan Arciniegas, who joined 777 Partners in August 2016, worked together to create one such slide deck.

At some point, Jafri's relationship with Signal soured, and on September 28, 2017, she submitted a resignation letter, effective immediately. Signal and Jafri then attempted to negotiate a transition agreement, but it never came to fruition, and she received no compensation for any time at Signal after September 28. During the negotiations, however, Jafri continued to have access to her Signal email account. On October 7, 2017, Jafri logged into her Signal email, searched for specific emails and files and forwarded them to her personal email account. These files included the previously mentioned slide deck, an EXCEL spreadsheet containing a financial model of projected operations, draft employment agreements, and underwriting guidelines. Shortly thereafter, Jafri founded Looking Glass, a litigation funding company and competitor of Signal. Using the forwarded slide deck as a "template," Jafri created a Looking Glass slide deck. She then sent her slide deck to approximately ten separate potential investors.

Signal soon came into possession of a copy of the Looking Glass slide deck. It immediately began an internal investigation and soon discovered that Jafri had forwarded the documents to herself. Signal alleges that those documents, including the slide deck, are trade secrets. It filed counts of trade secret misappropriation under both the Defend Trade Secrets Act

(DTSA) and the Illinois Trade Secrets Act (ITSA) against Jafri and Looking Glass.[2] Signal then sought and received a temporary restraining order enjoining Jafri and Looking Glass from using the forwarded documents. It later moved for a preliminary injunction on the same grounds. When presenting its motion for preliminary injunction on January 3, 2018, Signal argued that an evidentiary hearing was unnecessary because defendants had not mounted any factual defense. The court, recognizing that the preliminary injunction could be dissolved at any time, granted Signal's motion and allowed Looking Glass one week to submit a memorandum identifying contested issues of fact that would be clarified at an evidentiary hearing.[3] After reviewing the memorandum, the court scheduled a hearing for January 18. The hearing was limited in scope to issues raised by defendants in their memorandum.[4] Those issues included the history and intended applicability of an employee handbook, whether certain draft employment agreements are trade secrets, and, most important to the preliminary injunction, whether the slide deck is a trade secret.[5]

An evidentiary hearing was held on January 18, 19, and 24. Each side presented documentary evidence, which included the verified complaint, as well as testimonial evidence. Signal produced two witnesses. The first was David Hough, Signal's current CEO on whose

---

[2] Signal also brought a count for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, but that claim is not at issue here.

[3] "[T]he court need not conduct an evidentiary hearing unless one is called for as a result of a fact issue created by the response to a motion for a preliminary injunction." *Dexia Credit Local* v. *Rogan*, 602 F.3d 879, 884 (7th Cir. 2010) (collecting cases). Indeed, "in any case in which a party seeks an evidentiary hearing, he must be able to persuade the court that the issue is indeed genuine and material and so a hearing would be productive—he must show in other words that he has and intends to introduce evidence that if believed will so weaken the moving party's case as to affect the judge's decision on whether to issue an injunction." *Ty, Inc.* v. *GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997).

[4] At the time the memorandum was filed, Jafri was not represented. Looking Glass's counsel later filed an appearance on her behalf, and the court assumes that the motion was also applicable to her defense.

[5] The court also included the origin of an employee and vendor list that defendants claimed did not originate with Signal. Prior to the hearing, Signal voluntarily withdrew its trade secrets claims as to that document.

declaration it relied for its preliminary injunction motion.[6] Hough has nearly twenty-five years of professional experience in finance, as well as thirteen years of experience specific to pre-settlement financing. Signal's second witness was Arciniegas, the 777 Partners employee who had participated in creating the slide deck. He holds an MBA from Duke University and spent ten years on Wall Street advising private equity firms on their acquisitions of targets, including advising on the structure of those acquisitions, evaluating the merits of the acquisitions, and raising capital to finance those acquisitions. Jafri testified on behalf of the defendants. She received an MBA and JD from the University of Illinois in 2015. After receiving those degrees, Jafri worked for a year at a start-up that focused on healthcare IT. Signal was her first foray into litigation funding.

Regarding the history and intended applicability of an employee handbook, the parties offered relatively little evidence, which may be because the issue is somewhat of a red herring to the litigation. The parties agree that Jafri took part in drafting it and knew its contents, though she never signed a certificate of receipt acknowledging that she was bound by it. As to the two draft employment agreements, which also received relatively little attention, the court finds that they were likely red-lined by Signal's counsel as evidenced by Hough's testimony and the Latera Change Pro summary reports at the end of each agreement. The court also finds that the red-lined draft agreements, which are marked "CONFIDENTIAL" on their first pages, were sent to the third-parties, that is, the prospective employees or their counsel.

The slide deck necessitates greater discussion. As previously stated, Chodes, Jafri, and Arciniegas worked together on the slide deck. According to Arciniegas, the original distribution of work was for Jafri to source industry statistics and Arciniegas to digest that information and present it in a compelling manner. At some point, Chodes decided that Jafri should no longer be

---

[6] Chodes was terminated from Signal in late March 2017. Hough took over as interim CEO that April and became permanent CEO on September 1, 2017.

4

involved in preparing the slide deck and instructed her to transfer the whole project to Arciniegas, which she did. It is undisputed that the slide deck contains, in part, publicly available information, including citations to where that information originated. Indeed, Jafri testified regarding information she retrieved from a public report by Colonnade Ltd. and used in the slide deck. The display of that information in the slide deck, however, differs from the presentation format in the Colonnade report. Additionally, though information taken from public sources was cited to in footnotes in the slide deck, the Colonnade report is not listed as a source, and Arciniegas testified that he had not seen the report until this litigation. All witnesses agreed that the public information in the slide deck was organized and presented in a manner to best pitch Signal to potential investors.

In addition to the publicly available information, the slide deck also contains financial calculations performed by Arciniegas. For example, Arciniegas testified that he calculated potential returns under different market scenarios and included his results in the slide deck in an effort to entice potential investors to commit capital to Signal. Jafri testified that she knew Arciniegas's financial analysis was included in the slide deck. (Tr. 1/19/2018 at 172:23–25.)

Hough testified that standard practice at Signal required all third parties to sign a non-disclosure agreement (NDA) before Signal sent out a slide deck. He has personally sent out five or six NDAs for signature. Arciniegas testified that, during his time on Wall Street, he created close to two hundred slide decks used to market various companies to investors, and he was personally responsible for ensuring that potential viewers agreed to an NDA before a deck was distributed. His responsibility at Signal was the same. Arciniegas testified that Jafri was expected to do this also because she was a member of the "investment team," and all members were required to get NDAs, but the investment team was apparently a 777 Partners team, not a Signal team. Jafri, on the other hand, testified that she was never informed that slide decks being sent to investors required NDAs. On cross, however, she was asked whether one of her responsibilities

5

at Signal was drafting NDAs, and she responded, "I don't recall drafting an NDA." (Tr. 1/19/18 175:5.) She was then presented with a print-out of her LinkedIn page, which she admitted she created. When describing her job experience at Signal, the first of numerous responsibilities listed on her LinkedIn page is "[d]rafted NDAs . . . ." (Pls.' Hearing Ex. Q at 3.) She was not rehabilitated on re-direct. Accordingly, the court sees Jafri's credibility as impugned and finds Hough and Arciniegas are more credible in stating that Signal's practice was to require NDAs be signed before sending out slide decks.

## FINDINGS OF LAW

A party seeking a preliminary injunction must demonstrate that (1) its claim has some likelihood of success on the merits; (2) traditional legal remedies would be inadequate; and (3) absent injunctive relief, it will suffer irreparable harm in the period prior to final resolution of its claim. *Girl Scouts of Manitou Council* v. *Girl Scouts of the U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If the moving party satisfies these threshold requirements, the court must balance the threatened injury to the moving party with the threatened harm the injunction may inflict on the nonmovant. *Id*. The court also must consider the public interest in either the grant or denial of the injunctive relief. *Id*. In applying these criteria, the court uses a "sliding scale" approach: if a claim is very likely to succeed on the merits, less harm to the plaintiff will be required to justify injunctive relief and vice versa. *Abbott Labs.* v. *Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992).

I.   **Likelihood of Success on the Merits**

   A.   **The Slide Deck**

To succeed on a request for a preliminary injunction, the plaintiff must demonstrate a "'better than negligible' chance of success on the merits of at least one of his claims." *Girl Scouts,* 549 F.3d at 1096. The court finds that Signal's claims as to the slide deck far surpass "better than negligible."

6

The Defend Trade Secrets Act of 2016 (DTSA) creates a private right of action in favor of the "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Under the DTSA, a trade secret includes

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). Under the DTSA, "misappropriation" is defined as

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who--
> > (i) used improper means to acquire knowledge of the trade secret;
> > (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was--
> > > (I) derived from or through a person who had used improper means to acquire the trade secret;
> > > (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
> > > (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
> > (iii) before a material change of the position of the person, knew or had reason to know that--
> > > (I) the trade secret was a trade secret; and
> > > (II) knowledge of the trade secret had been acquired by accident or mistake[.]

*Id.* § 1839(5). "Improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage." 18 U.S.C. § 1839(6)(A).

The definitions of "trade secret," "misappropriation," and "improper means" are substantially similar under the Illinois Trade Secrets Act (ITSA). *See* 765 ILCS 1065/2(a), (b), (d). "Although [ITSA] explicitly defines a trade secret . . . Illinois courts frequently refer to six common law factors (which are derived from § 757 of the Restatement (First) of Torts) in determining whether a trade secret exists: (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which the information is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort and money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Learning Curve Toys, Inc.* v. *PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003). ITSA is slightly more restrictive, however, for in addition to showing that a trade secret was misappropriated, a plaintiff must also show that the trade secret was used in the defendant's business. *Id.* at 721.

The slide deck is a trade secret under both DTSA and ITSA. There is no dispute that the slide deck is, in part, a compilation of publicly available information. But "[a] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret."[7] *3M* v. *Pribyl*, 259 F.3d 587, 595–96 (7th Cir. 2001). Jafri in fact admitted that she had made a suggestion to recompile certain public information "in such a way that it presented the statistics in a way the company wanted to present it." (Tr. 1/19/2018 at 190:15–17.) The slide deck is not solely a compilation of public information. Hough testified that certain slides contain financial and statistical information

---

[7] Though the Seventh Circuit was interpreting the definition of "trade secret" under the Wisconsin Uniform Trade Secrets Act, that definition is substantially similar to the DTSA and ITSA definitions. *See* Wis. Stat. § 134.90(1)(c).

created by Arciniegas. Jafri admitted as much on cross examination. (*See id.* at 186:14–21.)

Hough and Arciniegas each credibly testified that before a third party could see the slide deck, the third party was required to sign an NDA. A copy of a representative NDA is attached to Hough's declaration. Additionally, each slide in the deck is marked "CONFIDENTIAL – NOT FOR DISTRIBUTION." These are reasonable measures to keep the slide deck secret.[8] And for good reason, as it is a valuable resource. There is no dispute that the slide deck was used by Signal to acquire investor funding. Signal is one player in the litigation funding industry, and it spent considerable time and effort creating the slide deck to best present itself and its strategies to potential investors. There is no dispute that investors see numerous slide decks and that a slide deck must be compelling so as to attract attention and cut through the pack. Signal's slide deck was apparently successful in that regard. It is telling that Jafri used the slide deck and incorporated much of it wholesale into the Looking Glass slide deck, including each slide being marked "CONFIDENTIAL – NOT FOR DISTRIBUTION." The Looking Glass slide deck was sent to potential investors, and it appears to the court that at least some of those investors have indeed given money to Looking Glass.[9]

The slide deck was also misappropriated. Jafri admittedly acquired the slide deck when she sought it out specifically and sent it to herself. More than a week before that, she had tendered a resignation letter that was effective immediately. Though she was negotiating a potential transfer agreement at the time, she was, by her own doing, not employed at Signal. That her email account had not been shut down is evidence of Signal's negotiating in good faith and hoping to reach a transition agreement. Under these circumstances, it is reasonable to find that

---

[8] Defendants did not challenge Signal's efforts to maintain the secrecy of the slide deck in their memorandum in support of an evidentiary hearing, and the court thus considers any challenge waived.

[9] At the evidentiary hearing, defendants' counsel stated that "not all ten have come up with money." (Tr. 1/19/2018 at 196:23.) This leads the court to infer that at least some investors have come up with money.

Jafri's actions in forwarding the slide deck, which she admits contained Arciniegas's financial analysis, were not authorized by Signal. Based on her education as well as her responsibilities at Signal, she had reason to know that the slide deck was not to be shared openly and that as an executive officer she had a duty to maintain its secrecy. "Although an employee may take general knowledge or information he or she has developed during their employment, he or she may not take any confidential information, including trade secrets." *Stampede Tool Warehouse, Inc.* v. *May*, 272 Ill. App. 3d 580, 590, 651 N.E.2d 209, 216–17 (1995), *as modified* (June 14, 1995) (internal citations omitted).

The court therefore finds that Signal has a much better than negligible chance of prevailing on its misappropriation claim as to the slide deck.

### B. The Other Claimed Documents

The court finds that the draft employee agreements are not trade secrets. They do not hold any independent economic value, and any claim of attorney-client privilege, to the extent it is even relevant to this inquiry, was waived when the drafts were sent to third parties. Signal has not presented any plausible argument that the draft agreements hold economic value as a result of their not being generally known. While Signal argued at closing that the agreements can serve as templates for future agreements, thereby saving it legal fees, that would be the case even if the documents were public. While "the threshold for establishing likelihood of success is low," *Michigan*, 667 F.3d at 782, Signal has not met that burden.

As to the other documents claimed as trade secrets, including a financial spreadsheet and underwriting guidelines, defendants have not offered any argument as to why they are not trade secrets. Accordingly, for purposes of the preliminary injunction, the court finds them to be trade secrets that were acquired by improper means.

## II.     Inadequate Remedy and Irreparable Injury

"Irreparable harm occurs in the context of trade secret misappropriation where the trade secret misappropriation results in the intangible loss of competitive advantage, customers, and goodwill." *Optionmonster Holdings, Inc.* v. *Tavant Techs., Inc.*, No. 10 C 2792, 2010 WL 2639809, at *9 (N.D. Ill. June 29, 2010) (citation omitted). Indeed, "Under Illinois law, there is a rebuttable presumption of irreparable harm in cases involving misappropriation of trade secrets." *Id.*

Here, Signal is at risk of losing potential investors as well as its competitive advantage, both irreparable injuries. Calculating damages for these types of injuries is not practicable, and therefore no remedy at law could adequately compensate Signal. *See Foodcomm Int'l* v. *Barry*, 328 F.3d 300, 304 (7th Cir. 2003).

## III.    Balance of the Hardships

Signal stands to suffer irreparable harm because of defendants' actions. It seeks an injunction preventing them from benefitting from its misappropriated trade secrets. Because Signal has such a strong chance of succeeding on the merits with regard to the slide deck, any harm suffered by the defendants as a result of an injunction carries considerably less weight. Defendants, for their part, offer little relevant argument regarding their potential hardship. They seem to claim that the continued existence of an injunction casts a cloud over their business. But, as stated above, Signal's likelihood of success is high, and that outweighs any hardship defendants may suffer as a result of their own wrongdoing.

For all these reasons, the preliminary injunction, as modified, stands.

Date: January 31, 2018

_____

U.S. District Judge Joan H. Lefkow