
**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILINOIS**
**Eastern Division**

| | |
|---|---|
| SIGNAL FINANCIAL HOLDINGS LLC, and<br>SIGNAL FUNDING LLC,<br>both Delaware limited liability companies,<br><br>Plaintiffs,<br><br>v.<br><br>LOOKING GLASS FINANCIAL LLC,<br>a Delaware limited liability company,<br>FARVA JAFRI,<br>PINNACLE STRUCTURES LLC,<br> a Delaware limited liability company,<br>LOOKING GLASS LEGAL LLC,<br> a Delaware limited liability company,<br>PINNACLE DISABILITY LLC,<br>a Delaware limited liability company,<br>LOOKING GLASS FINANCIAL LLC,<br> a Delaware limited liability company, and<br>LOOKING GLASS PARTNERS LLC,<br> a Delaware limited liability company,<br>MICHAEL OLSEN,<br>SUGAR FELSENTHAL GRAIS & HELSINGER LLP,<br>an Illinois limited liability partnership,<br>JONATHAN P. FRIEDLAND,<br>VANESSA J. SCHOENTHALER,<br>ETAHN M. COHEN, and<br>ELIZABETH B. VANDESTEEG,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>**Case No. 17-cv-8816**<br><br>Hon. Joan Humphrey Lefkow<br><br>**JURY DEMANDED** |

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

SIGNAL FINANCIAL HOLDINGS LLC ("SFH") and SIGNAL FUNDING LLC

('Signal') (together "Plaintiffs") complain of Defendants LOOKING GLASS FINANCIAL LLC

("Looking Glass"), FARVA JAFRI, PINNACLE STRUCTURES LLC, a Delaware limited

liability company, LOOKING GLASS LEGAL LLC,  a Delaware limited liability company,

PINNACLE DISABILITY LLC, a Delaware limited liability company, and LOOKING GLASS

PARTNERS LLC, a Delaware limited liability company, MICHAEL OLSEN, SUGAR

1

FELSENTHAL GRAIS & HELSINGER LLP, a law firm organized as an Illinois limited liability partnership (formerly known as Sugar, Felsenthal, Grais & Hammer LLP), and four of that firm's partners, JONATHAN P. FRIEDLAND, VANESSA J. SCHOENTHALER, ETAHN M. COHEN, AND ELIZABETH B. VANDESTEEG, as follows:

## INTRODUCTION

1.      Plaintiffs originally brought this action under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. 1830, *et seq.*, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. 1030, *et seq.*, and the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq.*, in part on account of Defendants Jafri's and Looking Glass' (a) theft and misuse of Plaintiffs' trade secrets and the theft and misuse of confidential computer files containing those secrets by Defendant Jafri in excess of her authority as part of her resignation and departure from the employ of Plaintiff Signal; (b) their misuse of those trade secrets in her own recently established business–Looking Glass–that directly competes with Plaintiffs.

2.      The trade secrets that were and in part still are the subject of this action are extremely sensitive financial, marketing, and investment data of Plaintiffs used in the course of Signal's business of pre-settlement litigation funding, a business Plaintiffs operate throughout the United States in interstate commerce, both to structure their business, develop and implement business plans, and make presentations to investors and potential investors, among other business purposes.

3.      Additional confidential trade secret information was stolen relating to opportunities and ongoing SFH transactions in the business of medical receivable funding. SFH operates several businesses in this market segment throughout the United States in interstate commerce. These trade secrets included highly sensitive financial data, client information, and information regarding

key people involved in potential joint ventures, all of which was shared with SFH under non-disclosure agreements and was maintained in a secure fashion.

4.       As part of their misconduct, Defendants Jafri, Looking Glass, and Olsen utilized the trade secrets they stole in business presentations regarding the business of legal funding designed to further Looking Glass' entry into that business and for other purposes unknown to Plaintiffs.

5.       Plaintiffs now bring this Amended Complaint against Defendant Jafri and Michael Olsen for the original claims, but also separate and apart from their theft and misuse of Plaintiffs' trade secrets, on account of their breaches of fiduciary duty, and aiding and abetting breaches of fiduciary duty, by reason of their organization and operation of businesses directly competing with Plaintiffs, their theft of corporate opportunities that should have been pursued for Plaintiffs' benefit, and Jafri's misuse and misappropriation of Plaintiffs' funds entrusted to safekeeping, custody, and control.

6.       Defendant Jafri was formerly an officer and employee of Signal who both before and soon after, resigning from Signal on September 28, 2017, improperly accessed computers and network drives maintained by SFH, Signal, and their parent company 777 Partners LLC, and transferred to her personal email account certain confidential, proprietary files and information, including the trade secrets described below.

7.       In addition to that illicit conduct, Defendant Jafri organized and operated several entities, including defendant Looking Glass, and other entities named Looking Glass Legal LLC, Looking Glass Partners LLC, Pinnacle Disability LLC, and Pinnacle Structures LLC, to directly compete with Plaintiffs in the litigation funding business, and to start new businesses offering structured settlement and Social Security disability representation services, that Plaintiffs were

exploring and had explored as realistic and potential businesses in which they were involved and intended to become more deeply involved in.

8.      Defendant Jafri is currently a resident and citizen of Armonk, New York.

9.      Defendant Michael Olsen is a resident of Elgin Illinois and a citizen of the State of Illinois.

## JURISDICTION AND VENUE

10.     Plaintiffs bring this action under federal question jurisdiction of this Court pursuant to 18 U.S.C. 1331, under the specific grant of jurisdiction of the DTSA in 18 U.S.C. 1836(c), under 28 U.S.C. 1367(a) providing for supplemental jurisdiction over state law claims, and under Illinois State common and statutory law on, Plaintiffs allege on information and belief, the basis of diversity of citizenship pursuant to 28 U.S.C. 1332, and therefore conditionally allege diversity jurisdiction as an alternate jurisdictional basis of this action.

11.     Venue is proper in this District under 18 U.S.C. 1391(b)(1) & (2) because Defendant Looking Glass operates within in this District, where a substantial part of the events and omissions giving rise to these claims occurred, and where four defendants–Olsen, Friedland, Cohen, and Vandesteeg–live and work.

## THE PARTIES

**Plaintiffs.**

12.     Plaintiff Signal Financial Holdings, a Delaware limited liability company, is engaged in interstate commerce in the businesses as the owner and operator of multiple businesses in pre-settlement funding and medical receivables. Signal Financial Holdings' principal place of business is at 600 Brickell Ave, Suite 1900, Miami, FL 33131.

13.     Plaintiff Signal Funding LLC, also a Delaware limited liability company, is engaged in interstate commerce in the business of pre-settlement legal funding (sometimes called

lawsuit funding or litigation funding). Signal Funding LLC's principal place of business is at 1855 Griffin Road, Suite B354 Dania Beach, FL 33004.

14.     For the purposes of establishing diversity jurisdiction, Plaintiffs allege that their members are domiciliaries and therefore citizens of Florida, California, Texas, New Jersey, and the District of Columbia.

**Defendants.**

15.     Defendant Looking Glass is also a Delaware limited liability company, organized in Delaware on or about October 12, 2017 by Defendant Jafri. Looking Glass is registered in Illinois as a foreign entity and its Illinois Registered Agent is Jonathan P. Friedland, 30 N. LaSalle St., Ste 3000, Chicago, IL 60602, a partner in the law firm of SFGH, which, on that date, was retained as legal counsel by Signal and whose attorneys, including Mr. Friedland, were performing extensive legal work on its behalf, including preparing Plaintiffs' "Information security policy, [and] written information security program."

16.     The Application to Register in Illinois as a foreign LLC, apparently signed by Defendant Jafri, lists her as the Manager of Looking Glass and states that its principal office is located at 50 Evergreen Row, Armonk, NY 10504, which, on information and belief from Westchester County, NY land records, Plaintiffs allege is the home of Defendant Jafri's parents or other relatives.

17.     Defendant Favra Jafri is an individual who was employed by Plaintiffs as Chief Operating Officer (COO).  She holds a J.D. and M.B.A. from the University of Illinois at Urbana-Champaign, a Masters of Public Health from the Keck School of Medicine at the University of Southern California, and a B.A. from New York University.  Her last known address is 3451 NE 1st Ave, Apt M602, Miami, FL 33137.

18. Prior to and during her employment by Plaintiffs, she repeatedly represented orally and in writing that she was an attorney admitted to the practice of law in some jurisdiction. She repeatedly signed emails and other communications stating that she was Plaintiffs' "General Counsel."

19. Plaintiffs' investigation has revealed, however, that this is likely not true and, therefore on information and belief, *i.e.* information obtained from the lawyer admissions office of the State of Alaska, Plaintiffs allege that in fact she is not licensed as an attorney at law in any U.S. state or jurisdiction, although Plaintiffs have confirmed that she was awarded an J.D. by the College of Law of the University of Illinois on May 16, 2015.

20. Plaintiff Signal Funding, LLC also brings this action against Defendant Michael Olsen, who from on or about October 16, 2016 until October 27, 2017 was the Chief Marketing Officer (CMO) of Signal Funding LLC, having been so hired pursuant to a written Employment Agreement.

21. Plaintiff also brings this Amended Complaint against the other entities included within Defendants Jafri's and Olsen's web of companies through which they effected their illicit efforts to breach their fiduciary duties to Plaintiffs before and after they left Plaintiffs' employ:

   a. Pinnacle Structures LLC, a Delaware limited liability company formally organized on October 3, 2017;

   b. Looking Glass Legal LLC, a Delaware limited liability company organized on October 4 as PreSF LLC;

   c. Pinnacle Disability LLC, a Delaware limited liability company formally organized on October 6, 2017;

   d. Looking Glass Financial LLC, a Delaware limited liability company formally organized on October 12, 2017, and registered on October 19, 2017 with the Illinois Secretary of State to transact business in Illinois; and

   e. Looking Glass Partners LLC, a Delaware limited liability company, formally organized on October 25 and registered on November 6, 2017 with the Illinois Secretary of State to transact business in Illinois.

22.     For the purpose of establishing diversity jurisdiction, Plaintiffs allege on information and belief that the domiciles and therefore citizenship of these entities– Looking Glass Financial LLC, Pinnacle Structures LLC, Looking Glass Legal LLC, Pinnacle Disability LLC, and Looking Glass Partners LLC–are Illinois and New York, but without process of court are unable to determine their citizenship.

23.     Plaintiff Signal Funding, LLC also brings this Amended Complaint against Defendant Sugar Felsenthal Grais & Helsinger LLP (formerly known as Sugar Felsenthal Grais & Hammer LLP) ("SFGH"), and its members/partners Jonathan Friedland, Vanessa Schoenthaler, Etahn M. Cohen, and Elizabeth Vandesteeg, all of whom rendered legal services to Signal Funding LLC from July 2016 to October 27, 2017.

24.     SFGH is an Illinois limited liability partnership. Pursuant to Illinois Supreme Court Rule 921, SFGH was and is registered with the Illinois Supreme Court as an entity entitled to practice law in Illinois.

25.     Defendant Friedland is licensed to practice law in Illinois, New York, New Jersey, and Arizona. Defendant Vandesteeg is licensed to practice law in Illinois and New York. Defendant Cohen is licensed to practice law in Illinois.  Defendant Schoenthaler is licensed to practice law in New York.

26.     SFGH's Chicago office, its principal place of business, is located at 30 N. LaSalle St., STE 3000, Chicago, IL 60602, where defendants Friedland, Cohen, and Vandesteeg, and all but one of its partners, Defendant Schoenthaler, office. Its New York office is located at 230 Park Avenue, Suite 908, New York, New York 10169, where Defendant Schoenthaler offices.

27.     On information and belief, and for the purposes of diversity jurisdiction under 28 U.S.C. 1332, Plaintiffs allege that SFGH's partners are domiciliaries and therefore citizens of

either Illinois or New York, and that none are residents, domiciliaries or citizens of Florida, Texas, California, New Jersey, and the District of Columbia.

28.     On information and belief, Plaintiffs further allege that the members of the Jafri entities are not residents, domiciliaries or citizens of Florida, Texas, California, New Jersey, and the District of Columbia.

29.     The individual lawyer defendants Friedland, Cohen, and Vandesteeg are residents, domiciliaries, and citizens of Illinois. Lawyer defendant Schoenthaler is a resident, domiciliary, and citizen of New York.

30.     From on or about at least July 16, 2016, as evidenced by a written Engagement Letter of July 16, 2016 described in Paragraph 143 below, SFGH, and the individual lawyer defendants were lawyers for, and rendered substantial legal advice to, Plaintiff Signal Funding LLC. (Exhibit 1.)

31.     As a result, SFGH, Friedland, Schoenthaler, Cohen, and Vandesteeg owed Plaintiff Signal Funding LLC the duties of:

    a.      professional competence and fiduciary loyalty;

    b.      full, complete and truthful disclosure of all information material to that
            representation; and

    c.      conflict-free representation to not engage in any legal representation or
            other activities that constituted or created material conflicts with their
            representation of Plaintiff Signal Funding LLC and its legal and
            business interests.

### FACTUAL BACKGROUND

32.     Plaintiff Signal is engaged in the business of pre-settlement legal funding (sometimes called lawsuit funding or litigation funding). It provides funding to victims of accidents and other legal harms who have been denied payments or settlements by the responsible parties or insurers, and who have therefore filed lawsuits to redress their rights and recover

damages but who, due to injury, sickness, or other disabilities do not have the means to support themselves or pay for the medical and other professional services that they require until the lawsuits are resolved. In essence, Plaintiff Signal purchases the rights to a portion of any recovery such a victim might in the future receive and makes non-refundable, non-recourse payments to those victims.

33.    In July of 2016, Defendant Jafri was hired by Signal's former CEO, Gary Chodes, as its Vice President of Operations.  Jafri soon after assumed the title of Chief Operating Officer ("COO"), and undertook those duties subject to the supervision of officers of Signal.  Prior to this position, Jafri had no experience in any field related to litigation finance.

34.    In the performance of her duties, Defendant Jafri worked primarily from Illinois, where, until recently, Signal's main offices were located before they were moved to Florida. A few months before her resignation she also moved to Miami and worked from Plaintiffs' offices there.

35.    During her tenure at Signal, Defendant Jafri was provided with access to a wide variety of Signal's confidential and proprietary trade secrets, including but not limited to investor profiles, funding models, projected settlements, underwriting standards and procedures, contracting and lien purchase documents, executive summaries, and descriptions of the companies' methods of operation, lists of purchased receivables, logs of original claims, portfolios of payouts, employee agreements, and lists of contact information for employees and specialized vendors with which Plaintiffs utilized or transacted business.

36.    In August 2016, Defendant Jafri drafted or participated in the drafting of Plaintiffs promulgated and published, a comprehensive Employee Handbook that, among the usual provisions, contained stringent confidentiality provisions applicable to all employees, including Jafri, including the following provision in a Section entitled "Confidentiality:"

Confidentiality

Throughout your employment with Signal, you will have access to confidential information. Confidential information includes information acquired in the course of one's work and not otherwise available to persons or companies outside the organization, which may include, but is not limited to: client information, equipment, documents, inventions, innovations, facilities, plans, sales/marketing/financial data, forms, and all other proprietary information that belong to Signal, our clients, and/or any partners. All such confidential information remains the sole property of Signal, our clients, and/or partners and should not be shared with other parties. If you have any question as to whether you should share information with someone, ask your manager. A failure to maintain confidentiality can result in disciplinary action, up to and including termination of employment.

37.     That Confidentiality section also contains strict restrictions about the return and non-use of confidential information after an employee's employment terminated, as follows:

Should your employment with Signal terminate for any reason, employees shall promptly surrender, without retaining copies (paper or electronic), all tangible things (including electronic files and information) that are or contain confidential information as described above. Failure to meet these obligations may result in legal action.

38.     Beginning in summer of 2017, Jafri was also awarded the opportunity to complete assignments as an investment associate of Signal's ultimate parent company 777 Partners LLC, where she was granted access to large amounts of confidential information and trade secrets regarding the broader corporate strategy of organizing a new entity, eventually organized in June 2017 as Signal Financial Holdings LLC, a Delaware limited liability company, for the purpose of acquiring and operating businesses in other market segments.  This information included, but was not limited to, financial models, portfolio performance data, client information, lists of potential acquisitions or joint venture partners, privileged and confidential drafts of legal documents for debt facilities, and strategic plans for corporate growth.

39.     Defendant Jafri performed her duties from July 2016 to late May 2017, when she began to systematically subvert the new executives in charge of Signal and then SFH, act in contradiction to specific instructions, and exercise authority over corporate decisions that she hid

from superiors. As those actions came to light in the late summer of 2017, she stopped communicating with supervisors, intentionally misrepresented her whereabouts and the work she was undertaking, had intermittent and sometimes extended absences that interfered with Plaintiffs' operations, and refused without explanation to attend at least one meeting that was called to review and correct her performance, which was critical to the successful continuation of Plaintiffs' business.

40.     On September 28th, 2017, she abruptly submitted her resignation effective immediately leaving Plaintiff Signal without a COO.

41.     To accommodate both their interests and Jafri's departure, Plaintiffs proposed that they enter into a "Transition Agreement," whereby Defendant Jafri would continue in a limited role, while Plaintiffs attempted to find a replacement and while her responsibilities and functions were reassigned to other of Plaintiffs' employees.

42.     On October 4th, 2017, Plaintiffs sent Defendant Jafri the proposed Transition Agreement and asked for her input.  Instead of responding, however, Jafri ceased communications with Plaintiffs' personnel and failed to respond to their urgent inquiries about the status of her actions. However, Jafri continued to exercise limited control she still had over certain bank accounts and information technology assets, without authorization from SFH or Signal.

43.     On the morning of October 7, 2017, a human resources director serving Plaintiffs sent an electronic mail communication to Defendant Jafri stating that because a number of questions had arisen regarding her conduct both pre- and post-resignation, the Transition Agreement was being rescinded.  Jafri was asked to come to an in-person meeting in Miami on Wednesday October 11, 2017 to resolve these questions and discuss the possibility of reinstating some form of the Transition Agreement offer if a cooperative arrangement was agreed upon.

44.    In the afternoon of October 7, 2017, unbeknownst to Plaintiffs, Defendant Jafri accessed her Signal corporate email account and forwarded numerous documents containing confidential and proprietary trade secret information to her personal email account: farvastra@gmail.com.

45.    After transmitting these documents to her personal email account, Jafri finally responded to a LinkedIn Inmail message sent by a human resource director serving Plaintiffs, stating that Jafri no longer had any time available to be of assistance to SFH or Signal in her transition away from the company and that she was consumed with work on a prior "start-up" company she had founded in Chicago.

46.    Five weeks later, Plaintiffs discovered that Jafri had formed a competing entity also to be involved in the business of litigation funding.

47.    In fact, on October 12th, 2017, there was filed in the Office of the Secretary of State of Delaware a Certificate of Formation of an entity known as Looking Glass Financial LLC. That Certificated was signed by one 'Stuart Rathje," which, on information and belief from the website of SFGH, Plaintiffs allege was a paralegal at that firm.

48.    Thereafter, on October 19, 2017, there was filed in the Office of the Secretary of State of Illinois, registration on behalf said Looking Glass Funding LLC, to obtain authorization as a foreign entity to transact business in Illinois. That filing disclosed that the Manager of Looking Glass Financial LLC was Defendant Jafri, and stated that the registered agent was one Jonathan P. Friedland, 30 N. LaSalle St., Ste 3000, Chicago, IL 60602, a partner in SFGH, which, on that date was retained by and acting as legal counsel for Signal, and whose attorneys, including Mr. Friedland, were performing extensive legal work on Signal's behalf.

49.    That filing also stated that Looking Glass' principal office is located at 50 Evergreen Row, Armonk, NY 10504. On information and belief from Westchester County, NY

land records, Plaintiffs allege that this is the home of Defendant Jafri's parents or other relatives because those records show that the owners of record are Agha and Masoomeh Jafri.

50.     Upon the discovery of these actions by Jafri or some of them, Plaintiffs began an investigation of the circumstances of Defendant Jafri's departure, including her use of the company email, and discovered that on October 7, 2017, she had entered the company computer servers, copied numerous files containing Plaintiffs' most sensitive financial and other information, and emailed those files to her personal email: farvastra@ gmail.com.

51.     Defendant Jafri committed those improper acts without any authorization and in excess of her authorization as an officer of Plaintiffs, and in violation of Signal policies, as detailed in the operative August 2016 employee handbook that she drafted.

52.     The files Defendant Jafri emailed to herself included are as follows (in general description): investor profiles, funding models, projected settlements, underwriting standards and procedures, contracting and lien purchase documents, executive summaries, and descriptions of the companies' methods of operation, lists of purchased receivables, logs of original claims, portfolios of payouts, employee agreements, and lists of contact information for employees and specialized vendors with which Plaintiffs utilized or transacted business.[1]

53.     Much of this information was proprietary to Plaintiffs, and a great deal was sophisticated and complicated compilations and summaries of market data prepared by Plaintiffs' experienced and skilled financial staff and analysts, and therefore not known outside of Signal.

54.     Signal undertook extensive efforts to safeguard the secrecy of those files and the information contained therein. Access to the files Jafri took was limited to certain employees on a need to know basis, stored on a network drive controlled by Signal's ownership group and known

---

[1] To preserve the confidentiality of these materials, Plaintiffs have described them only generally in this Complaint and filed them under seal in the course of the preliminary injunction proceedings early in the case.

as the "Executive Drive," to which access was severely limited to the ownership group's investment and legal teams, the supervising executives overseeing Signal as a portfolio company, and a select small group of Signal operating executives, all of whom were subject to Signal's Confidentiality restrictions in the Employee Manual quoted in part above.

55.     The files and information contained therein were extremely valuable to Signal and to its competitors because it demonstrated both how Signal conducted its business, and provided a detailed roadmap for its competitors to do the same without the necessary complex and expensive ramp-up to develop such a sophisticated level of financial analysis.

56.     Plaintiffs invested enormous time, effort, and expense to produce these files and the information contained therein, an effort that took months and consumed the full-time efforts of highly skilled and experienced investment professionals for weeks at a time. The value of this work and these information and files exceeds several tens of thousands of dollars.

57.     This information is so sophisticated that it would be extremely difficult for others to acquire or develop in its highly accurate form.

58.     Two of the computer files that Defendant Jafri stole were Microsoft PowerPoint "slide decks" that contained the most confidential financial, marketing, and investor information. Both slide decks were marked "Confidential," but in any event, Defendant Jafri was well aware from her education, experience, and role at Plaintiffs that the slide decks and the other files she stole contained the most sensitive and confidential information and constituted Plaintiffs' trade secrets.

59.     The slide decks contained extensive amounts of Plaintiffs' trade secret information, including, in particular, proprietary information regarding disability receivables, a potential market for Plaintiffs, and industry specific financial models created by Plaintiffs.

60.     The slide decks were prepared by one of Plaintiffs' investment principals, working full-time over 2-3 weeks. That professional holds an MBA from Duke University and has over a decade of Wall Street investment experience.  His work involved complicated calculations and modeling that were then embedded in the slides.

61.     Another of the files Jafri emailed to herself was an EXCEL spreadsheet that was a financial model of projected operations prepared for the use in making a presentation to a large international investment firm that was investigating investing in or joint venturing with Plaintiffs.

62.     The preparation of that model file was a difficult and time-consuming task performed in-house by two or three investment professionals based on highly proprietary and secret calculations and formulas.  The preparation of that model took nearly a month of full-time work to build.

63.     Plaintiffs' slide deck and model spreadsheet were shared with only a very select and sophisticated persons and entities as part of Plaintiffs' investment marketing efforts. Those entities and persons were deeply experienced in investment matters, and always agreed to execute and abide by strict Nondisclosure Agreements (NDA), that provided in part as follows:

> **Use and Disclosure of Confidential Information**. The Receiving Party hereby agrees (a) to use the Confidential Information only for the purposes of evaluating, negotiating, consummating or administering the Transaction and (b) not to disclose Confidential Information to any person other than (i) those of its Representatives who the Receiving Party reasonably deems need to know such Confidential Information to assist in its evaluation, negotiation, consummation or administration of the Transaction, provided that the Receiving Party shall inform such Representatives of the confidential nature of the Confidential Information and instruct them to treat the Confidential Information confidentially, (ii) as consented to by the Disclosing Party in writing (including in the form of an email), (iii) pursuant to Law and in accordance with the terms set forth in Section 3 of this Agreement, or (iv) as otherwise provided herein. The Receiving Party shall be responsible for any breach of the confidentiality or non-use provisions herein by any of its Representatives. The Receiving Party agrees to protect, and direct its Representatives to protect, the Confidential Information using the same degree of care it uses to protect its own most valuable confidential information, but in no event using less care than a reasonable person would use to protect its most valuable proprietary and confidential information.

64.     Additional files that Jafri emailed to herself were "Underwriting Guidelines" prepared for various potential deals.  These Guidelines are a roadmap of the criteria and process by which Plaintiffs evaluate the acceptance of various financing transactions, and are confidential to the highest degree because they disclose Plaintiffs' confidential business methods in considering and accepting transactions that are at the heart of their business–pre-settlement funding.

65.     Subsequently, on November 13th, 2017, Plaintiffs were provided with copies of a slide deck utilized in some sort of presentation by Defendant Jafri or someone else unknown to Plaintiffs on behalf of Defendant Looking Glass. That slide deck was obviously a sloppily altered version of one of the slide decks to which Defendant Jafri had access  during her employment at Plaintiffs. This is demonstrated by the identical slide deck pages with Signal's name blacked out and Looking Glass's name inserted. In fact, on one of the pages, the name of Signal was not obliterated.

66.     The remaining files that Jafri stole were "deal documents," that is information and files exchanged between Plaintiffs and related entities of three other companies that Plaintiffs were investigating to acquire, primarily financial, administrative, and underwriting information. Two of those transactions have closed and the companies involved are now part of the Signal family of entities.   The third transaction is still pending, and so Defendants have in their possession extremely sensitive and confidential financial, underwriting, and other information about a transaction that Plaintiffs are still attempting to complete.  The harm from their theft and possession of this material is incalculable.

67.     During the period that Defendant Jafri was committing these acts, three individuals–Michael Olsen, Michael Walker, and Pamela Kalfen–were officers and employees of Plaintiff.  Olsen was Plaintiffs' Chief Marketing Officer (CMO); Walker was its Chief Technology Officer (CTO), and Kalfen was its Chief Underwriter.

68.     All three appear in the Looking Glass slide deck presentation, with detailed description of their backgrounds, experience, and expected roles.  Olsen is listed as Looking Glass' "prospective CMO/President;" Walker is listed as its "prospective CTO/COO;" Kalfen is listed as its "prospective Chief Underwriter."

69.     Without process of Court, Plaintiffs do not know and cannot discover whether Kalfen and Walker were knowing participants in Defendants Jafri's and Olsen's improper actions. Nevertheless, the inclusion of Olsen, Kalfen and Walker in this marketing deck establishes Defendants' intention to create a venture competitive with Plaintiff Signal using not only its trade secret information, but also its management staff.

70.     Based on these discoveries, Signal has terminated the employment of all three.

71.     This misuse of Plaintiffs' trade secrets by Defendant Jafri on behalf of Defendant Looking Glass was entirely unauthorized and improper, and constitutes a theft and misappropriation of Plaintiffs' trade secrets.

72.     Plaintiffs were and are the owners of all of this information, documents, and files stolen by Defendant Jafri and used to promote her competitive entity, Defendant Looking Glass.

73.     Any and all of the information, documents, and files stolen by Defendant Jafri and then used to promote her competitive entity, were Plaintiffs' confidential and sensitive trade secrets.

74.     Plaintiffs took extensive and reasonable steps to ensure that those materials remained confidential, including the following: labeling on the materials of its confidential nature, limited exposure to non-employee personnel, and access limited to specific, company personnel in a protected online "hard drive."

75.     Defendants' theft of this information, documents, and files has caused Plaintiffs damage in excess of $5,000, in that they are required to seek legal assistance to protect their trade

secrets, forced to conduct a complicated and expensive forensic computer analysis and investigation, and are now suffering competitive damage in that Looking Glass is attempting to steal business from them by using their own trade secret information.

76.     Plaintiffs cannot quantify the precise monetary losses that might continue to be suffered due to the loss of goodwill, the loss of sales, and the unfair economic advantages that Looking Glass Jafri has gained or is likely to gain.

77.     The loss of business that Jafri threatens to cause and the profits lost with such business are unquantifiable and the mere difficulty of determining what business has been or will be lost makes Plaintiffs' injury irreparable.

78.     Furthermore, Looking Glass' emergence as a competitor is sufficient to establish irreparable harm by reason of the threat of the continuation of such losses to Plaintiffs' legitimate and ongoing competitors, creating ongoing competition with Signal, making it difficult to identify or predict which customers Signal has lost or will lose.

79.     Finally, Plaintiffs' potential loss of a competitive position is an intangible but real damage not readily measurable, and is a harm that cannot be adequately remedied in law.

## NEWLY DISCOVERED FACTS

*Background*

80.     Defendant Jafri was hired by Plaintiff Signal Funding LLC in late July 2016. For the first thirteen months of her employment she worked in Signal's Highland Park, IL Office. There were other employees at that location including Michael Olsen and Michael Walker.

81.     In April 2017, David Hough, an experienced Wall Street investment and finance professional, was hired as Interim CEO. He became permanent CEO on September 1.

82.     As COO, Jafri had a variety of operating responsibilities, and after May 2017 reported to David Hough. Among other things, Jafri had unrestricted access to 777's and Signal's

otherwise secure restricted servers which contained all manner of confidential business, financial, industry, personnel, and other information.

83. In late July 2017, at the request of Company Management, Jafri moved to Miami to work at Signal's headquarters. The building security access records show that she was at the Miami office regularly in August but was absent for all but one day in September (early in the month) before she resigned late on Thursday, September 28, 2017. As explained below, she returned to the office on Friday, September 29, for a brief "farewell" visit.

*Jafri's Travel*

84. Jafri's travel, credit card, and other records reconstruct her whereabouts during September and early October.

85. Before she resigned on September 28, she was at Signal's HQ only one day in September, Tuesday September 5. From September 1-4, she was in Las Vegas at a consumer lawyers convention; from September 6-12 she was in Chicago/Highland Park; and from September 13-23, she traveled to and from South Africa for a safari.

86. Upon her return from South Africa on the weekend of September 23-24, she went directly to Chicago and spent the Monday-Thursday of that the week in Chicago/Highland Park/Champaign.

87. On Wednesday, September 27, because of her extended absence from Signal HQ, her supervisors emailed her and demanded her presence at Signal's Miami HQ.

88. Late on the evening of Thursday September 28, she emailed her resignation letter to two of Signal's principals.

89. The next day, she paid a brief visit to Signal's Miami HQ and then at some point traveled to New York City, where she continued her solicitation of potential investors.

90.     Sometime as early as the Summer of 2017, Jafri hatched a plan to create her own web of companies not only to compete directly with Signal in the pre-settlement funding business, but also to enter the structured finance and Social Security disability representation markets, business segments that Signal and its parent 777 were either also involved in or were planning to enter.

91.     Sometime before mid-September, she misappropriated a highly confidential Signal investment slide deck and other financial documents for her use in soliciting potential investors for her new ventures. That slide deck and those files are virtually identical to the ones found by Judge Lefkow to contain Signal trade secrets that Jafri had stolen on October 7.

92.     She doctored the misappropriated files–especially the highly confidential investor slide deck and financial spreadsheet that Signal used to describe its special pre-settlement business and financial strategies to potential investors–by substituting her preliminary company name "NewCo" in place of Signal's name, and added additional slides related to her planned disability businesses. However, her plagiarism was sloppy because she missed one page, leaving "Signal" in one of the column headings without removing or redacting it, but instead only covering it over with a blue box so that a search for the word "Signal" locates it, thus corroborating it as originally a Signal document. Moreover, she did not remove the metadata in those files that identified Juan Arciniegas, Signal's lead investment analyst, as the author.

93.     Then, starting in early September, while still Signal's COO, she began soliciting investments from potential investors, touting her new venture–first as "NewCo," then as "PreSF LLC," and finally under the Looking Glass/Pinnacle trade names. To those who responded with interest, she emailed the plagiarized files, touting her pre-settlement and disability entities.

*Other Persons Involved*

94.     Jafri solicited four Signal employees, the first three of whom worked at its Highland Park office, to join her business while they were still employed at Signal, and all of whom were terminated in late October 2017:

> Michael Olsen        –        Signal's Chief Marketing Officer (CMO)
>
> Michael Walker       –        Signal's Chief Technical Officer (CTO)
>
> James Habel   –        –        Signal's Vice President of Sales; and
>
> Pamela Kalfen        –        Senior Underwriter.

95.     During September and October 2017, and while still an officer and employee of Plaintiff Signal Funding LLC, Michael Olsen was assisting Jafri in her solicitation of investors during September while he was still Signal's CMO.

96.     While still an officer and employee of Plaintiff Signal Funding, LLC, Defendant Olsen was at least drafting documents for presentation to potential investors in the new Jafri entities, participating in conference calls with potential investors seeking to persuade them to invest in those entities. and allowing Defendant Jafri to represent to those investors and others that Olsen was part and would be part of her new entities "Management Team."

97.     In all his acts, practices and omissions, Defendant Olsen acted with malice aforethought, reckless indifference, wantonness and spite, justifying an appropriate award of punitive damages.

98.     As part of her organization of her disability representation business–Pinnacle Disability LLC–Jafri also enlisted a former 777 employee, Diana Gramenos, a Chicago lawyer with experience in Social Security Disability proceedings who had previously been employed in a 777 Partners company to develop such a business.

99.     The involvement of these five is established by the sloppily plagiarized slide deck which named them and summarized their resumes as part of the "Management Team." She also mentioned Olsen and Gramenos in her solicitation emails and meetings with potential investors.

*Jafri's Solicitation of Investors*

100.    In September 2017, while still Signal's COO, Jafri actively and secretly promoted her new competing businesses by soliciting numerous potential investors, investors who would have been appropriate candidates to invest in Signal.

101.    Jafri's September email solicitations included the following:

"I want[] to chat about a platform I'm working on to see if there's any interest in collaborating." (to Harlan Capital on September 3).

"I'm in the pre-settlement funding space and am working on a new venture that I'd like to share with you - it's a specialty finance platform across litigation finance and disability servicing." (to JCFCO on September 4).

"I'm in the pre-settlement funding/disability services space and am working on a new venture that I'd like to share with DFJ - it's a specialty finance platform across litigation finance and disability servicing. The team that will be coming on board has over five decades of litigation funding, disability servicing and tech experience." (to Draper Fisher Jurvetson on September 4).

"I'm in the pre-settlement funding space and am working on a new venture that I'd like to share with you – it's a specialty finance platform across legal funding, structured settlements and disability servicing." (to Tom Livingston on September 27).

102.    During that same timeframe, she solicited a New Jersey-based investor Matt Eager of an investment firm known as OTRA Capital LLC. In an email chain beginning September 2, she asked for a meeting to discuss investment in her new ventures, explaining that she got his contact information from an email he had sent in August to Signal's "info email" inquiring about investment opportunities in Signal. On September 16, after several days of back and forth efforts to schedule a meeting, she emailed him the plagiarized slide deck and other stolen documents:

. . . Attached is a model for the pre-settlement funding business along with a presentation. The premise of this investment would be a legal/financial services strategy, beyond just pre-settlement funding.

> Since we last talked, the strategy around this deal has shifted.... This deal would not necessarily be with Signal, rather the deal would be with NewCo. NewCo could launch with several product offerings to remain diversified....

103.    Eager and/or OTRA in fact have invested in Jafri's companies.

104.    Jafri also enlisted the help of Christopher Gandy, a suburban Chicago investment adviser experienced in structured settlements, who some years earlier had unsuccessfully tried to recruit her out of her MBA/JD Program to join his previous employer. Sometime in August or early September 2017, Jafri contacted him, pitched him on partnering in her new structured settlement entity, and asked him to introduce her to potential investors.

105.    On September 19, Gandy introduced her by email to Pete Karnowski, the principal of Great Point Capital LLC, a downtown Chicago investment firm. On September 20, she emailed Karnowski the sloppily plagiarized slide deck for "NewCo" and the other documents stating:

> Please see attached. This is a diversified, legal services play - Chris and I will collaborate on the structured settlement side. The presentation/financials highlight two potential product lines. I have staff and technology ready to go, and the management team has decades of experience in the space.

106.    The slide deck listed herself, Michael Olsen, Pam Kalfen, and Michael Walker (all then Signal employees) as the "Management Team" for "Legal Funding," and Diana Gramenos for "SSDI & Legal Tech."

*Solicitations in Chicago*

107.    On Saturday, September 23, 2017, Jafri returned to the US from her safari vacation. She traveled through one of the New York City airports to Chicago, not to Miami. Once in Chicago, it appears that she was doing some Signal work, but that much, if not most, of her activity involved the solicitation of investors for her new ventures, obviously a serious breach of fiduciary duty.

108.    She had a meeting scheduled with Pete Karnowski of Great Point Capital for Monday, September 25, and as she traveled to Chicago that weekend, she emailed Diana Gramenos asking her to attend that meeting.

109.    Gramenos agreed and they met with Karnowski and his partners as scheduled. Follow-up emails from Karnowski confirmed that the meeting occurred with Gramenos in attendance. Jafri's September 26 follow-up email sent him "an updated deck" and "high level financials . . . along with information on the "Management Team." Her email also says that "Mike Olsen (former chief marketing officer of Oasis and current CMO of Signal) and I are working on tweaking both of these models…." The files she sent were the ones she had plagiarized and supplemented.

110.    The same day, September 26, she sent an email solicitation, including the plagiarized files, to another potential investor, Brij Shah, of an Illinois investment entity known as SAR Alternative Investments:

> Here is the investor deck with accompanying financials. We have been pitching to both investors, and friends/family. We're working on revised financials for the two initial product lines and should have something revised to you in a week.

111.    Shah is one of the investors in Jafri's entities and would have been a likely candidate as an investor in Signal.

*Jafri is Summoned to Miami*

112.    By this time, Jafri had been absent from Signal HQ for three weeks.

113.    On September 26, David Hough emailed her about her whereabouts, saying "we were expecting you to be here [at HQ] yesterday." She responded that she was in Chicago "trying to wrap up the sublease." That email is false because it failed to disclose that she was soliciting investors for her new businesses. Mr. Hough replied that she should return to Miami immediately and suspended her authority to sign any contracts.

114.     The next day, Wednesday, September 27, Steve Pasko, Co-Managing Partner of 777, also ordered her to appear at Signal's Miami HQ that Friday morning, explaining that:

> It has been almost two weeks since you last appeared at work. We are concerned about both your personal well-being and the damages your absence is causing the business.

115.     She quickly replied with the same misleading explanation she had given Mr. Hough, and Mr. Pasko responded:

> Please understand that your first and only priority is to be here this Friday by 10 am. Nothing else takes precedence over your appearance here on Friday. All other Signal business is secondary to this requirement.

*Jafri's Trip to Champaign/Urbana*

116.     Notwithstanding that order, Jafri continued with her Illinois solicitations for her new businesses. That day, September 27, she drove downstate to the University of Illinois to meet with two University of Illinois Business School Professors–Brian Lilly and Harlee Sorkin. Lilly emailed Sorkin this introduction:

> Harlee, say hello to Farva and vice versa. Farva was my former TA for 461. She is ready to launch a startup looking for investment. She has a lot of experience in the field. It's a financial services business which you likely have a solid understanding and can hopefully advise her or steer her towards interested investors.

117.     She also asked a Tom Livingston asking for a meeting:

> Brian Lilly recommended that I reach out to you as I'm in Champaign today – do you have some time to meet?

118.     Her September Signal American Express Bill has a gas station charge in Urbana that day as well.

119.    At 9:59 p.m., she emailed her resignation to Mr. Pasko. This was a complete surprise to Signal and 777 Partners. Her terse resignation letter offered no explanation and said nothing of her new competing businesses:

> Please accept this letter as formal notification that I am leaving my position with Signal Financial Holdings, effective immediately.
>
> Thank you for the opportunities you have provided me during my time with the company. If I can be of any assistance during this transition, please let me know.

*Her Visit to HQ*

120.    Signal's Miami HQ building security records show that on the morning of Friday, September 29, she swiped in at 10:09 a.m.

121.    She met briefly with Mr. Pasko. At the PI Hearing she testified that "Steve Pasko actually told [her] to hold on to all of [her email] access because we were going to try to negotiate a transition services agreement."

122.    A few days later, Signal emailed a proposed Transition Services Agreement to her. Within a few days, she declined the offer by a Linked-In "In-mail." But the Transition Agreement was never agreed to and she provided no assistance whatsoever to Signal after her abrupt departure.

*Further Solicitations and Organizations*

123.    Instead, she undertook to get her business off the ground with the clandestine assistance of SFGH.

124.    On Monday, October 2, she contacted Dylan Beynon, a principal of Mighty, Inc. a New York City-based pre-settlement funding administration software vendor with whom she had had prior dealings on behalf of Signal:

> I have some news, and there is a way we likely will be able to work together soon.
> If you're around later today or some time tomorrow, we should connect.

125.     On Tuesday, October 3, she met in a New York City suburb with Matt Eager of OTRA Investments. That evening, they exchanged emails confirming how "great" their meeting had been, and Jafri described legal advice she had received afterwards:

> I spoke to my attorneys after our meeting. According to them, my former investors would have no legal leg to stand on and in addition, no standing to sue in the scenario we discussed earlier today; thereby any suit filed would be frivolous. My lawyers also mentioned that my previous investors likely would have no incentive to sign any agreement that I would put in front of them and it may ruffle feathers unnecessarily. I'm happy to go into more details over the phone or in person so that this explanation makes a bit more sense. (emphasis added).

126.     On Thursday, October 5, she asked Beynon of Mighty to "get started with the paperwork for Mighty – looks like we are going to start funding soon."

127.     The next day, she told Beynon that her new company was "PreSF, LLC" and that she would "establish a DBA soon or change the name." As explained below, SFGH had filed the Delaware organization papers for "PreSF, LLC," the day before, Wednesday, October 4.

128.     On Wednesday, October 11, she said that her "attorney is reviewing [Mighty's proposed contract] and should have something back to me shortly." The next day, Thursday, October 12, she sent Mighty detailed comments on the contract, saying: "comments from my lawyer are below."

129.     The lawyer she referred to was Etahn Cohen of SFGH.

130.     By October 20, the contract with Mighty was in place, and Looking Glass had in fact begun funding cases.  All the cases obtained through this illicit conduct should have been placed with Plaintiffs.

*Misuse and Misappropriation of Funds*

131.     At some time in 2016, Defendant Jafri opened two bank accounts at the Highland Park, IL Branch of BMO Harris Bank, N.A.  Based on information received from the Manager of

that Branch, Plaintiffs believe and therefore hereby allege that Defendant Jafri was the only signatory on that account.

132.     On her last day of employment with Plaintiffs, September 28, 2017, and without prior notice to or authorization from her superiors, she wrote a check to Michael Walker supposedly for a bonus without the proper deductions and accounting for state and federal taxes thereby exposing Signal Funding LLC to tax penalties and interest.

133.     On September 13, 2017, as she was about to leave the country for Africa she wire-transferred $25,015 to herself for "Payroll Expense Bonus per employment agreement." She did so without proper notice to and beyond her authorization insofar as she paid that bonus in gross without the proper deductions and accounting for state and federal taxes thereby exposing Signal Funding LLC to tax penalties and interest.

134.     Defendant Jafri also held an AMEX credit card in the name of Signal Funding, LLC, and she regularly paid the charges on that account from the BMO Harris accounts at least in part.

135.     During the last week of her employment at Signal Funding, LLC, she improperly used that card for personal and other expenses associated with her clandestine operation of her new and competing businesses, including hotel, car rental, and gasoline charges while she was in Illinois.

136.     Then, on October 3, 2017, pursuant to instructions that she issued there was paid or transferred to SFGH (then known as Sugar Felsenthal Grais & Hammer LLP) from one of the BMO Harris accounts a total of $32,988.28. Those transfers were undertaken without the knowledge or approval of her superiors and given the improper conduct of that firm should not have been made.

*Jafri's October 7 File Theft*

137.    Then on October 7, she signed on to the Signal servers and emailed herself the files that were the subject of the early proceedings in this case.

*Malice of Defendant Jafri*

138.    In all her acts, practices and omissions, Defendant Jafri acted with malice aforethought, reckless indifference, wantonness and spite, justifying an appropriate award of punitive damages.

*Responsibility of the Jafri Entities*

139.    As the prime organizer, managing members, chief administrative officer of her entities Looking Glass Financial LLC, Pinnacle Structures LLC, Looking Glass Legal LLC, Pinnacle Disability LLC, and Looking Glass Partners LLC–those entities are responsible for her misconduct by reason of the doctrine of respondeat superior, and she acted for all and each of them in her illicit conduct, fully within the scope of her employment and other positions in and for those entities and with the full knowledge of those entities of her illicit conduct.

140.    Furthermore, for example, in addition to those acts herein alleged, in the presentations to the potential investors that she usurped, she described the structure of her businesses that identified Looking Glass Financial LLC, Pinnacle Structures LLC, and Pinnacle Disability LLC. She variously identified the entities as "NewCo," "Pinnacle Structures" and "Pinnacle Disability."

141.    Additionally, in the course of her negotiation with Mighty Inc. of the pre-settlement administration software, she informed him that the entity she had formed for that purpose was named "PreSF LLC," the limited liability company for which SFGH had filed organization papers in Delaware on October 4, 2017, and that on October 16, 2017 was formally renamed as "Looking Glass Legal LLC."

142.    Finally, Defendant Jafri and/or Olsen developed this organization chart showing the close integration of the Defendant entities:



## Sugar Felsenthal Grais & Helsinger LLP

*Engagement of SFGH*

143.    On July 16, 2016, acting through its former CEO, Gary Chodes, Plaintiff Signal Funding, LLC entered into an "Engagement Letter" hiring SFGH to provide legal advice and services "in all general corporate matters." The terms of that Engagement Letter explicitly applied to "any new or expanded engagement" unless a further agreement was entered into. (Exhibit 1.) No further agreement ever was entered, although the scope of SFGH's work did expand.

144.    The Engagement Letter named Friedland and his partner, Vanessa Schoenthaler, as having primary responsibility for the engagement, with the caveat that other lawyers or legal assistants might be assigned to Signal matters. Over the next year and a quarter of the relationship, several lawyers and staff worked on Signal matters, including Etahn Cohen, and Lisa Vandesteeg.

145.    In Paragraph 9, entitled "Conflicts of Interest," Signal, through Chodes signature, waived a conflict arising from SFGH's separate representation of Chodes in another matter, and only that matter.

146.    The Engagement Letter also stated that except for that representation of Chodes, SFGH did not and would not represent any of Signal's officers or employees, and absent a separate engagement to represent such other persons, no attorney-client relationship with those persons was created.

147.    In January and February 2017, again acting for Signal, Chodes signed two separate conflict waiver letters regarding SFGH's representation of him and two other Signal employees in two cases brought by Chodes' former employer Oasis Legal Finance, one in Cook County Circuit Court for theft of trade secrets, and the other in the Northern District of Illinois for trademark infringement. There were no other conflict waivers or separate representation letters.

148.     Over the next year and a half, SFGH performed a variety of important legal work for Signal reflected in periodic itemized billing statements.

149.     After May 2017, Jafri was SFGH's primary contact, and Friedland appears to have emailed the bills to her for approval.

150.     SFGH numbered the Signal "account" as "9936," with additional trailing numeric designations, apparently to identify different matters:

> 9936-000     General Corporate
> 9936-004     Sales Force (a Signal vendor)
> 9936-005     Trademark Matters

151.     From August 2016 until August 2017, SFGH's bills to Signal Funding LLC totaled $306,720.40, and all were paid.

*Matters Pending in September/October 2017*

152.     As of the date of Jafri's resignation, SGFH had several important Signal matters pending. On October 13, Friedland sent Ed Gehres, Signal Funding LLC's chief in-house counsel, a status email listing those matters:

> Ed,
>
> Hi and hope this finds you well.
>
> First, we understand that Farva has left and want to touch base with you to apprise you of things on our plate for Signal. (Exhibit 2.)

153.     Friedland summarized the work essentially as follows: five trademark applications before the USPTO; employment matters regarding "unhappy employees," and implementation of information security policies and programs. (*Id.*)

154.     Friedland's email also asked for more business from Signal: "Indeed, we would welcome any opportunity to expand our relationship with other the other portfolio companies." [*sic*] (*Id.*)

155. On Thursday, October 19, 2017, in response, but based in part on other information, Mr. Gehres emailed Friedland informing him that Jafri was adverse to Signal and asking point blank if SFGH represented her:

. . . I need to hear from you on something rather important. Farva Jafri resigned from Signal and promised to assist in transition. We offered her a transition services agreement that was confidential. She flatly ignored all communication and then communicated through LinkedIn that she was refusing to help with anything at all.

In the meantime, we have uncovered a number of things that give us grave concern about Farva's tenure. The investigation has been ongoing.

It came to my attention today that Farva communicated with your partner Matthew Schiff on the transition agreement we offered and actually provided a copy. Farva is most certainly adverse to us at this time. I need to understand why this happened with SFGH and whether there is an attorney-client relationship (even if brief or temporary) with Farva. (Exhibit 3.)

156. The next day, Friday, October 20, 2017, Friedland responded as follows:

Farva contacted Matt to ask if he could advise on her separation. He rendered no counsel and advised her he would need to check with me with respect to conflict issues. In the meantime Farva sent Matt a copy of her resignation letter and a copy of the separation agreement, but Matt did not (nor did anyone at my firm) review them or render any substantive advice regarding them or regarding anything having to do with her separation. I told Matt that we cannot represent Farva in any manner that is adverse to Signal, and then I told Farva the same thing. So, no, there was no point in time at which we represented Farva in a manner adverse to Signal. If you are also asking the broader question of whether we represent Farva on other matters, I cannot answer that. Our firm policy is to neither confirm nor deny the representation of a client unless circumstances warrant such disclosure, as applicable ethical rules provide that the very fact of representation is, itself, a confidential matter. (*Id.*)

*Friedland's October 27 "I choose Farva" email*

157. A week later Friedland abruptly terminated SFGH's representation of Signal:

Ed, I am following up on the below.

Farva has asked us to represent her in matters unrelated to Signal (and, at my request, has given the ok to disclose this to you).

Because I anticipate that her future endeavors may not be completely unrelated to the space in which Signal operates, I feel it necessary to choose between Signal and

Farva. While not an ethical conflict, it is a business conflict which would trouble me if I were either client.

In short, and with nothing but the utmost respect for you and for Signal, I choose Farva…. (*Id.*)

*What SFGH was really doing.*

158.   In fact, beginning on September 29 (and likely earlier), SFGH, Friedland, Schoenthaler, Cohen, and Vandesteeg, as well as its Paralegal Stuart Rathje had begun representing Jafri and her new entities. Thus, Friedland's October 13, 20, and 27 emails to Mr. Gehres were false by both affirmative misstatements and material omissions.

159.   Signal's DocuSign "geo-location" records that show that Defendant Jafri she was at 30 N. LaSalle, SFGH's address, when she signed a Signal Funding LLC client deal agreement. On the basis of that information, Signal Funding LLC believes and hereby alleges that she was at SFGH's offices and informed them of her intention to resign from Signal.

160.   In any event, the next day, September 29, Jafri had an hour-long conference call with Friedland, Schoenthaler, Cohen, and Lisa Vandesteeg, during which they discussed "pre- vs. post-settlement funding" and various other matters.

161.   Because Jafri had resigned from Signal Funding LLC the night before and had no authority to act on its behalf, she had no reason to be discussing "pre- vs. post-settlement funding" on Signal Funding  behalf, and that call could only have concerned her new businesses that she had been operating for at least the prior four weeks.

162.   But whether or not that call was about Jafri's business, the SFGH lawyers communicated with her in the days just after her resignation, and immediately began covertly representing and advising her on her organization and operation of her businesses directly competitive to Signal Funding LLC.

163. During this work, SFGH had in its possession the most sensitive privileged and confidential Signal Funding LLC information, data, and materials.

*Organizational Filings*

164. Stuart Rathje is a corporate paralegal at SFGH. He had periodically performed services for Signal in the preceding months, and so he was aware that SFGH represented Signal.

165. Beginning on October 3, 2017, and throughout that month, working through the Corporate Services Department of CT Corporation, Rathje filed the organizational documents in Delaware, Illinois, New Jersey, and probably New York State, for Jafri's new entities, including especially Looking Glass Financial LLC, the direct competitor to Signal. Some of the filings were signed by Rathje and others by Jafri, but they were all filed by Rathje or someone else at SFGH.

166. This is the sequence of those filings:

October 3:     Pinnacle Structures LLC – Organization document signed & filed by Rathje in Delaware.

October 4:     PreSF LLC (later renamed to Looking Glass Legal LLC) – Organization document signed and filed by Rathje in Delaware.

October 6:     Pinnacle Disability LLC – Organization document signed and filed by Rathje in Delaware.

October 12:    Looking Glass Financial LLC – Organization document signed & filed by Rathje in Delaware.

October 16:    Looking Glass Legal LLC (originally PreSF LLC, *see* Oct. 4 entry above) – Name Change filed in Delaware – PreSF LLC to Looking Glass Legal LLC – electronically signed in Jafri's name, prepared by SFGH.

October 19:    Looking Glass Financial LLC – Application as Foreign LLC signed by Jafri & filed by Rathje in Illinois.

October 20:    Looking Glass Financial LLC – Application as Foreign LLC signed by Jafri & filed by Rathje in New Jersey.

October 25:    Looking Glass Partners LLC - Organization document filed by Rathje in Delaware.

*Advice on Mighty Contract*

167.    As alleged above, during the week of October 9, Jafri was communicating with Mighty Inc. regarding its pre-settlement funding service agreement. On Tuesday, October 10, she emailed Mighty that her "attorney is reviewing [Mighty's proposed contract] and should have something back to me shortly." The next day, Wednesday, October 11, she sent Mighty detailed comments on the contract, saying: "comments from my lawyer are below."

168.    The lawyer she referred to was Etahn Cohen of SFGH.

*Olsen's Signal Employment Agreement*

169.    On October 16, Jafri emailed Vanessa Schoenthaler a copy of **Michael Olsen's** employment agreement **with Signal** that had been executed in late 2016 by Olsen and Chodes. Although the email had no substantive content, this involved Schoenthaler's advice to Jafri about Olsen's place in Jafri's new entities, or something related thereto. At the time, Olsen was still Signal's CMO.

*Registered Agent*

170.    Friedland was also listed as the Illinois Registered Agent for three of Jafri's entities: Looking Glass Financial LLC, Looking Glass Partners LLC, and Pinnacle Structures LLC. Thus, pursuant to the Illinois Limited Liability Company, this created a business relationship, albeit a limited one, between SFGH and Friedland, on the one hand, and Jafri and those entities, on the other, because as a matter of law, Friedland's office was the Illinois registered office of those entities. 805 ILCS 180/1-5 & 180/1-35(a).

171.    In late September 2018, about six weeks ago, Friedland resigned as Illinois registered agent for those companies; the resignations became effective in late October. The Secretary of State's online records show that he has not been replaced and that the designation of registered agent has been "vacated."

172.     Plaintiff received no response. Instead, four days later, December 12, Defendant Friedland emailed Mr. Gehres, asking "when we may expect payment" of those Bills. To date, those Bills have not been paid.

173.     Plaintiffs do not seek to impose liability on the SFGH Defendants related to Defendants Jafri's or Olsen's misappropriation of trade secrets as alleged above, but Plaintiffs reserve the right to assert such a claim after discovery herein.

## COUNT ONE

**VIOLATION OF THE DEFENSE OF TRADE SECRETS ACT – 18 U.S.C. 1830,** *et seq.*

**DEFENDANTS JAFRI & HER DEFENDANT ENTITIES, AND DEFENDANT OLSEN**

174.     Plaintiffs re-allege and incorporate herein all of the allegations set forth in paragraphs 1 through 173 above and the allegations of the other Count(s) herein.

175.     Plaintiffs bring this Count against Defendants Jafri, Olsen, Pinnacle Structures LLC, Looking Glass Legal LLC, Pinnacle Disability LLC, Looking Glass Financial LLC, and Looking Glass Partners LLC.

176.     By means of the acts, practices, omissions, and conduct alleged above, these Defendants and each of them have committed violations of 18 U.S.C. 1832 of the DTSA, in that they

> (a) with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—

> (1) stole, or without authorization appropriated, took, carried away, or concealed, or by fraud, artifice, or deception obtained such information;

> (2) without authorization copied, duplicated, sketched, drew, downloaded, uploaded, altered, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, and conveyed such information;

> (3) received, possesses such information, knowing the same to have been stolen or

appropriated, obtained, or converted without authorization;

(4) attempted to commit those acts described in paragraphs (1) through (3); and

(5) conspires with one or more other persons to commit such acts and did commit an act to effect the object of that conspiracy.

177. Section 18 U.S.C. 1836(b)(1) & (3)(A) provides Plaintiffs with an appropriate civil remedy against these Defendants for their wrongdoing, including the grant of injunctive relief both prohibiting continued misuse of the trade secrets and requiring protective measures.

178. Section 18 U.S.C. 1836(3)(B) provides for the damages for actual loss caused by the misappropriation of the trade secret; and damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret.

179. Section 18 U.S.C. 1836(c) grants this Court jurisdiction over such claim.

WHEREFORE, Plaintiffs respectfully request the Court to enter the following relief in its favor and against these Defendants:

A. That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining these Defendants from using or disclosing any information that they improperly obtained;

B. That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining these Defendants or any other person acting with or for them from contacting any clients or other persons and transmitting any of the information Jafri accessed, transferred, or downloaded in violation of the DTSA;

C. That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered enjoining and restraining these Defendants from misappropriating and using the confidential and/or proprietary information alleged herein;

D.     That a mandatory injunction order be issued requiring these Defendants to return to Plaintiffs any and all written materials, including copies thereof, and/or computer disks, diskettes, databases and/or other retrievable data (whether encoded, taped, code electronically, electromagnetically, or otherwise) which reflect, refer, or relate to the confidential and/or proprietary information, and any copies thereof that may be in their possession, or to which they may have access;

E.     That a mandatory injunction order be issued requiring these Defendants to permit Plaintiffs to collect a forensic image of these Defendants computers, emails accounts, social media accounts, laptop computers, cloud-based storage areas, portable or handheld devices including portable phones and iPhones, and any other electronic storage media they use that contains or may contain electronic information relating to the confidential and/or proprietary information of Plaintiffs;

F.     That following the imaging described above, that these Defendants be ordered to permanently delete all Plaintiffs' confidential and/or proprietary information from computers, computer hard drives, USB drives, CDs/DVDs, or any other type of digital storage device described herein; and

G.     That the Court grant additional relief to Plaintiffs, including (i) an accounting of monies obtained through these Defendants wrongful acts, (ii) disgorgement of the monies obtained through their wrongful acts, (iii) lost profits incurred by Plaintiffs as a result of Defendants wrongful acts, (iv) compensatory damages, (v) punitive damages, (vi) attorneys' fees, (vii) costs, including those costs incurred in the forensic imaging and investigation of computer systems, and (viii) such other and further relief as this Court may deem appropriate.

## COUNT TWO

## VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT - 18 U.S.C. 1030, *et seq.*

## DEFENDANT JAFRI

180.    Plaintiffs re-allege and incorporate herein all of the allegations set forth in paragraphs 1 through 173 above and the allegations of the other Count(s) herein.

181.    This claim for relief is brought against Defendant Jafri.

182.    Plaintiffs use their computers, including the desktops and laptops that it had provided for use by the Defendant Jafri, in interstate and foreign commerce.

183.    Defendant Jafri was at no time authorized to access those computers for the purpose of transferring information, documents, or files belonging to Plaintiffs that were and are stored on Plaintiffs' computers.

184.    Plaintiffs' computers are protected computers within the meaning of the CFAA. 18 U.S.C. § 1030(e)(2)(B).

185.    Defendant Jafri knowingly and intentionally, with the intent to defraud, without authorization and/or by exceeding her authorized access, in violation of their fiduciary duties of good faith and loyalty, destroyed, deleted, transferred, copied, downloaded, uploaded, and/or deleted Plaintiffs' confidential and proprietary information and other trade secrets in violation of 18 U.S.C. 1030(a)(2), (a)(4), and (a)(5)(A)-(C).

186.    As a direct and proximate result of Defendant Jafri's unlawful taking of Plaintiffs' confidential and/or proprietary information and other wrongful conduct, Plaintiffs each has suffered damages in an amount yet to be determined, but in excess of $5,000, and Defendants Jafri, and Looking Glass have been unjustly enriched by her theft of these files and information by the possession and misuse of these files and information in presentations to unknown persons by Defendant Jafri or others unknown at this time to Plaintiffs.

187.    Furthermore, the Defendants will continue to use such unlawfully gained information to benefit themselves unless the Court prevents them from using and disseminating such information in the future.

188.    Plaintiffs have been forced to retain an external computer forensic consultant to conduct a damage assessment, including but not limited to the assessment and attempted retrieval of permanently deleted, erased, impaired or altered files, programs, usage history, and other data. The costs of such forensic work also will likely exceed $5,000.

189.     Defendant Jafri transferred such information outside of Plaintiffs' control for her own possession and the possession and use of Looking Glass, an entity she surreptitiously established during and as part of her course of conduct of misappropriating and obtaining valuable confidential and proprietary information belonging to Plaintiffs.

190.     Thereafter, Looking Glass, acting through Jafri, or others unknown to Plaintiffs utilized that information for promotional or solicitation purposes, or other purposes unknown to Plaintiffs.

191.     Defendants' conduct constitutes a violation of the CFAA.

192.     Defendants conduct has caused and continues to cause Plaintiffs substantial and immediate irreparable harm, including the actual and potential loss of client relationships and goodwill and confidential and proprietary information. Unless enjoined, Defendants will continue to cause further such irreparable harm.

WHEREFORE, Plaintiffs respectfully request the Court to enter the following relief in its favor and against Defendants:

A.     That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining Defendants from using or disclosing any information that they improperly obtained;

B.     That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining Defendants or any other person acting with or for them from contacting any clients or other persons and transmitting any of the information Jafri accessed, transferred, or downloaded in violation of the CFAA;

C.     That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered enjoining and restraining Defendants from misappropriating and using the confidential and/or proprietary information alleged herein;

D.     That a mandatory injunction order be issued requiring the Defendants to return to Plaintiffs any and all written materials, including copies thereof, and/or computer disks, diskettes, databases and/or other retrievable data (whether encoded, taped, code electronically, electromagnetically, or otherwise) which reflect, refer, or relate to the confidential and/or proprietary information, and

any copies thereof that may be in his possession, or to which they may have access;

E.   That a mandatory injunction order be issued requiring the Defendants to permit Plaintiffs to collect a forensic image of the Defendants computers, emails accounts, social media accounts, laptop computers, cloud-based storage areas, portable or handheld devices including portable phones and iPhones, and any other electronic storage media they use that contains or may contain electronic information relating to the confidential and/or proprietary information of Plaintiffs;

F.   That following the imaging described above, that the Defendants be ordered to permanently delete all Plaintiffs' confidential and/or proprietary information from computers, computer hard drives, USB drives, CDs/DVDs, or any other type of digital storage device described herein; and

G.   That the Court grant additional relief to Plaintiffs, including (i) an accounting of monies obtained through the Defendants wrongful acts, (ii) disgorgement of the monies obtained through their wrongful acts, (iii) lost profits incurred by Plaintiffs as a result of Defendants wrongful acts, (iv) compensatory damages, (v) punitive damages, (vi) attorneys' fees, (vii) costs, including those costs incurred in the forensic imaging and investigation of computer systems, and (viii) such other and further relief as this Court may deem appropriate.

## COUNT THREE

## VIOLATION OF THE ILLINOIS TRADE SECRETS ACT - 765 ILCS 1065/1, *et seq.*

## DEFENDANT JAFRI & HER DEFENDANT ENTITIES AND DEFENDANT OLSEN

193.   Plaintiffs re-allege and incorporate herein all of the allegations set forth in paragraphs 1 through 173 above and the allegations of the other Count(s) herein.

194.   Plaintiffs bring this Count against Defendants Jafri, Olsen, Pinnacle Structures LLC, Looking Glass Legal LLC, Pinnacle Disability LLC, Looking Glass Financial LLC, and Looking Glass Partners LLC.

195.   At all relevant times herein, there existed as part of the laws of the State of Illinois the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq.* ("ITSA"). Among other things, section 3 of the ITSA provides for the enjoinder of either actual or threatened misappropriation of trade secrets. See 765 ILCS 1065/3.

196.     Section 2(d) of the ITSA defines a "trade secret" as:

[I]nformation, including but not limited to, technical or non-technical data, a formula, pattern compilation, program, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:

(1)     is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure and use, and

(2)     is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality. 765 ILCS 1065/2(d).

197.     The data that Plaintiffs maintained and that was stolen, copied, and misappropriated by Defendant Jafri, and Olsen, acting for themselves and for Defendants Pinnacle Structures LLC, Looking Glass Legal LLC, Pinnacle Disability LLC, Looking Glass Financial LLC, and Looking Glass Partners LLC, the entities they created in the course of their illicit conduct included sensitive and confidential investment and financial data about the business operations of Plaintiff, including proprietary financial and operations information, competitive market analysis compiled using the expertise of Plaintiffs' officers and employees, target client profiles, investor profiles, and investment return potentials, among other things.

198.     That data and those files and information constitute trade secrets under the ITSA, whose actual and threatened misappropriation may be enjoined.

199.     Plaintiffs took affirmative steps to keep its confidential and proprietary information secret, including internal and external security measures. Plaintiffs' employees, including especially Jafri, Olsen, Walker, and Kalfen were and are aware of the highly confidential and secret nature of the confidential and proprietary information.

200.     Despite the statutory obligations to maintain the confidentiality of such trade secrets, these Defendants maliciously misappropriated such trade secrets in violation of the ITSA.

201.     Sections 2 and 3 of the ITSA allow for an injunction to be issued enjoining the actual or threatened misappropriation of trade secrets.

202.     Plaintiffs have no adequate remedy at law to protect against the illegal misappropriation and use of its trade secrets by these Defendants. Injunctive relief is therefore necessary and appropriate to restrain the illegal misappropriation and use of such information.

203.     Unless these Defendants are restrained and enjoined from using the subject confidential, proprietary, and trade secret information, Plaintiffs will suffer immediate and irreparable injury in that the Defendants will continue to have access and the ability to make use of Plaintiffs' trade secrets.

204.     As a direct and proximate result of these Defendants' misappropriation of Plaintiffs' trade secrets, Plaintiffs have suffered damages in an amount yet to be determined, and the Defendants have been unjustly enriched through their use of such information. Therefore, pursuant to section 4 of the ITSA, Plaintiffs are entitled to recover damages.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against these Defendants as follows:

A.   Granting a temporary restraining order, and thereafter a preliminary and permanent injunction barring these Defendants from utilizing any of Plaintiffs' trade secrets;

B.   That a mandatory injunction order be issued requiring these Defendants to return to Plaintiffs any and all written materials, including copies thereof, and/or computer disks, diskettes, databases, portable or handheld devices including portable phones and their iPhones, and/or other retrievable data (whether encoded, taped, code electronically, electromagnetically, or otherwise) which reflect, refer, or relate to the confidential and/or proprietary information, and any copies thereof that may be in his possession, or to which they may have access;

C.   Awarding compensatory damages for Plaintiffs' actual losses and damages and these Defendants' unjust enrichment, as provided for under 765 ILCS 1065/4;

D.   Awarding exemplary damages, costs and reasonable attorneys' fees; and

E. Awarding such other and further relief this Court deems to be just and appropriate.

## COUNT FOUR

## BREACH OF FIDUCIARY DUTY

## DEFENDANTS JAFRI & OLSEN

205. Plaintiffs re-allege and incorporate herein all of the allegations set forth in paragraphs 1 through 173 above and the allegations of the other Count(s) herein.

206. Plaintiffs bring this Count against Defendants Jafri and Olsen.

207. By reason of their positions as officers and employees of Signal Funding LLC, Jafri as COO and Olsen as CMO, were bound by the duty of faithful, true, honest, and loyal service to Plaintiffs, and therefore were subject to the fiduciary duties for persons holding such positions within a company.

208. Separate and apart from their theft and misuse of Plaintiffs' trade secrets, by the acts, practices, and omissions herein alleged, Defendants Jafri and Olsen breached the fiduciary duties the each and both owed to Plaintiffs in while they were both still employed as officers and employees Plaintiffs, they

    a. organized and commenced the operation of a competing business of pre-settlement funding,

    b. organized and began operating the businesses of structured settlements and social security disability advocacy and representation, the latter being businesses that Plaintiff were contemplating and able to enter that were therefore stolen and usurped from Plaintiffs,

    c. solicited potential investors for investment in these new businesses, investors who were obvious and appropriate candidates for investment in Plaintiffs, thereby stealing and usurping business opportunities that properly belonged to Plaintiffs,

    d. created a competing pre-settlement funding business that resulted in the acquisition of a number of funded cases and clients that properly belonged to Plaintiff Signal Funding LLC, and

e.　failed to devote their entire energies to the operation of Plaintiffs' pre-settlement business but instead devoted extensive time and resources in promoting their new businesses, traveling for the purpose of contacting and soliciting potential investors.

209.　Defendant Jafri further breached her fiduciary duties to Plaintiffs by diverting money from Plaintiffs, primarily by the use of her AMEX credit card that she held in the name of Plaintiff Looking Glass Funding LLC, for purposes unrelated to Plaintiffs' business or interests but related solely to her operation and promotion of her new businesses while she was still in Plaintiffs' employ, and by paying herself and another employee moneys purportedly as bonuses outside the regular course of Plaintiffs' procedures without proper accounting for federal and state taxes and other deductions.

210.　Defendant Jafri further breached her fiduciary duties to Plaintiffs during the month of September by falsely stating the work she was undertaking for Plaintiff in Illinois by omitting the truth that she was in fact meeting with potential investors for her new businesses, a material fact she concealed from Plaintiffs.

211.　Defendant Olsen further breached his fiduciary duties to Plaintiffs by concealing from Plaintiffs the fact that he was assisting Defendant Jafri in her solicitation of investors for her new businesses.

212.　These breaches of fiduciary duty by Defendants Jafri and Olsen proximately caused substantial damage to Plaintiffs by the loss of potential investors, loss of pre-settlement funding clients and deals, loss of other business opportunities, loss of misused and misappropriated funds, and substantial attorney's fees and cost incurred in the prosecution of this case and investigation of these Defendants' wrongdoing.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against these Defendants as follows:

F.  Awarding compensatory damages for Plaintiff Signal Funding LLC's actual losses and damages;

G.  Awarding damages to Plaintiff Signal Funding, LLC according in the amount of the unjust enrichment of these Defendants on account of their receipt of investment funds a transactional income that should have gone to Plaintiff;

H.  Awarding exemplary and punitive damages of at least Two Million Dollars, plus an award of attorney's fees according to the rule of E.J. McKernan Co. v. Gregory, 252 Ill. App. 3d 514, 623 N.E.2d 981 (2d Dist. 1993);

I.  Awarding the costs of this action, including reasonable attorneys' fees to the extent otherwise permitted by law; and

J.  Awarding such other and further relief this Court deems to be just and appropriate.


## COUNT FIVE

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

## DEFENDANT OLSEN & THE JAFRI DEFENDANT ENTITIES

213.    Plaintiffs re-allege and incorporate herein all of the allegations set forth in paragraphs 1 through 173 above and the allegations of the other Count(s) herein.

214.    Plaintiffs bring this Count against Defendants Olsen, Pinnacle Structures LLC, Looking Glass Legal LLC, Pinnacle Disability LLC, Looking Glass Financial LLC, and Looking Glass Partners LLC.

215.    By the acts, practices and omissions alleged herein, these Defendants aided and abetted Defendant Farva Jafri in her breaches of fiduciary duty that she owed to Plaintiffs.

216.    They did so because (1) Defendant Jafri, the party whom these Defendants aided and abetted, performed the wrongful acts alleged herein proximately causing Plaintiffs injury (2) these Defendants were continually aware of their role in providing that assistance when they

provided it and (3) these Defendants must and substantially assist the principal violations by Defendant Jafri.

217. The aiding and abetting by these Defendants of the breaches of fiduciary duty by Defendant Jafri proximately caused substantial damage to Plaintiffs by the loss of potential investors, loss of pre-settlement funding clients and deals, loss of other business opportunities, loss of misused and misappropriated funds, and substantial attorney's fees and cost incurred in the prosecution of this case and investigation of these Defendants' wrongdoing.

## COUNT SIX

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

## DEFENDANT JAFRI & HER DEFENDANT ENTITIES

218. Plaintiffs re-allege and incorporate herein all of the allegations set forth in paragraphs 1 through 173 above and the allegations of the other Count(s) herein.

219. Plaintiffs bring this Count against Defendants Jafri, Pinnacle Structures LLC, Looking Glass Legal LLC, Pinnacle Disability LLC, Looking Glass Financial LLC, and Looking Glass Partners LLC.

220. By the acts, practices and omissions alleged herein, these Defendants aided and abetted Defendant Michael Olsen in the breaches of fiduciary duty that he owed to Plaintiffs as an officer and employee of Plaintiff Signal Funding LLC during September and October 2017.

221. They did so because (1) Defendant Olsen, the party whom these Defendants aided and abetted, performed the wrongful acts alleged hereinabove proximately causing Plaintiffs injury (2) these Defendants were continually aware of their role in providing that assistance when they provided it, and (3) these Defendants substantially assisted the principal violations by Defendant Jafri.

222. The aiding and abetting by these Defendants of the breaches of fiduciary duty by Defendant Jafri proximately caused substantial damage to Plaintiffs by the loss of potential investors, loss of pre-settlement funding clients and deals, loss of other business opportunities, loss of misused and misappropriated funds, and substantial attorney's fees and cost incurred in the prosecution of this case and investigation of these Defendants' wrongdoing.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against these Defendants as follows:

A. Awarding compensatory damages for Plaintiff Signal Funding LLC's actual losses and damages;

B. Awarding damages to Plaintiff Signal Funding, LLC according in the amount of the unjust enrichment of these Defendants on account of their receipt of investment funds a transactional income that should have gone to Plaintiff;

C. Awarding exemplary and punitive damages of at least Two Million Dollars, plus an award of attorney's fees according to the rule of *E.J. McKernan Co. v. Gregory*, 252 Ill. App. 3d 514, 623 N.E.2d 981 (2d Dist. 1993);

D. Awarding the costs of this action, including reasonable attorneys' fees to the extent otherwise permitted by law; and

E. Awarding such other and further relief this Court deems to be just and appropriate.


## COUNT SEVEN

## BREACH OF CONTRACT

## DEFENDANT OLSEN

223. Plaintiffs re-allege and incorporate herein all of the allegations set forth in paragraphs 1 through 173 above and the allegations of the other Count(s) herein.

224. Plaintiff Signal Funding LLC brings this Count against Defendant Olsen.

225.    On or about August 22, 2016, Defendant Olsen signed a Confidentiality Agreement by which, among other things, he agreed not to use Confidential Information of Plaintiff Signal Funding for anything other than in Signal Funding' business and interests and not to attempt or assist in any way to solicit employees of Signal Funding LLC to leave the employment of Signal Funding LLC. (Exhibit 4.)

226.    During September and October 2017, Defendant Olsen breached that Agreement by misusing confidential information belonging to Plaintiff Signal Funding LLC for purposes related to his participation in Defendants Jafri's and Looking Glass' organization, operation, and his usurping and theft of corporate opportunities as herein alleged.

227.    At all times, Plaintiff Signal Funding LC was in strict compliance with and fully performing its obligations under that Agreement, which was in force, valid, and enforceable.

228.    Defendant Olsen's breach of contract proximately caused substantial and continuing damage to Plaintiff Signal Funding LLC by reason of the loss of potential investors, loss of pre-settlement funding clients and deals, loss of other business opportunities, loss of misused and misappropriated funds, and substantial attorney's fees and cost incurred in the prosecution of this case and investigation of these Defendants' wrongdoing.

229.    WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against these Defendants as follows:

A.  Awarding compensatory damages for Plaintiff Signal Funding LLC's actual losses and damages including forfeiture of the fees paid to SFGH for at least the time periods in which they were engaged in the illicit conduct alleged herein;

B.  Awarding exemplary and punitive damages of at least Two Million Dollars, plus an award of attorney's fees according to the rule of E.J. McKernan Co. v. Gregory, 252 Ill. App. 3d 514, 623 N.E.2d 981 (2d Dist. 1993).

C.  Awarding the costs of this action, including reasonable attorneys' fees to the extent otherwise permitted by law; and

D. Awarding such other and further relief this Court deems to be just and appropriate.

## COUNT EIGHT

## LEGAL MALPRACTICE

## DEFENDANT SFGH, AND THE INDIVIDUAL ATTORNEY DEFENDANTS

230. Plaintiffs re-allege and incorporate herein all of the allegations set forth in paragraphs 1 through 173 above and the allegations of Count Nine below.

231. Plaintiff Signal Funding LLC brings this Count against Defendants SFGH, Friedland, Schoenthaler, Cohen, and Vandesteeg.

232. This claim for relief is brought in the alternative to the breach of contract claim stated in Count Nine hereafter.

233. From at least July 16, 2016 until October 27, 2017, these Defendants were attorneys performing extensive legal work for Plaintiff Signal Funding LLC and therefore there existed an attorney-client relationship between them and Plaintiff Signal Funding LLC.

234. Therefore, as attorneys for Plaintiff Signal Funding LLC, as a matter of law, they owed Plaintiff Signal Funding LLC the duty of competent legal representation, including in particular conflict-free representation.

235. These Defendants were therefore under a duty to use such skill and care as lawyers of ordinary ability would exercise and, in the performance of legal services for Signal Funding LLC, were required to exercise an ordinary and reasonable level of skill, knowledge, care, attention, and prudence common to members of the legal profession in the community.

236. These Defendants were therefore under a duty to use such skill and care as lawyers of ordinary ability would exercise and, in the performance of legal services for Signal Funding

LLC, were required to exercise an ordinary and reasonable level of skill, knowledge, care, attention, and prudence common to members of the legal profession in the community.

237. Contrary to that duty, by the acts, practices, and omissions alleged herein, these Defendants breached that duty proximately causing damages to, and sustained by, Plaintiff Signal Funding LLC.

238. This wrongdoing and these illicit acts by these Defendants caused substantial damage to Plaintiffs by the improper payment of attorneys fees to SFGH and accrual of still unpaid fees, loss of potential investors, loss of pre-settlement funding clients and deals, loss of other business opportunities, loss of misused and misappropriated funds, and substantial attorney's fees and cost incurred in the prosecution of this case and investigation of these Defendants' wrongdoing.

239. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against these Defendants as follows:

A. Awarding compensatory damages sustained by Plaintiff Signal Funding occasioned and caused by the SFGH Defendants' misconduct and wrongdoing, including but not limited to the loss of business opportunities, loss of investment capital, and loss of funding clients, as well as the attorney's fees imposed on Plaintiff in its actions to discover and prevent Jafri's wrongdoing;

B. Awarding the costs of this action, including reasonable attorneys' fees to the extent otherwise permitted by law; and

C. Awarding such other and further relief this Court deems to be just and appropriate.

## COUNT NINE

## BREACH OF CONTRACT

## DEFENDANT SFGH

240.     Plaintiffs re-allege and incorporate herein all of the allegations set forth in paragraphs 1 through 173 above and the allegations of Count Eight herein.

241.     Plaintiff Signal Funding LLC brings this Count against Defendant SFGH.

242.     From at least on or about July 16, 2016 Plaintiff Signal Funding LLC had an enforceable contract with SFGH, the obligations of which Plaintiff Signal Funding LLC fully performed, by which Defendant SFGH agreed to not undertake any conflicting representation and also agreed that it did not and would not represent and any employees of Plaintiff.

243.     This claim for relief is brought in the alternative to the legal malpractice claim stated in Count Eight above.

244.     At all times, Plaintiff Signal Funding was in strict compliance with and fully performing its obligations under that Agreement, which was in force, valid, and enforceable.

245.     In breach of the contract, Defendant SFGH in fact represented Defendant Jafri and her entities which constituted a stark conflict, and fraudulently concealed that representation and conflict from Plaintiff Signal Funding LLC.

246.     Therefore, by the acts, practices and omissions alleged herein, these Defendants breached that contract proximately causing damages to, and sustained by, Plaintiff Signal Funding LLC.

247.     This wrongdoing and these illicit acts by these Defendants caused substantial damage to Plaintiffs by the improper payment of attorney's fees to SFGH and accrual of still unpaid fees,  the loss of potential investors, loss of pre-settlement funding clients and deals, loss

of other business opportunities, loss of misused and misappropriated funds, and substantial attorney's fees and cost incurred in the prosecution of this case and investigation of these Defendants' wrongdoing.

248.     WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against these Defendants as follows:

A.  Awarding compensatory damages sustained by Plaintiff Signal Funding occasioned and caused by the SFGH Defendants' misconduct and wrongdoing, including but not limited to the loss of business opportunities, loss of investment capital, and loss of funding clients, as well as the attorney's fees imposed on Plaintiff in its actions to discover and prevent Jafri's wrongdoing;

B.  Awarding the costs of this action, including reasonable attorneys' fees to the extent otherwise permitted by law; and

C.  Awarding such other and further relief this Court deems to be just and appropriate.

## COUNT TEN

## BREACH OF FIDUCIARY DUTY

## DEFENDANT SFGH, AND THE INDIVIDUAL ATTORNEY DEFENDANTS

249.     Plaintiffs re-allege and incorporate herein all of the allegations set forth in paragraphs 1 through 173 above as if fully set forth herein.

250.     Plaintiff Signal Funding LLC brings this Count against Defendants SFGH, Friedland, Schoenthaler, Cohen, and Vandesteeg.

251.     From at least July 16, 2016 until October 27, 2017, these Defendants were attorneys performing extensive legal work for Plaintiff Signal Funding LLC and therefore there existed an attorney-client relationship between them and Plaintiff Signal Funding LLC.

252.     Therefore, as attorneys for Plaintiff Signal Funding LLC, as a matter of law, they owed Plaintiff Signal Funding LLC the fiduciary duties of loyalty, complete candor, and honesty.

253.    Those fiduciary duties required that these Defendants (1) place the interests of Signal Funding LLC, their client, first (2) act with utmost fairness toward his or her client; (3) preserve the confidences of his or her client (4) make full disclosure of all material facts and matters within the scope or and bearing on their representation of Signal Funding LLC, including the disclosure of any conflicting representation the SFGH Defendants had undertaken or intended to undertake.

254.    Contrary to those duties, however, from at least September 29 to October 27, 2017, these Defendants intentionally, and willfully, actually and secretly concealed that they represented and rendered legal services to Defendant Jafri and her competing entities–Defendants Pinnacle Structures LLC, Looking Glass Legal LLC, Pinnacle Disability LLC, Looking Glass Financial LLC, and Looking Glass Partners LLC, all to the detriment and substantial damage to Plaintiff Signal Funding LLC.

255.    In violation of their duties of loyalty and fair, honest, and complete disclosure, Defendants SFGH, Friedland, Schoenthaler, Cohen, and Vandesteeg failed to disclose to their client Signal Funding LLC the substance of the conference call alleged in Paragraphs 160 above

256.    In violation of his duties of loyalty and fair, honest and complete disclosure Defendant Cohen failed to disclose to his client Signal Funding LLC the advice he rendered to Defendant Jafri in regard to the Mighty Inc. contract alleged in Paragraphs 128-129 above

257.    In violation of her duties of loyalty and fair, honest, and complete disclosure, Defendant Schoenthaler failed to disclose to Plaintiff Signal Funding LLC her receipt from Defendant Jafri of the Defendant Olsen's employment agreement with Signal Funding, as alleged in Paragraphs 169 above.

258.    In violation of his duties of loyalty and fair, honest, and complete disclosure, Defendant Friedland failed to disclose to his client Plaintiff Signal Funding LLC the registrations and business relationship with the Jafri entities alleged in Paragraph 170 above.

259.    Friedland and the SFGH Defendants committed those acts because with the departure of Defendant Jafri from Signal, the person who had become his primary contact at Signal, who had directed his and SFGH's work and paid or arranged the payment of SFGH's bills was gone from Signal.

260.    Defendant Friedland sent the email described in Paragraphs 152-154 above in part seeking additional business from Signal because the departure of Defendant Jafri necessitated for him to establish that relationship with another decisionmaker at Signal.

261.    But, as a precaution, to deal with the likelihood that Defendant Jafri's departure would lead to SFGH's loss of Signal as a client, he and his partners secretly undertook to develop its relationship with Defendant Jafri and her new entities with the expectation that he and his firm would replace Signal and Jafri and her entities as a new and more lucrative client.

262.    It became clear to Defendant Friedland that with the departure of Defendant Jafri from Signal, it was likely that he and his firm would lose Signal as a client, a conclusion reaffirmed by his receipt on October 19, 2017 of the email from Signal's in-house counsel inquiring if he and his firm had undertaken any legal work for Defendant Jafri.

263.    As a result, the SFGH Defendants secretly undertook that acts alleged herein to represent, devise, and assist Defendant Jafri in getting her new entities off the ground and operational so as to become her and her entities' lawyers and legal advisors in place of Signal.

264.    Therefore, after consultation within his firm, including consultations with SFGH attorney Matthew B. Schiff who "[r]eview[ed] and analyze[e] memos from Jonathan Friedland

and Client regarding question of representation and transitional issues," Defendant Friedland send the email described in Paragraph 157 above terminating the attorney-client relationship with Plaintiff Signal Funding, "throwing it to the wolves" by dropping it like a "hot potato" in order to obtain the more lucrative business Defendant Jafri and her new entities seemed likely

265.    Therefore, the acts by the SFGH Defendants were intended to assist Defendant Jafri in launching her new entities in direct competition with Plaintiff Signal Funding and in areas that Signal had been considering entering so that SFGH would have a new and continuing lucrative client after Plaintiff Signal Funding was terminated.

266.    Because of their relationships with both Defendant Jafri and Plaintiff Signal Funding, and because of the work they undertook for Defendant Jafri as herein alleged, the SFGH Defendants actually knew, or should have known, that her new entities and business plans were and would be directly competing with that of Plaintiff Signal Funding, at least in the area of pre-settlement funding, Signal Funding's core business.

267.    On November 12, 2017, Friedland emailed Mr. Gehres three final Bills for work in Signal matters totaling $3,898.34. On December 8, 2017, the day after this lawsuit was filed, Plaintiffs, through counsel, demanded that SFGH preserve all evidence and that notify its malpractice carrier of potential claims by Signal against SFGH.

268.    Plaintiff received no response. Instead, four days later, December 12, Defendant Friedland emailed Mr. Gehres, asking "when we may expect payment" of those Bills. To date, those Bills have not been paid.

269.    On October 4, 2018, as a part of a pre-suit investigation, Plaintiffs, again through counsel, sent a letter of questions to Defendant Vandesteeg about the circumstances of its conflicting representation of Jafri and her entities.

270. The failure of Vandesteeg and SFGH to answer those questions about matters material to their prior representation of Signal Funding LLC violated their duties of fair, honest, and complete disclosure.

271. An attorney for SFGH eventually responded and refused to answer the questions, stating that SFGH's work for Jafri was only "ministerial," an assertion that is incorrect.

272. To date, Plaintiffs have received no other explanation or justification from SFGH about its misconduct.

273. In all this acts, practices and omissions, Defendant Friedland acted with malice aforethought, reckless indifference, wantonness and spite, justifying an appropriate award of punitive damages.

274. In all their acts, practices and omissions, Defendants Schoenthaler, Cohen, and Vandesteeg acted with reckless indifference justifying an appropriate award of punitive damages.

275. In all its acts, practices and omissions, Defendant SFGH acted with reckless indifference justifying an appropriate award of punitive damages.

276. Furthermore, in his email correspondence with Signal Funds in-house counsel, Defendant Friedland falsely stated that he and SFGH had not undertaken any representation of Defendant Jafri or any entities or businesses formed or to be formed by her when in fact he, his Defendant partners, and SFGH had done so.

277. All these Defendants intentionally, willfully, and fraudulently, or by reckless indifference, as the case may be, concealed that representation and conflict from Plaintiff Signal Funding LLC, and even now fails and refuses to disclose all aspects thereof.

278. Moreover, Defendant Friedland falsely stated and misrepresented both by affirmative false statement and by omission of the truthful and material facts, that he and SFGH

did not represent Defendant Jafri and her entities when in fact he and SFGH did so represent them, and was performing services for them, at the very time those false and materially incomplete statements were made.

279. In doing so, Friedland, and by his Defendant partners' concealment of their conflicting representation of Defendant Jafri, the SFGH Defendants acted with the specific intention to enable Defendant Jafri to significantly advance the interests of her new illicitly competitive business or reckless disregard that that would be the effect and result of their concealment and fraud.

280. Further, these Defendants have breached their fiduciary duty to Plaintiff Signal Funding LLC by refusing to disclose the truth behind its conflicting representation of Defendant Jafri and her entities once that representation was discovered by Plaintiff Signal Funding LLC.

281. As a result, that lack of loyalty, conflict, and lack of candor, and the secret unknown representation of Defendant Jafri and her entities proximately caused damage to Plaintiff Signal Funding LLC by preventing it from protecting itself against the continued access by Defendant Jafri to its confidential and restricted servers that contained highly sensitive and confidential information and trade secrets, by forcing it to incur significant legal expenses and costs in prosecuting this action against Defendant Jafri and Defendant Looking Glass Financial LLC, by forcing it to conduct an extensive investigation to uncover these Defendants wrongdoing, and by imposing upon Plaintiff Signal Funds LLC the costs of bringing these claims against these Defendants.

282. Furthermore, Plaintiff Signal Funding LLC was damaged by the Bills received from Defendants Friedland and SFGH for its work purportedly on behalf of Signal Funding LLC during October 2017, as described above, which fees Defendant SFGH should be required to forfeit.

283.     Had Plaintiff Signal Funding and its in-house counsel known the truth about the SFGH's conflicting representation of Defendant Jafri and her entities, it would have immediately terminated the representation of SFGH and its partners and further undertaken to protect itself from Defendant Jafri's theft and misuse of confidential information and illicit competitive activity.

284.     This wrongdoing and these illicit acts by these Defendants caused substantial damage to Plaintiffs by the delay in uncovering the illicit conduct of Defendant Jafri, and the consequent filing of this lawsuit to remedy and protect its rights, the loss of potential investors, loss of pre-settlement funding clients and deals, loss of other business opportunities, loss of misused and misappropriated funds, and substantial attorney's fees and cost incurred in the prosecution of this case and investigation of these Defendants' wrongdoing.

285.     WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against these Defendants as follows:

A.  Awarding disgorgement, forfeiture and repayment of the fees paid to SFGH in the amount of $32,988.28, the amount of fees improperly paid SFGH as alleged in Paragraph 136 above, in the total amount of $306,720.40 as alleged in Paragraph 151 above, and in the alternative alleged in for at least the time periods in which they were engaged in the conflicting representation herein alleged;

B.  Declaring that the bills rendered by SFGH for work allegedly performed for Plaintiff Signal Funds during October 2017, as alleged in Paragraph 267, in the amount of $3,898.34 are void and need not be satisfied;

C.  Awarding nominal damages to the extent permitted by law;

D.  Awarding exemplary and punitive damages of at least Two Million Dollars, plus an award of attorney's fees according to the rule of E.J. McKernan Co. v. Gregory, 252 Ill. App. 3d 514, 623 N.E.2d 981 (2d Dist. 1993).

E.  Awarding the costs of this action, including reasonable attorneys' fees to the extent otherwise permitted by law; and

F.  Awarding such other and further relief this Court deems to be just and appropriate.

## COUNT ELEVEN

## FRAUD AND FRAUDULENT CONCEALMENT

## DEFENDANTS FRIEDLAND & SFGH

286.     Plaintiffs re-allege and incorporate herein all of the allegations set forth in paragraphs 1 through 173 above and the allegations of Count Ten for Breach of Fiduciary duty herein.

287.     Plaintiff Signal Funding LLC brings this Count against Defendant Friedland individually and against SFGH as vicariously liable for Defendant Friedland's acts, practices, and omissions.

288.     By his emails to and with Mr. Gehres during October 2017 described above, Defendant Friedland falsely concealed that he, his partners, and his firm were providing legal representation, services, and advice to Defendant Jafri and her entities, including the details of that representation, those services, and that advice, all of which was highly material of Plaintiff Signal Funding LLC in the operation of its business and continued retention of Friedland, his partners, and SFGH as its lawyers.

289.     Among other things, Defendant Friedland falsely stated that he, his firm, and his partners were not and would not represent Defendant Jafri on any matter adverse to or in conflict with the interests of Plaintiff Signal Funding LLC.

290.     Defendant Friedland's October 20, 2017 email to Signal Funds in-house counsel Ed Gehres, described in Paragraph 156 above falsely stated:

> So, no, there was no point in time at which we represented Farva in a manner adverse to Signal.

291. In the same email, this statement by Defendant Friedland was materially incomplete and misleading by failing to disclose the truth that he, his partners, and SFGH were in fact representing and had been representing and advising Defendant Jafri and her competing entities that were and continued to be adverse to Plaintiffs:

> If you are also asking the broader question of whether we represent Farva on other matters, I cannot answer that. Our firm policy is to neither confirm nor deny the representation of a client unless circumstances warrant such disclosure, as applicable ethical rules provide that the very fact of representation is, itself, a confidential matter.

292. Further, Friedland fraudulently concealed the truth of the representation, services, and advice it was rendering to Defendant Jafri, including the establishment of businesses that were or would be in direct competition to Plaintiff Signal Funding LLC, the organization and registration of those entities as limited liability companies in Delaware and other states, the negotiation of a case administration service contract with Mighty Inc., and advice regarding Plaintiff's employment contract with Defendant Michael Olsen.

293. Defendant Friedland's October 27, 2017 email described in Paragraph 157 above falsely stated the following:

> Farva has asked us to represent her in matters unrelated to Signal (and, at my request, has given the ok to disclose this to you).

> Because I anticipate that her future endeavors may not be completely unrelated to the space in which Signal operates, I feel it necessary to choose between Signal and Farva. While not an ethical conflict, it is a business conflict which would trouble me if I were either client.

294. In fact, the matters that Defendant Jafri had ask SFGH to represent her in included matter directly related to and in direct competition with the businesses of Plaintiff Signal Funding, and that representation was in fact and would be an ethical conflict.

295. Mr. Gehres, and therefore Plaintiff Signal Funding LLC, relied on those false statements and omissions to its substantial damage and detriment, in that it did not terminate the

representation of it by SFGH and Friedland, was delayed and impeded in discovering the fraudulent and illicit conduct of Defendants Jafri and Olsen, and the solicitation of investors and funding clients that they properly should have not usurped from Plaintiff Signal Funding LLC, this expenses and costs of this litigation.

296.    Because of their relationships with both Defendant Jafri and Plaintiff Signal Funding, and because of the work they undertook for Defendant Jafri as herein alleged, the SFGH Defendants actually knew, or should have known, that her new entities and business plans were and would be directly competing with that of Plaintiff Signal Funding, at least in the area of pre-settlement funding, Signal Funding's core business.

297.    Those damages were proximately caused by Defendant Friedland's fraud and fraudulent concealment.

298.    Under the doctrine of respondeat superior, Defendant SFGH is vicariously liable for the fraud and fraudulent concealment committed by Friedland and is further liable for the continued concealment of the trust to this day.

299.    SFGH's fraudulent concealment has continued to the present day insofar as it has refused to disclose the true and full extent of its conflicting and illicit representation, services and advice to Defendants Jafri, her entities and Michael Olsen.

300.    WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against these Defendants as follows:

    A.    Awarding disgorgement, forfeiture and repayment of the fees paid to SFGH in the amount of $32,988.28, the amount of fees improperly paid SFGH as alleged in Paragraph 136 above, in the total amount of $306,720.40 as alleged in Paragraph 151 above, and in the alternative alleged in for at least the time periods in which they were engaged in the conflicting representation herein alleged;

B.  Declaring that the bills rendered by SFGH for work allegedly performed for Plaintiff Signal Funds during October 2017, as alleged in Paragraph 267, in the amount of $3,898.34 are void and need not be satisfied;

C.  Awarding nominal damages to the extent permitted by law;

D.  Awarding exemplary and punitive damages of at least Two Million Dollars, plus an award of attorney's fees according to the rule of *E.J. McKernan Co. v. Gregory*, 252 Ill. App. 3d 514, 623 N.E.2d 981 (2d Dist. 1993).

E.  Awarding the costs of this action, including reasonable attorneys' fees to the extent otherwise permitted by law; and

F.  Awarding such other and further relief this Court deems to be just and appropriate.

## JURY DEMAND

Plaintiffs demand a jury on all issues so triable.

* * * *

Date: April 19, 2019                                   Respectfully submitted,

                                    /s/ Constantine John  Gekas
                                   Constantine John Gekas
                                    cjg@gekaslaw.com
                                   GEKAS LAW LTD.
                                   33 North LaSalle Street STE 2220
                                   Chicago, Illinois 60602
                                   Tel: (312) 726-4501
                                   Fax: (312) 726-4505

                                   *Attorney for Plaintiffs*

**EXHIBIT 1**

**Sugar Felsenthal
Grais & Hammer LLP**

Jonathan P. Friedland
Direct: (312) 704-2770
Email: jfriedland@sugarfgh.com

Vanessa J. Schoenthaler
Direct: (212)-899-9781
Email: vschoenthaler@sugarfgh.com

July 13, 2016

**VIA Email**

Signal Funding, LLC
Mr. Gary Chodes, CEO
2320 Linden Avenue
Highland Park, IL 60035

> RE: **Representation of Signal Funding, LLC**

Dear Gary:

Thank you for selecting Sugar Felsenthal Grais & Hammer LLP (the "*firm*", "*our*" or "*us*") as your legal counsel, effective as of June 13, 2016.

1. Client. Our client in this engagement is Signal Funding, LLC, a Delaware limited liability company ("*Signal*", "*you*" or "*your*"). Except as provided in Paragraph 9 below, our firm will not be representing any of your owners, members, directors, officers, or employees unless specifically engaged to do so. Accordingly, absent a separate engagement to represent such other persons or entities, our representation of you does not create an attorney-client relationship between the firm and any other persons or entities. We expect that our principal contact with you for purposes of this engagement will be your Chief Executive Officer, Gary Chodes ("*Gary*"), until you tell us otherwise.

2. Scope of Engagement. Our firm has been engaged to represent you in all general corporate matters. We must mutually agree to any material change in the nature of our engagement. The terms set out in this letter will apply to any new or expanded engagement unless we enter into a further agreement for such new matter.

3. Staffing. My partner, Vanessa Schoenthaler, and I will have primary responsibility for this engagement. She or I may request other firm lawyers or legal assistants to work on your matter(s) in order to provide services to you in a timely and efficient manner or in circumstances where they bring special expertise to bear on your work.

4. Fees. Our firm charges for services on an hourly basis, in .10-hour increments. Our hourly rates for attorneys and other professionals are based upon their experience and specialized knowledge. My current rate is $650.00. Current rates for others who are likely to work on your matters range from $305.00 to $650.00 for attorneys and $195.00 for paralegals but may be higher or lower depending on the particular staffing requirements for your matter(s). Our hourly rates are reviewed annually and may be adjusted without prior notice. In preparing

DocuSign Envelope ID: A0C681C2-8553-45DF-9FD1-02105EBB5D4C

our statements for professional services, we will use our hourly rates in effect when such services were rendered.

5.     Disbursements.  You are responsible for cash disbursements and other charges related to our professional services.  These include, without limitation, expenses for travel, computerized research, filing fees, messenger or overnight delivery, and international telephone calls.  In addition, you are responsible for payment of filing fees, and fees of expert witnesses, court reporters, and special or co-counsel or other professionals whom our firm engages on your behalf and with your approval. Our firm may, in its discretion, advance nominal fees and expenses, but invoices for significant third party charges will be sent directly to you for prompt payment.

6.     Billing and Payment.  We render statements on a monthly basis.  Payment is due upon presentation. At our option, a late payment fee at the rate of one and one-half percent (1.5%) per month may be charged on statements not paid when due. If you do not pay our statements in a timely fashion, our firm reserves the right to suspend further work on your account and, if we cannot resolve the arrearage after notice of delinquency to you, to terminate our representation of you.

8.     Security Retainer.  Our firm requests an initial security retainer of $10,000 which will be deposited in our client trust fund account and will remain your property subject to a first priority security interest in our favor until used to pay for services rendered.  You acknowledge and agree that we will hold the retainer to satisfy a payment you owe us. Any unapplied portion of the retainer will be returned to you upon completion of our engagement. The retainer is not intended as an estimate or cap on our billing to you.

9.     Conflicts of Interest.  Our firm currently represents Gary, as an individual, in connection with the proposed investment by SuttonPark Capital LLC, a Delaware limited liability company, in Signal and in connection with certain related transactions. We also anticipate representing Gary in other capacities unrelated to Signal. We do not believe that our representation of Gary poses a conflict of interest with our representation of Signal. In an abundance of caution, however, we seek under Rules 1.7 and 1.13 of the Illinois Rules of Professional Conduct that Signal consent to our dual representation. Because Rule 1.13 requires such consent be given by someone other than Gary, we have included a signature block below for Joshua Wander, so that he may provide such consent. Gary also, by his signature in his individual capacity, hereby acknowledges and waives any conflict of interest arising from our representation of Signal.

Our firm acknowledges that your waiver does not extend to the representation by us of Gary or Signal in any litigation or other adverse proceeding that may arise between Gary and Signal. In the event of such litigation or other adverse proceedings, or if Gary or Signal are

DocuSign Envelope ID: A0C681C2-8553-45DF-9FD1-02105EBB5D4C

actively considering such litigation, we will not represent either party in connection therewith unless both parties provide a new written waiver permitting us to represent the other party in such litigation or other adverse proceeding.

You are encouraged to consult with another attorney prior to waiving any conflict of interest.

10. <u>Your Cooperation</u>. To enable us to represent you effectively, you will cooperate fully with us and completely disclose to us all facts and documents relevant to the matter we are undertaking. Also, you will inform us, in writing, of any changes in name or contact information so that we can remain in contact with you. Whenever we need you instructions or authorization in order to proceed with legal work on your behalf, we will contact you at the latest business address we have received from you.

11. <u>Confidentiality and Electronic Communications</u>. Our firm owes a duty of confidentiality to all of our clients. Accordingly, our firm will not be required to disclose to you, or to use on your behalf, any information our firm's possess with respect to which our firm owes a duty of confidentiality to another current or former client. In addition, unless you advise us otherwise, our firm will use electronic communications devices in the normal course (which may include wired or wireless e-mail, cellular telephones, voice over Internet and electronic data/document websites such as Box and Dropbox) to communicate with you and others. Absent special arrangements or circumstances, our firm does not employ encryption technologies in our electronic communications. Although security risks exist with respect to the confidentiality of your information using these technologies, we believe the benefits outweigh the risks of unauthorized disclosure. By signing this letter, you consent to our use of these communication and electronic storage methods.

12. <u>Termination of Representation</u>.

(a) You may terminate our representation of you at any time for any reason by written notice to us. Our firm has the same right to terminate our representation of you subject to our giving reasonable notice to allow you to arrange alternative counsel. Additionally, our firm's representation of you will terminate (i) with respect to a particular matter for which we have been engaged, upon completion of our work on such matter, or (ii) after a period of six (6) consecutive months in which we perform no work on your behalf if no further work is then contemplated.

(b) If our representation of you is terminated for any reason, you will take all steps necessary to free our firm of any obligation to perform further services for you, including the execution of any documents necessary to substitute counsel and to consent to our withdrawal as your counsel in any proceeding.

(c)     The termination of our attorney-client relationship will not affect your ongoing responsibility for any fees or other charges incurred through the date of termination or our ongoing duty of confidentiality with respect to your matters.

(d)     Upon termination of our active involvement in a particular matter, our firm will have no duty to inform you of new developments or changes in law which may be relevant to such matter or to monitor renewal or notice dates or similar deadlines which may arise with respect to such matter.  If our firm obtains a judgment on your behalf, we will only be responsible for those post judgment services (such as recording abstracts, filing judgment liens, and calendaring renewal of judgments) as are expressly agreed to by our firm.

13.     <u>Document Retention</u>.  Upon the conclusion of our representation of you on a particular matter, you may request that the firm deliver to you the client files on the matter (excluding internal work product).  If you do not request the return of your file at that time, our firm is authorized to destroy your files in accordance with our file retention policy then in effect, without further notice to you.  The firm retains the right to make copies of your file, at our expense, for our own information purposes.

14.     <u>Disputes</u>.  If you have any questions about our work for you or our fees, please contact Vanessa or me in the first instance.  We will investigate any concerns promptly and do what we reasonably can to resolve the matter to your satisfaction.

15.     <u>Governing Law</u>.  This engagement letter will be governed by the internal laws of the State of Illinois.

Please review this letter carefully.  If the terms of this letter are not consistent with your understanding of our engagement in any respect or if you have any questions concerning our engagement, please contact me promptly.  For avoidance of doubt, we ask that you confirm your acceptance of these terms by signing this letter and returning it to me at your earliest convenience.

As a general matter this letter will not take effect, and we will have no obligation to provide you with the services described above, until we receive a duly executed copy of the signature page to this letter and the security retainer described in paragraph 8. We may, however, in our sole and absolute discretion, begin providing legal services to you in reliance on your oral directions to us.  Even if you do not sign this letter you will be obligated to pay us for any services we may have performed for you at such oral direction.  Although we have set forth the terms of our representation of you in a letter, this letter is a binding legal contract.

Signal Funding LLC

We appreciate the opportunity to serve as your counsel and look forward to working with you.

Very truly yours,

Jonathan P. Friedland

The undersigned confirms and agrees that the above correctly states that basis on which it has engaged Sugar Felsenthal Grais & Hammer LLP as its legal counsel.

CONFIRMED and AGREED:

Signal Funding, LLC

By: _____
      Gary Chodes
      Chief Executive Officer

Date: July _____, 2016


CONFIRMED and AGREED with respect to the conflict of interest waiver disclosed in Paragraph 9.

By: _____
      Gary Chodes, personally


By: _____
      Joshua Wander

Date: July _____, 2016

**EXHIBIT 2**

**From:** Jonathan Friedland <jfriedland@sfgh.com>
**Date:** October 13, 2017 at 1:02:46 PM EDT
**To:** "Ed Gehres (egehres@777part.com)" <egehres@777part.com>
**Cc:** Elizabeth Vandesteeg <evandesteeg@sfgh.com>
**Subject: SFGH's ongoing and outstanding work / visit to Miami**

Ed,

Hi and hope this finds you well.

First, we understand that Farva has left and want to touch base with you to apprise you of things on our plate for Signal.

Second,  I will be in **Miami next week** and want to know if we might get together- or if there is a way I can otherwise meet any of the other key guys if you are not available. Please let me know.

Summary of work ongoing and outstanding:

Trademark:

- We have filed five trademark applications for Signal Funding, of which four have not ripened into registrations.  At this point in time, there is nothing to do with respect to those applications.  Etahn is the attorney of record for all those applications.
- With respect to two of these marks, they are being published for opposition.  If there are no oppositions filed following publication, a Notice of Allowance will be issued for these two marks.  After such issuance Signal will need either to file Statements of Use (SOU) for them to ripen them into registrations or to file extensions of time to file a SOU if they are not yet in use. If an opposition is filed, things get complicated.
- Three to six months from now, the USPTO examiners will review the two other applications.  If any of those reviews generates an office action, Signal will need to respond to the office action.  Most, but not all, office actions give the applicant six months in which to respond. Many office actions require only a little work but some may require a mini-brief if a substantive issue such as likelihood of confusion is raised by the USPTO examiner.

Employment:

- We have been advising Signal on the best course of action for dealing with unhappy employees, Tyson Beauchamp in particular.

<u>Information Security</u>:

- Information security policy, written information security program, and bring-your-own-device documents were finalized last month and were ready for roll-out and implementation.

We will look for your response. Needless to say, we were happy to stay on after Signal and Gary separated, and we hope nothing changes with Farva's departure. Indeed, we would welcome any opportunity to expand our relationship with other the other portfolio companies.

**Jonathan Friedland** | Partner
**Sugar Felsenthal Grais & Hammer LLP**

30 N. LaSalle Street, Suite 3000, Chicago, IL 60602
230 Park Avenue, Suite 908, New York, NY 10169
Tel: 312-704-2770  |  Fax: 312-372-7951 | Mobile: 224-436-5142
jfriedland@sfgh.com | vCard | Biography

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. If you are not the intended recipient, please contact the sender and delete all copies of this email.

**EXHIBIT 3**

**From:** Jonathan Friedland <jfriedland@sfgh.com>
**Date:** October 27, 2017 at 1:07:52 PM EDT
**To:** Ed Gehres <egehres@777part.com>
**Cc:** Elizabeth Vandesteeg <evandesteeg@sfgh.com>, Vanessa Schoenthaler <vschoenthaler@sfgh.com>,
Etahn Cohen <ecohen@sfgh.com>, Matthew Schiff <mschiff@sfgh.com>
**Subject:** RE: Signal work

Ed, I am following up on the below.

Farva has asked us to represent her in matters unrelated to Signal (and, at my request, has given the ok to disclose this to you).

Because I anticipate that her future endeavors may not be completely unrelated to the space in which Signal operates, I feel it necessary to choose between Signal and Farva. While not an ethical conflict, it is a business conflict which would trouble me if I were either client.

In short, and with nothing but the utmost respect for you and for Signal, I choose Farva. Given that virtually all of our communications with Signal were through Farva since Gary's departure, I think this makes sense from Signal's perspective as well.

We will therefore no longer be rendering legal services to Signal and will have no further attorney-client relationship with it.

We will be pleased to assist in the transition of any matters or files to you or to new counsel, as you may ask. In the absence of any request, we will retain our files in accordance with our firm's policy. I will send you a final invoice in about a week.

We wish Signal every success in business. On a personal note, I wish you the best as well. Lisa and I really enjoyed meeting you and we are sorry we did not have a chance to work more closely with

you. Should you find yourself somewhere in the future where you could use our help again, we would welcome the opportunity.

**Jonathan Friedland** | Partner
**Sugar Felsenthal Grais & Hammer LLP**

30 N. LaSalle Street, Suite 3000, Chicago, IL 60602
230 Park Avenue, Suite 908, New York, NY 10169
Tel: 312-704-2770 | Fax: 312-372-7951 | Mobile: 224-436-5142
jfriedland@sfgh.com | vCard | Biography

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. If you are not the intended recipient, please contact the sender and delete all copies of this email.

**From:** Jonathan Friedland
**Sent:** Friday, October 20, 2017 11:32 AM
**To:** Ed Gehres <egehres@777part.com>
**Cc:** David Hough <dhough@signalfunds.com>; Sheila Shuster <sshuster@777part.com>; Elizabeth Vandesteeg <EVandesteeg@sfgh.com>; Matthew Schiff <MSchiff@sfgh.com>
**Subject:** RE: Signal work

Hi Ed, at al.

Farva contacted Matt to ask if he could advise on her separation. He rendered no counsel and advised her he would need to check with me with respect to conflict issues. In the meantime Farva sent Matt a copy of her resignation letter and a copy of the separation agreement, but Matt did not (nor did anyone at my firm) review them or render any substantive advice regarding them or regarding anything having to do with her separation. I told Matt that we cannot represent Farva in any manner that is adverse to Signal, and then I told Farva the same thing. So, no, there was no point in time at which we represented Farva in a manner adverse to Signal. If you are also asking the broader question of whether we represent Farva on other matters, I cannot answer that. Our firm policy is to neither confirm nor deny the representation of a client unless circumstances warrant such disclosure, as applicable ethical rules provide that the very fact of representation is, itself, a confidential matter.

**Jonathan Friedland** | Partner
**Sugar Felsenthal Grais & Hammer LLP**

30 N. LaSalle Street, Suite 3000, Chicago, IL 60602
230 Park Avenue, Suite 908, New York, NY 10169
Tel: 312-704-2770 | Fax: 312-372-7951 | Mobile: 224-436-5142

jfriedland@sfgh.com | vCard | Biography

This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. If you are not the intended recipient, please contact the sender and delete all copies of this email.

**From:** Ed Gehres [mailto:egehres@777part.com]
**Sent:** Thursday, October 19, 2017 3:37 PM

**To:** Jonathan Friedland <jfriedland@sfgh.com>
**Cc:** David Hough <dhough@signalfunds.com>; Sheila Shuster <sshuster@777part.com>
**Subject:** Signal work

Jonathan –

Thanks for your emails this last week. I have had a crazy schedule the last few days, and have actually been in DC at the Association of Corporate Counsel annual meeting and handling some other things away from Miami.

I appreciate you reaching out for direction. Copied on this email are Signal CEO David Hough and the new General Counsel of Signal, Sheila Shuster. We should set a call for us to discuss the ongoing work and the future.

Before we do that though, I need to hear from you on something rather important. Farva Jafri resigned from Signal and promised to assist in transition. We offered her a transition services agreement that was confidential. She flatly ignored all communication and then communicated through LinkedIn that she was refusing to help with anything at all.

In the meantime, we have uncovered a number of things that give us grave concern about Farva's tenure. The investigation has been ongoing.

It came to my attention today that Farva communicated with your partner Matthew Schiff on the transition agreement we offered and actually provided a copy. Farva is most certainly adverse to us at this time. I need to understand why this happened with SFGH and whether there is an attorney-client relationship (even if brief or temporary) with Farva.

Happy t9o discuss on the phone but I'd like a response in writing please.

Thanks

Ed



**Ed Gehres**
General Counsel
777 Partners
(W) 212.529.9079
(M) 202.258.5530
600 Brickell Ave, 19th floor | Miami, FL 33131
777part.com

**EXHIBIT 4**

_____

Dear Michael:

This Confidentiality Agreement (the "Agreement") is by and between you **(Michael Olsen)** (the "Employee") and Signal Funding, LLC.

Employee has requested certain oral and written information regarding Signal Funding, LLC, and Employee agrees to use such information solely for the purpose of evaluating employment opportunities at (the "Purpose"). As a condition to such information being furnished to Employee and/or its directors, officers, employees, agents, affiliates, auditors or advisors (including without limitation, attorneys, accountants and/or consultants) (collectively, "Representatives"), Employee agrees to treat any and all non-public information concerning Signal Funding, LLC that is furnished to Employee or its Representatives by or on behalf of Signal Funding, LLC (the "Confidential Information") in accordance with the provisions of this Agreement.

The term "Confidential Information" shall be deemed to include (a) information that has been designated in writing as confidential or proprietary, (b) all financial information concerning Signal Funding, LLC, its affiliates and subsidiaries, and (c) all notes, analyses, compilations, studies, interpretations or other documents prepared by Employee that contain, reflect or are based upon, in whole or in part, the information furnished to Employee or its Representatives pursuant to the terms of this Agreement.

The term "Confidential Information" does not include information that (i) is or becomes generally available to the public other than as a result of a disclosure by Employee or its Representatives, or (ii) was within Employee's possession prior to it being furnished to Employee by or on behalf of Signal Funding, LLC, or becomes available to Employee on a non-confidential basis from a source other than Signal Funding, LLC or any of its respective Representatives, provided in either case that the source of such information was not known by Employee to be bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to, any party with respect to such information, or (iii) is independently developed by Employee with no use or knowledge of the Confidential Information.

Employee hereby agrees that Employee will not disclose any of the Confidential Information, or the fact that it has been made available to him, to any person or entity (including any of his respective attorneys or advisors); provided, however, that any of such information may be disclosed by Employee (A) to his Representatives who need to know to accomplish the Purpose, is aware of the confidential and proprietary nature of such information, and each of which Representatives who is an officer, director or employee has agreed to maintain the confidentiality of all such information pursuant to Signal Funding, LLC's policies and procedures, and any other Representatives being bound to keep such information confidential pursuant to the terms of their professional engagement, (B) in order to comply with any law, order, regulation or ruling applicable to Employee and (C) to government agencies, regulatory bodies or representatives thereof, courts or pursuant to legal process.

DocuSign Envelope ID: 62125659-17E4-4261-89BC-8E693203D877

In the event that Employee is requested or required (by oral question, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other legal process) to disclose any of the Confidential Information, Employee shall (i) promptly provide Signal Funding, LLC with notice of any such request or requirement, and (ii) prior to disclosing such material, request that confidential treatment be accorded such information.

Confidential Information furnished pursuant to this Agreement by Signal Funding, LLC shall remain the property thereof and, upon the request of Signal Funding, LLC, shall be returned immediately thereto, together with all copies made by Employee (in whatever form, electronic or otherwise) and by anyone to whom such Confidential Information has been made available by Employee, and in addition, any reports, analyses, notes, memoranda, presentations, summaries, or other documents or information prepared by or on behalf of Employee that contain or reflect any Confidential Information shall be destroyed (and upon request, Employee shall provide to Signal Funding, LLC a certificate confirming the return of all such Confidential Information and such destruction).

Employee acknowledges and agrees that Signal Funding, LLC makes no representation or warranty, express or implied, as to the accuracy or completeness of the Confidential Information, and Employee agrees that neither Signal Funding, LLC nor any of its Representatives shall have any liability under this Agreement to Employee resulting from the use of the Confidential Information with regard to the Purpose or any other use.

Employee agrees to be responsible for any breach of this Agreement by it or its Representatives and hereby agrees to indemnify and hold Signal Funding, LLC harmless from and against any and all suits, claims, demands, causes of action, damages, consequential damages, losses, costs and expenses of any kind (including, without limitation, fines and penalties and reasonable attorneys' fees and disbursements, including the cost of in-house attorneys) whether known or unknown arising out of any breach of this Agreement or any obligation under this Agreement by Employee or its Representatives. In addition, Employee acknowledges that money damages and other remedies at law may be inadequate to protect against a breach of this Agreement and Employee hereby agrees to the granting of injunctive or other equitable relief in the favor of Signal Funding, LLC without proof of actual damages.

Notwithstanding anything herein to the contrary, any party to this Agreement (and any representative of any party to this Agreement) may disclose to any and all persons without limitation of any kind, the tax treatment and tax structure of any proposed transaction or employment relationship contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure.

The terms of this Letter Agreement shall remain in full force and effect for a period of three (3) years from the date hereof.

Additionally, for a period of two years after any Confidential Information is furnished to Employee under this Agreement, Employee shall not, on its own behalf or on behalf of any

DocuSign Envelope ID: 62125659-17E4-4261-89BC-8E693203D877

other person, partnership, association, corporation, or entity, directly or indirectly solicit or in any manner attempt to influence, induce or encourage any employee of Signal Funding, LLC or its subsidiaries or affiliates to leave the employment thereof, nor shall Employee use or disclose to any person, partnership association, corporation or other entity any information obtained from Signal Funding, LLC regarding the names, positions and contact information of such employees, provided, however that nothing in this Agreement shall be deemed to prohibit the employment by Employee or its affiliates of any employee (a) as the result of any general solicitation for employment not specifically directed at employees of Signal Funding, LLC or (b) who has been terminated by Signal Funding, LLC prior to commencement of employment discussions between Employee and such employee.

This Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties hereto and their respective successors and assigns. Neither this Agreement nor any provision hereof may be waived or amended except by an instrument in writing signed by the party against which enforcement of such waiver or amendment is sought.
This Agreement sets forth the entire agreement and understanding of the parties hereto, and supersedes all prior agreements and understandings between the parties hereto with respect to the transactions contemplated hereby.

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without giving effect to any choice of law principles. Each party hereto irrevocably and unconditionally consents to the jurisdiction of the federal and state courts in the State of Illinois, in any action to enforce, interpret or construe any provision of this Agreement, and also hereby irrevocably waives any defense of improper venue or forum non convenience to any such action brought in either of those courts. Each party further irrevocably agrees that any action to enforce, interpret or construe any provision of this Agreement will be brought only in either of those courts and not in any other court.

This Agreement may be signed (including by facsimile) in counterparts, each of which shall be an original and both of which taken together shall constitute a single document.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date set forth below.

By: _____  8/22/2016
Name:

**Signal Funding, LLC:**

By: _____
Name:
Title:

DocuSign Envelope ID: 62125659-17E4-4261-89BC-8E693203D877

Date: