# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| SIGNAL FINANCIAL HOLDINGS LLC, and SIGNAL FUNDING LLC, both Delaware limited liability companies, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 17 C 8816 |
| LOOKING GLASS FINANCIAL LLC, a Delaware limited liability company, et al., | ) ) ) | Judge Joan H. Lefkow |
| Defendants. | ) ) | |

## OPINION AND ORDER

Plaintiffs Signal Financial Holdings LLC and Signal Funding LLC (together, "Signal") allege that Farva Jafri, a former Signal executive, misappropriated Signal's trade secrets while separating from Signal and used them to compete against Signal. Signal now sues Jafri; several corporate entities Jafri formed: Looking Glass Financial LLC ("Looking Glass"); Pinnacle Structures LLC, Looking Glass Legal LLC, Pinnacle Disability LLC, and Looking Glass Partners LLC (together, the "Related Entities"); a law firm (Sugar Felsenthal Grais & Helsinger LLP ("the Firm")) and four of its attorneys (Jonathan P. Friedland, Vanessa J. Schoenthaler, Etahn M. Cohen, and Elizabeth B. Vandesteeg), who allegedly assisted Jafri; and Michael Olsen, another former Signal executive. Now before the court are the Firm's, the Related Entities', and Olsen's motions to dismiss.

For the reasons below, the Firm's (dkt. 247) motion is granted in part and denied in part. The Related Entities' motion (dkt. 253) and Olsen's motion (dkt. 254) are denied.[1]

## BACKGROUND[2]

### I. Jafri's Departure and Competition

Signal operates a pre-settlement legal funding business, advancing loans to people with potential legal claims in exchange for a portion of any recovery they might secure. (Dkt. 247 ¶¶ 12–13, 32.) In July 2016, Jafri joined Signal as its Vice President of Operations and later became its Chief Operating Officer. (*Id.* ¶ 33.) But by Summer 2017, while still Signal's COO, Jafri began preparing to hang her own shingle and compete against Signal. (*Id.* ¶ 90.) Sometime before September 2017, Jafri started taking confidential Signal documents to use in her competing pre-settlement legal funding enterprise, including a document designed for presentations to potential investors. (*Id.* ¶ 91.) By early September 2017, Jafri stopped showing up to work at Signal and began soliciting investors for her own venture, using altered copies of the investor presentation she had taken from Signal. (*Id.* ¶¶ 83, 92–93.) Signal alleges that these investors would have been "candidates to invest in Signal" had Jafri not solicited them. (*Id.* ¶ 100.) Indeed, Jafri found at least one investor by reading an email the investor had sent to an account at Signal inquiring about investment opportunities at Signal. (*Id.* ¶ 102–03.)

After Jafri went several weeks without coming into the office, on September 27, her supervisors emailed her to demand that she return. (*Id.* ¶¶ 86, 112–14.) On September 28, Jafri resigned. (*Id.* ¶ 40, 87, 119.) The next morning, she returned to the office and spoke with an HR

---

[1] The court has jurisdiction under 28 U.S.C. §§ 1331 and 1367. Venue is proper in this district under 28 U.S.C. § 1391.

[2] The facts are taken from Signal's complaint and are presumed true for this motion. *See Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011).

representative who told her to keep her email access while she and Signal negotiated a transition plan to help ease the fallout from her departure. (*Id.* ¶ 121.) To that end, Signal proposed that Jafri enter into a transition agreement, but Jafri cut off all communications with Signal. (*Id.* ¶ 41–42.) On October 7, 2017, unbeknownst to Signal and without its permission, Jafri accessed her Signal email account to forward many confidential Signal documents to her personal email account, including the investor presentation. (*Id.* ¶¶ 43–44, 50–53.) Signal alleges that these documents contained trade secrets, including particularly "summaries of market data," "proprietary information regarding disability receivables," and "industry specific financial models." (*Id.* ¶¶ 53–66, 71–79.) Once she had the documents in hand, Jafri finally responded to Signal's outreach attempts, declined its proposal to sign a transition agreement, and informed Signal that she would no longer assist Signal in any way. (*Id.* ¶ 45.)

Jafri then began forming Looking Glass and the Related Entities between October 12 and October 19, 2017. (*Id.* ¶¶ 46–48.) By October 20, Looking Glass and the Related Entities had begun funding cases and operating as a going concern. (*Id.* ¶ 130.)

At some point, Jafri also solicited Signal executives to join her new venture, including Olsen, Signal's chief marketing officer. She represented to investors that these Signal executives were part of her venture's management team. (*Id.* ¶¶ 67–68, 94, 99.) In Signal's original and first amended complaints, Signal alleged that it could not determine whether Olsen worked with Jafri or whether Jafri mentioned him without his knowledge or permission. (Dkt. 1 ¶ 51; dkt. 184 ¶ 69.) But Signal's now-operative second amended complaint alleges that Olsen knowingly assisted Jafri. (Dkt. 247 ¶ 69.) Signal now believes that Olsen drafted investor presentation materials for Jafri's new venture before he stopped working for Signal on October 27, 2017. (*Id.* ¶ 95–97.)

Shortly after these events, Signal sued Jafri and Looking Glass for misappropriation of trade secrets and breach of fiduciary duty. After some discovery, Signal added the Related Entities and Olsen as defendants to those claims and added a count of breach of contract against Olsen. Signal alleges that the Related Entities are responsible for Jafri's actions because she was "the prime organizer, managing member[], [and] chief administrative officer" of Looking Glass and the Related Entities. (*Id.* ¶ 139.) The Related Entities, Signal claims, are therefore responsible for Jafri's actions under the doctrine of *respondeat superior*. (*Id.*) Signal also alleges that Jafri mentioned three of the four Related Entities in presentations to investors and mentioned the fourth in negotiations with a vendor. (*Id.* ¶¶ 140–41.) Finally, Signal provides an organization chart showing that the Related Entities are subsidiaries of Looking Glass. (*Id.* ¶ 142.) Signal concedes that the Related Entities operated, in part, in markets that Signal was "exploring" but was not yet competing in. (*Id.* ¶ 7.)

## II. The Firm's Involvement

Signal alleges that its own law firm helped Jafri compete against Signal while still representing and receiving fees from Signal. Signal first engaged the Firm in 2016 to provide legal advice and services "in all general corporate matters." (*Id.* ¶ 143.) Signal and the Firm signed an engagement letter that provided in relevant part that "our firm will not be representing any of your owners, members, directors, officers, or employees unless specifically engaged to do so. Accordingly, absent a separate engagement to represent such other persons or entities, our representation of you does not create an attorney-client relationship between the firm and any other persons or entities." (Dkt. 247, Ex. 1 ¶ 1.) The Firm periodically obtained conflict waivers from Signal for representing Signal employees but never received one for Jafri. (Dkt. 247 ¶¶ 145, 147.) The engagement letter also provided that the Firm "will not be required to disclose to

4

[Signal] . . . any information our firm[] possess[es] with respect to which our firm owes a duty of confidentiality to another current or former client." (Dkt. 247, Ex. 1 ¶ 11.)

On September 29, 2017, the day after Jafri separated from Signal, she had an hour-long conversation with the four individual defendant attorneys from the Firm. (*Id.* ¶ 160.) The Firm (including all four attorneys) then helped Jafri form Looking Glass and the Related Entities, while still representing Signal, and Firm attorney Friedland served as registered agent for some of the entities. (*Id.* ¶ 170.)

While still representing Signal, the Firm also provided Jafri with legal advice about several issues. The Firm reviewed and commented on the Related Entities' contract with a software vendor. (*Id.* ¶ 128.) The Firm also advised Jafri about potential litigation. (*Id.* ¶ 125.) As Jafri explained to a prospective investor on October 3, while the Firm represented both Signal and Jafri,

> I spoke to my attorneys after our meeting. According to them, my former investors would have no legal leg to stand on and in addition, no standing to sue in the scenario we discussed earlier today; thereby any suit filed would be frivolous. My lawyers also mentioned that my previous investors likely would have no incentive to sign any agreement that I would put in front of them and it may ruffle feathers unnecessarily.

(*Id.* ¶ 125.) This investor had reached out earlier to Signal looking for investment opportunities, and Jafri told him that "[t]his deal would not necessarily be with Signal, rather the deal would be with NewCo." (*Id.* ¶ 102.) Considering her suggestion that investing in NewCo instead of Signal was an insubstantial matter of corporate form, it is reasonable to infer that Jafri misrepresented to the investor that Signal was an investor of hers, rather than her employer. The court thus infers that when she mentioned litigation with "former/previous investors," she meant Signal. Thus, taking the allegations in the light most favorable to Signal, the Firm offered Jafri advice about

potential litigation against Signal while also representing Signal. (*Id.* ¶ 125.) In turn, this advice assuaged the investor's fears and convinced him to invest. (*Id.* ¶ 103.)

Finally, on October 16, while the Firm still represented Signal, Jafri emailed Vanessa Schoenthaler a copy of Olsen's employment agreement with Signal while Olsen was still a Signal executive. (*Id.* ¶ 169.) Construing the allegations in the light most favorable to Signal, the court infers that through this email, Jafri asked Schoenthaler—while the Firm still represented Signal—to counsel her on how to poach Olsen from Signal without causing him to breach his employment agreement.

Signal also claims that the Firm lied to Signal by saying it did no work for Jafri. On October 19, 2017, Signal's in-house counsel emailed Firm attorney Friedland, worried about whether the Firm represented Jafri, whom Signal considered adverse. (*Id.* ¶ 155.) In-house counsel asked, "I need to understand . . . whether there is an attorney-client relationship (even if brief or temporary) with Farva." (*Id.*) Friedland replied on October 20 that although there was "no point in time at which we represented Farva in a manner adverse to Signal," "[i]f [Signal is] also asking the broader question of whether we represent Farva on other matters, I cannot answer that." (*Id.* ¶ 156.) A week later, on October 27, Friedland ended the Firm's representation of Signal, stating,

> Farva has asked us to represent her in matters unrelated to Signal (and, at my request, has given the ok to disclose this to you). Because I anticipate that her future endeavors may not be completely unrelated to the space in which Signal operates, I feel it necessary to choose between Signal and Farva. While not an ethical conflict, it is a business conflict which would trouble me if I were either client. In short, and with nothing but the utmost respect for you and Signal, I choose Farva."

(*Id.* ¶ 157.)

Signal alleges that the Firm knew in advance that Jafri planned to resign because while still a Signal employee she once signed a Signal deal document from the Firm's offices. (*Id.*

¶ 159.) Signal does not, however, allege that the Firm performed any work for Jafri before she resigned from Signal.

For ease of reference, the chronology of key events (taken in the light most favorable to Signal) is as follows:

| DATE | EVENT |
|---|---|
| 2016 | Firm begins representing Signal |
| September 28, 2017 | Jafri resigns from Signal |
| September 29, 2017 | Jafri meets with Firm attorneys. Firm begins representing Jafri |
| October 3, 2017 | With Firm's assistance, Jafri begins forming Related Entities |
| October 3, 2017 | Jafri tells prospective investor that Firm gave her advice about potential litigation with Signal |
| October 9–11, 2017 | Firm helps Jafri negotiate contract with software vendor |
| October 16, 2017 | Jafri emails Firm a copy of Olsen's employment agreement |
| October 19, 2017 | Signal in-house counsel asks whether Firm represents Jafri |
| October 20, 2017 | Firm responds that it does not represent Jafri in any matter adverse to Signal but cannot say whether it otherwise represents her |
| October 27, 2017 | Firm terminates representation of Signal |
| October 27, 2017 | Olsen leaves Signal |

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted. In ruling on a Rule 12(b)(6) motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011); *Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also establish that the requested relief is plausible on its face. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009); *Bell Atl.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007). The allegations in the complaint must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955. At the same time, the plaintiff need not plead legal theories; it is the facts that count. *Hatmaker* v. *Mem'l Med. Ctr.*, 619 F.3d

741, 743 (7th Cir. 2010); *see also Johnson* v. *City of Shelby*, 574 U.S. 10, 135 S. Ct. 346, 346 (2014) (per curiam) ("Federal pleading rules call for a short and plain statement of the claim showing the pleader is entitled to relief; they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.").

ANALYSIS

I. **The Firm's Motion (Dkt. 249)**

A. **Malpractice (Count 8)**

In order to state a claim for legal malpractice under Illinois law, which the parties agree controls here, a plaintiff must allege (1) the existence of an attorney-client relationship, (2) a breach of a duty, (3) proximate cause, and (4) damages. *Hefferman* v. *Bass*, 467 F.3d 596, 600 (7th Cir. 2006). The Firm acknowledges that it had an attorney-client relationship with Signal but argues that it neither breached any duty nor proximately caused any damages. Though the Illinois Rules of Professional Conduct do not create private rights of action, they "may be relevant to the standard of care in a legal malpractice suit." *Nagy* v. *Beckley*, 578 N.E.2d 1134, 1138, 218 Ill. App. 3d 875 (1991). Most relevant here, the Rules provide that attorneys have a duty generally not to represent a client if they have a "concurrent conflict of interest," which exists if "the representation of one client will be directly adverse to another" or "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client[.]" Ill. Sup. Ct. R. Prof. Conduct 1.7(a).[3]

The Firm breached its duty to Signal because it advised Jafri on two matters directly adverse to Signal. First, on October 3, 2017, the Firm advised Jafri about potential litigation

---

[3] The Rule permits clients to waive these conflicts under certain circumstances, *see* Ill. Sup. Ct. R. Prof. Conduct 1.7(b), but there is no suggestion that Signal could have or did.

8

against Signal, while still representing Signal. Second, on October 16, 2017, Jafri emailed Schoenthaler a copy of Olsen's employment agreement, also while the Firm represented Signal. Shortly after that, Olsen left Signal and joined Jafri's venture. From these allegations, the court may reasonably infer that the Firm gave advice to Jafri about potential litigation against Signal and how best to poach Signal's employee. These were both "directly adverse." Ill. Sup. Ct. R. Prof. Conduct 1.7(a)(1). Just as the Firm could not represent both Signal and Jafri in a lawsuit over Jafri's poaching the investor and Olsen, it could not advise both sides as the poaching unfolded. *Hoagland ex rel. Midwest Transit, Inc.* v. *Sandberg, Phoenix & von Gontard, P.C.*, 385 F.3d 737, 744 (7th Cir. 2004) ("An attorney's throwing one client to the wolves to save the other is malpractice.").

The Firm responds that it was merely representing economic competitors in unrelated matters. "[S]imultaneous representation in unrelated matters of clients whose interests are only economically adverse, such as representation of competing economic enterprises in unrelated litigation, does not ordinarily constitute a conflict of interest . . . ." Ill. Sup. Ct. R. Prof. Conduct 1.7 cmt. 6. But because Signal alleges two clear incidents where a conflict was present, it has shown more than "representation in unrelated matters."

Signal also plausibly demonstrates that the Firm's conflict of interest caused Signal's injuries. "The proximate cause element of this claim requires that the plaintiff must plead facts sufficient to show that, but for the attorney's malpractice, the client would have been successful in the undertaking the attorney was retained to perform." *Owens* v. *McDermott, Will & Emery*, 736 N.E.2d 145, 155, 316 Ill. App. 3d 340 (2000). Signal alleges that the Firm caused seven types of damages: 1) Fees Signal paid to the Firm; 2) Fees Signal owes but did not pay to the Firm; 3) Loss of investors; 4) Loss of clients; 5) Loss of "other business opportunities"; 6) Loss

of misused and misappropriated funds; and 7) The costs of prosecuting this action. The second category contains no damages, as Signal cannot recoup what it never paid. As to the seventh category, in the American legal system, "[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *Baker Botts L.L.P.* v. *ASARCO LLC*, — U.S. —, 135 S. Ct. 2158 (2015). Signal's citations of cases permitting malpractice plaintiffs to recoup fees that they spend correcting former attorneys' errors are inapposite because Signal does not allege having had any such expense. *E.g.*, *Nettleton* v. *Stogsdill*, 899 N.E.2d 1252, 1258, 387 Ill. App. 3d 743 (2008).

Signal plausibly alleges causation for its remaining categories of damages. Jafri emailed the investor that her attorneys assured her that Signal would have no grounds to sue. Implicit in this email is the premise that the investor was concerned about a lawsuit, and it is plausible that the Firm's advice ensured he invested in Jafri instead of Signal. Similarly, Signal plausibly claims that the Firm's advice about Olsen's employment contract helped Jafri recruit Olsen. Finally, Signal also plausibly claims that the Firm's conflict caused Signal to pay the Firm fees it should not have paid. The Firm argues that a client can never recoup the fees it paid to conflicted counsel, but it can. *Hoagland*, 385 F.3d at 744 (7th Cir. 2004) (holding that disgorgement is a common equitable remedy that a plaintiff may plead in a malpractice claim).[4] Signal must still prove that Signal paid the Firm for work that was plausibly affected by the conflict of interest. *See Universal Mfg. Co.* v. *Gardner, Carton & Douglas*, 207 F. Supp. 2d 830, 834 (N.D. Ill.

---

[4] The court disagrees with the Firm's interpretation of *Hoagland*. The Seventh Circuit did not, as the Firm contends, "reject an argument that a law firm should 'be required to rebate ("disgorge") the fees.'" (Dkt. 283 at 13 (quoting *Hoagland*, 385 F.3d at 744).) In *Hoagland*, the plaintiff's malpractice claim failed for lack of an expert on the professional standard of care. 385 F.3d at 743–44. The plaintiff responded that he did not need an expert because his claim did not sound in malpractice (a common-law tort) because he sought restitution (an equitable remedy). *Id.* at 744. The Seventh Circuit disagreed, holding that malpractice claims may indeed seek disgorgement as a remedy. *Id.* at 744–45.

2002) (holding plaintiff cannot disgorge fees unrelated to alleged conflict). Here, Signal has shown that it paid the Firm to "advis[e] Signal on the best course of action for dealing with unhappy employees" while simultaneously helping a competitor who was poaching a Signal employee. (Dkt. 247, Ex. 2 at 1–2.)

The motion to dismiss Count 8 is therefore denied, though Signal cannot claim as damages its fees for prosecuting this action or fees it never paid to the Firm.

### B. Breach of Contract (Count 9)

Signal alleges that the Firm breached its retention agreement with Signal by representing Jafri. "To bring a successful breach of contract claim under Illinois law, a party must show '(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages.'" *nClosures Inc.* v. *Block & Co.*, 770 F.3d 598, 601 (7th Cir. 2014) (citation omitted). The parties agree that the retention agreement is a valid and enforceable contract. They dispute the meaning of the following clause: "our firm will not be representing any of your owners, members, directors, officers, or employees unless specifically engaged to do so." (Dkt. 247, Ex. 1 ¶ 1.) Signal argues that through this clause, the Firm promised never to represent agents of Signal without Signal's express permission. The Firm argues that it merely defines the scope of its relationship with Signal.

But because the Firm never represented an owner, member, director, officer, or employee of Signal, Signal's claim fails under both interpretations. Jafri resigned on September 28, 2017 and, construing the complaint in the light most favorable to Signal, spoke with the Firm about her own venture for the first time on September 29, 2017. Although Signal attempted to bring Jafri back into the fold for long enough to transition her duties, it never did; she thus was not an "employee" at any time when the Firm represented her. Moreover, Signal fails to demonstrate

11

that Jafri engaged the Firm before resigning. Signal alleges that Jafri once came to the Firm's offices while on Signal business. But the Court cannot reasonably infer from this that she formed her own attorney-client relationship during that visit.

Because the Firm never represented a Signal employee, it did not breach that provision of the contract even under Signal's proposed interpretation. Signal correctly observes that the agreement required the Firm not to undertake representation adverse to Signal, which as discussed above, Signal plausibly alleges the Firm did.

The motion to dismiss Count 9 is therefore denied, but the claim is limited to being exclusively in the alternative to Count 8. *See Collins* v. *Reynard*, 607 N.E.2d 1185, 1186, 154 Ill. 2d 48 (1992) ("[A] complaint against a lawyer for professional malpractice may be couched in either contract or tort and . . . recovery may be sought in the alternative.").

### C. Breach of Fiduciary Duty (Count 10)

The Firm argues that the breach of fiduciary duty count duplicates the malpractice count. Acknowledging that Illinois law prohibits claiming legal malpractice and breach of fiduciary duty based on the same facts, Signal argues that its breach of fiduciary duty claim instead rests exclusively on the single alleged misrepresentation in Friedland's October 20, 2017 email to Signal's in-house counsel.

The claim is duplicative no matter which way Signal slices it. As Signal concedes, the fiduciary duty claim would duplicate the legal malpractice claim if it challenged the Firm's decision to represent Jafri and Signal simultaneously. *See Brush*, 783 N.E.2d at 81 ("Illinois courts have repeatedly rejected breach of fiduciary duty claims brought against attorneys on the basis that they are duplicative of . . . malpractice claims."). But if the claim challenges only the alleged misrepresentation, as Signal asks the court to construe it, it duplicates the fraudulent

misrepresentation claim. Similarly, if the claim challenges the Firm's failure to disclose that it represented Jafri in any capacity, it would duplicate the fraudulent concealment claim, which embraces nondisclosures that the defendant had a duty to disclose. *Vandenberg* v. *Brunswick Corp.*, 90 N.E.3d 1048, 1056, 2017 IL App (1st) 170181, ¶ 31.

Finally, Signal argues that it may plead claims in the alternative, citing *Collins* v. *Reynard*, 607 N.E.2d at 1186. But *Collins* holds that a plaintiff may plead legal malpractice and breach of contract in the alternative, not that a plaintiff may plead in the alternative *any* two claims against a law firm. *Id*. Because Signal alleges that the Firm breached both a fiduciary duty of loyalty and a professional standard of care by representing adverse parties simultaneously, the fiduciary duty claim is duplicative, not alternative. The same is true if Signal alleges that the Firm both breached a fiduciary duty of candor and made a fraudulent misrepresentation or omission by making the same statement.

Because Count 10 duplicates either Count 8 or Count 11, it is dismissed with prejudice.

**D.     Fraud (Count 11)**

    **1.     Fraudulent Misrepresentation**

To state a claim for fraudulent misrepresentation, Signal must allege "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induces the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Tricontinental Indus., Ltd.* v. *PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841–42 (7th Cir. 2007).

Signal argues that Friedland made a false statement when he denied on October 20 that the Firm represented Jafri in any matter adverse to Signal. The Firm argues that the statement

13

was truthful. But, as explained above, Signal plausibly shows that the statement was false because, in the weeks before Friedland made the statement, the Firm advised Jafri about potential litigation against Signal and Olsen's employment agreement, matters directly adverse to Signal.

The Firm also argues that Signal has not shown reliance. Signal alleges that its in-house counsel told the Firm that it had "grave concern about Farva's tenure" and demanded to know whether the Firm had a relationship with her. (Dkt. 247 ¶ 155.) Signal then alleges that it did not terminate the Firm based on Friedland's denial. (*Id.* ¶ 295.) This sequence is plausible: had Friedland said that the Firm represented Jafri, Signal plausibly would have fired the Firm. Signal thus plausibly alleges that the misrepresentation caused Signal to pay attorneys' fees it might otherwise not have paid.

But Signal does not show any other kind of reliance on this statement. Signal claims to have been "delayed and impeded" in uncovering Jafri's torts because Friedland said that the Firm did not represent her, but there is no logical connection between the two. It is unreasonable to infer that Signal stopped investigating whether Jafri had stolen trade secrets once it heard that the Firm did not represent her (in some matters).

The motion to dismiss is denied as to the fraudulent misrepresentation component of Count 11. Damages are limited to the fees Signal paid to the Firm after the alleged misrepresentation on October 20, 2017.

### 2. Fraudulent Concealment

Friedland plausibly made a false statement when he denied representing Jafri in matters directly adverse to Signal. But when asked whether the Firm represented Jafri at all, Friedland expressly refused to answer, which is not a denial and therefore not false. (Dkt. 247 ¶ 157 ("If you are also asking the broader question of whether we represent Farva on other matters, I

cannot answer that.").) Lacking a false statement, Signal instead alleges that Friedland's refusal to divulge that the Firm represented Jafri on matters not directly adverse to Signal constituted fraudulent concealment. Fraudulent concealment, however, requires that "there exists a duty to speak." *Vandenberg* v. *Brunswick Corp.*, 90 N.E.3d 1048, 1056, 2017 IL App (1st) 170181, ¶ 31. The Firm did not have a duty to disclose unconflicted representations of other clients; to the contrary, Signal agreed that the Firm would not disclose other clients' confidences. (Dkt. 247, Ex. 1 ¶ 11.) The fraudulent concealment portion of Count 11 is therefore dismissed.

### E. Punitive Damages

Finally, the Firm moves to strike all claims for punitive damages. Under Illinois law, "In all cases, whether in tort, contract, or otherwise, in which the plaintiff seeks damages by reason of legal . . . malpractice, no punitive, exemplary, vindictive or aggravated damages should be allowed." 735 Ill. Comp. Stat. 5/2-1115. Confronted with this statute in an earlier motion to dismiss, Signal amended its complaint to remove requests for punitive damages on its claims for legal malpractice (count 8) and breach of contract (count 9). But it still seeks punitive damages on its claim of fraudulent misrepresentation (count 11) (and breach of fiduciary duty, which the court dismisses with prejudice).

The remaining request for punitive damages against the Firm must be stricken. "[T]he availability of punitive damages depends on whether plaintiffs' breach of fiduciary duty claim falls within the rubric of malpractice. . . . [T]he court must look to the 'nature of the behavior alleged' in plaintiffs' complaint to 'determine whether the activities fall within the term legal malpractice." *Brush* v. *Gilsdorf*, 783 N.E.2d 77, 80–81, 135 Ill. App. 3d 356 (2002). Similarly, Section 2-1115 "also applies to intentional fraud arising from the provision of legal services." *Calhoun* v. *Rane*, 599 N.E.2d 1318, 1323, 234 Ill. App. 3d 90 (1992).

Here, as in *Brush*, because Signal alleges that it was injured "by reason of the attorneys' professional conduct during the course of legal representation, the gravamen of the claim is legal malpractice, regardless of which theory or claim has been pled." *Id.* Signal argues that the Firm committed fraud by Friedland's denying that the Firm represented Jafri. But the first argument Signal marshals to show that this email constituted fraud is, tellingly, that the email violated the Illinois Rules of Professional Conduct. (Dkt. 275 at 10.) That point typifies Signal's claims, which rest on the quality of the Firm's representation of Signal after the Firm denied representing Jafri, rather than duties independent of its role as counsel.

The request for punitive damages in Count 11 is stricken, and Signal may not replead any other claims for punitive damages against the Firm.

## II. The Related Entities' Motion (Dkt. 253)

The Related Entities allege that the Second Amended Complaint does not plausibly show that they are liable for any of Jafri's alleged wrongdoing. They emphasize in particular that Signal did not compete in the same market as the Related Entities. Signal responds that the Entities are responsible for all of Jafri's actions under *respondeat superior*.

Signal has alleged sufficient facts to claim plausibly that the Related Entities are liable for Jafri's actions. For the Related Entities to be liable under *respondeat superior*, Signal must show: 1) An agency relationship existed; 2) the Related Entities controlled or had the right to control Jafri's conduct; and 3) Jafri's conduct fell within the scope of the agency relationship. *Wilson* v. *Edward Hosp.*, 981 N.E.2d 971, 978, 2012 IL 112898. Signal alleges that Jafri was not only the Related Entities' owner, but also their "chief administrative officer." (Dkt. 247 ¶ 139.) Jafri solicited investors on behalf of the Related Entities, mentioning them by name in her investor presentation and therefore plausibly acting at their behest and within the scope of her

16

relationship with them. (*Id.* ¶¶ 140–42.) Thus, Signal does not allege mere guilt by association; the Related Entities, along with Looking Glass, were the entities for whose benefit Jafri stole trade secrets and breached her fiduciary duties.

The Related Entities' motion to dismiss is therefore denied.

### III. Olsen's Motion (Dkt. 254)

Olsen moves to dismiss under Rule 12(b)(6) but does not argue that the complaint fails to state a claim. Rather, he argues that although the Second Amended Complaint states a claim against him, the First Amended Complaint did not, estopping Signal from suing him.

"It is axiomatic that an amended complaint supersedes an original complaint and renders the original complaint void." *Flannery* v. *Recording Indus. Ass'n of Am.*, 354 F.3d 632, 638 n.1 (7th Cir. 2004). Thus, "where the original complaint and an amended complaint contain contradictory or mutually exclusive claims, only the claims in the amended complaint are considered; the contradicted claims in the original complaint are knocked out." *Scott* v. *Chuhak & Tecson, P.C.*, 725 F.3d 772, 783 (7th Cir. 2013); *see also Nisbet* v. *Van Tuyl*, 224 F.2d 66, 71 (7th Cir. 1955) (rejecting defendant's argument that admissions in original complaint estopped later amendment). Olsen relies on *Soo Line Railroad Co.* v. *St. Louis Southwestern Railway Co.*, 125 F.3d 481 (7th Cir. 1997), which does not apply here. *Soo Line* holds that admissions in the *operative* complaint that show the claims to be time-barred bind the plaintiff. *Id.* at 483.

Even if an earlier complaint could estop a later one, it would not in this case. Signal originally claimed not that Olsen was innocent but that without discovery it could not determine whether Olsen was part of Jafri's schemes. (Dkt. 184 ¶ 69.) Signal then took discovery and now has sufficient information to allege consistently with Rule 11 that Olsen knowingly participated in torts against Signal.

17

Olsen's motion to dismiss (dkt. 254) is denied.

**ORDER**

The motion of Sugar Felsenthal Grais & Helsinger LLP, Jonathan P. Friedland, Vanessa J. Schoenthaler, Etahn M. Cohen, and Elizabeth B. Vandesteeg to dismiss (dkt. 247) is granted in part and denied in part. The motion to dismiss Counts 8 and 9 is denied. Count 10 is dismissed with prejudice. The motion to dismiss Count 11 is granted as to fraudulent concealment and denied as to fraudulent misrepresentation, as to which the request for punitive damages is stricken. The motion of Pinnacle Structures LLC, Looking Glass Legal LLC, Pinnacle Disability LLC, and Looking Glass Partners LLC (dkt. 253) is denied. Michael Olsen's motion to dismiss (dkt. 254) is denied.

Date: December 2, 2019

_____
U.S. District Judge Joan H. Lefkow