IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SIGNAL FINANCIAL HOLDINGS LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 17 C 8816 |
| | ) | |
| LOOKING GLASS FINANCIAL LLC, *et al.*, | ) | Hon. Joan Humphrey Lefkow |
| | ) | |
| Defendants. | ) | |

MOTION TO VACATE 1/31/18 PRELIMINARY INJUNCTION ORDER AND OPINION
BY MOVING DEFENDANTS
(DEFENDANTS LOOKING GLASS FINANCIAL LLC, LOOKING GLASS PARTNERS LLC,
LOOKING GLASS LEGAL LLC, PINNACLE DISABILITY LLC,
PINNACLE STRUCTURES LLC, MICHAEL OLSEN AND FARVA JAFRI)

Defendants Looking Glass Financial LLC ("LGF"), Looking Glass Partners LLC, Looking Glass Legal LLC, Pinnacle Disability LLC, Pinnacle Structures LLC (collectively "the LLCs"), Michael Olsen and Farva Jafri (all together the "Moving Defendants") respectfully move this honorable Court to vacate the preliminary injunction entered in favor of Plaintiffs' Signal Financial Holdings LLC and Signal Funding LLC's ("Signal") on January 31, 2018 (Dkt. 79) and in support state the following:

<u>Plaintiffs' Data from the Slide Deck is Stale, Rendering it Obsolete and Useless, and
Defendants Are No Longer in the Business of Pre-Settlement Funding.</u>

1. The Court held a preliminary injunction evidentiary hearing, starting on January 18, 2018, over two years ago. The slide deck that was the subject of that hearing (Plaintiffs' Sealed Exh. F), originated from a slide deck created by Oasis Legal Finance LLC ("Oasis"), the largest consumer legal funding company in the United States. The Oasis slide deck was used as a template by Signal (thereby triggering the October 24, 2016 filing of a trade secrets theft case in the Circuit Court of Cook County, Illinois, *Oasis Legal Finance Operating Company LLC v. Signal Funding*

1

*LLC, et al.,* No. 2016-CH-13882, a case that is ongoing but out of which Signal extricated itself by settlement on January 2, 2018. Jafri adapted and used Signal's version of Oasis' slide deck as a template for her start-up litigation settlement funding business in September 2017.

2. Plaintiffs drafted the slide deck in 2016, with the help of Jafri, Olsen and founder of both Oasis and Signal, Gary Chodes; Chodes founded Signal three years after leaving Oasis. The Signal slide deck at issue in this action is now four years old. During a hearing on May 9, 2018 before Judge Lefkow, Plaintiffs' counsel stated, "Now I raised settlement earlier in this case. And I can tell you that my client is interested in getting this resolved. So we're going to move as quickly as we can to do this discovery." (Exhibit A hereto, Tr. 5/9/18 hearing, p. 7).

3. Two years later, Plaintiff's counsel has abandoned his pretext to the Court of needing discovery before he could even discuss settlement with Jafri and her entities, but has expanded this litigation hydra-like from two original defendants to 12 defendants. Instead of the relatively simple original case, that sought purely injunctive relief limited to Signal's 2016 slide deck, Plaintiffs' counsel has grafted on a new damages suit in a second amended complaint (Dkt. 247) that added four new counts, against former attorneys for Jafri and Signal, four counts that nowhere name Jafri or the LLCs as defendants. Jafri regrets to inform the Court that Plaintiffs' representations to the Court almost two years ago to the day were false, and knowingly so. Plaintiffs' have never initiated or responded to any of Jafri's settlement initiatives except with blanket rejection. Plaintiffs have no intention of ever settling this case, but only of keeping the case pending as long as the Court will permit.

4. Plaintiffs have persisted in their no-settlement strategy (while falsely assuring the Court that they could not meaningfully try to settle with Jafri until they pursued discovery) in complete (but concealed) indifference to the Court's reasonable settlement conference suggestion at that self-same May 9, 2018 hearing: "I would ask that you think seriously about going to the magistrate

judge, as Mr. Stang suggests…sometimes they're creative and independent insight can be very helpful" (Exhibit A, Tr. 5/9/18 hearing, p. 7). Mr. Stang withdrew as counsel shortly after this hearing, on May 16, 2018 (Dkt. 131), after Jafri candidly informed him that Looking Glass' cash reserves had been totally depleted and she could no longer pay for the expense of ongoing, protracted litigation (as distinguished from paying for short-term legal services incurred in crafting and drafting an expeditious settlement).

5. Undersigned counsel, as a *pro se* litigant, did approach Plaintiffs' counsel to renew settlement discussions (Exhibit B hereto, Jafri 05/24/18 email to Constantine Gekas). Despite the Court's common-sense recommendation, Plaintiffs' counsel has consistently refused to discuss settlement (Exhibit C hereto, 05/30/18 Gekas reply email to Jafri), other than to state Plaintiffs' continuing, obstinate refusal to engage in any such discussions. The slide deck at the core of this case is stale at best and completely irrelevant at worst. Plaintiffs have no intention of settling this case, now or ever. Plaintiffs do, however, intend to misuse this litigation as a cynical vehicle by which to (i) subpoena numerous individuals for fishing expedition depositions, (ii) destroy all of Defendants' business interests (even those that never had anything to do with the Oasis or Signal slide decks in the first place), and (iii) block or derail Jafri's incipient new career as a litigation attorney rather than a litigation funder (discussed below).

6. Plaintiffs have weaponized and are shamelessly exploiting the Court's 1/31/18 preliminary injunction order as a permanent angry Scarlet Letter, not an "A" for Adulteress but a

large capital "T" for "THIEF," not *sewn* on Jafri's *blouse*, but *branded* on her *breast*.[1]

7. There is no threat now or in the future that any of the Moving Defendants will use a four-year-old slide deck to raise capital or even use it as a reference tool. In fact, Defendants Looking Glass Legal LLC and Farva Jafri have not been in the business of originating new pre-settlement funding deals since July of 2018. The remaining LLC defendants have *never* been in the business of pre-settlement funding. In fact, Looking Glass Partners LLC and Looking Glass Financial LLC have been dissolved. Defendant Olsen also is not in the business of pre-settlement funding and thus has no litigation funding clients. Defendant Jafri is a full-time litigator, not just in this action, but in other cases, including a group libel action pending before Judge Kennelly.

8. Although Defendants are under no legal obligation to refrain from competing in the field of pre-settlement funding (Jafri and Olsen never entered into any "non-compete" with Signal, nor did Signal ever request Jafri or Olsen to do so), they presently have no intention of re-entering the field of pre-settlement funding. If they were to enter the field of pre-settlement funding, there is no threat to Plaintiffs that the Moving Defendants would use stale data from four years ago. Indeed, Signal itself tasked Juan Arciniegas to use fresh data for his financial analysis, less than one-year old, when the slide deck at issue in this case was created in 2016. If one were to inquire of Plaintiffs' counsel on the record, "Is Signal still using the slide deck in the form it appears in Plaintiffs' Sealed Exhibit F, with the same 2016 data analyzed by Mr. Arciniegas," the only truthful response would

---

[1] Jafri, of course, is no thief at all. She will regret for the rest of her life having made a copy of the Oasis/Signal slide deck for use as a template in September 2017, when she was 29 years old and so busily engaged in setting up Looking Glass that she foolishly and naively exposed herself to the depredations of Signal and its counsel for years, rather than take ten hours to create a slide deck from scratch. But Jafri has truthfully admitted to copying the slide deck in and out of court, and never did anything to try to "cover" her "tracks." Jafri has paid the price of hundreds of thousands of dollars of legal expense, hundreds of hours of lost time, the destruction of her businesses, and now, Plaintiffs' counsel's attempt to abort her new career aspiration of becoming a litigation attorney. Jafri makes no pretension to being a Jean Valjean, but Plaintiffs' counsel has become a 21st Century Inspector Javert, far more relentless and obsessed with ceaseless punishment of his quarry than the fictional one. Only this Court has the power to save Jafri, Olsen and the LLCs from a cruel fate, and they beseech the Court to use its authority to terminate this "litigation without end" that Plaintiffs' counsel seeks to inflict on Jafri, Olsen, the LLCs and the Court.

be, "No, your Honor, Signal is no longer using that slide deck for any marketing purposes."

The Court Found in May 2018 that Just Two Pages
of the 30-page Slide Deck Ever Constituted a Trade Secret.

9. The preliminary injunction evidentiary hearing was held over two years and three months ago. It is vital to point out that the Court found that at the most, three pages of the slide deck that kicked off this lawsuit were trade secrets. The Court stated, "It is undisputed that the slide deck contains, in part, **publicly available information**, including citations to where that information originated" (1/31/18 Order and Opinion, Dkt. 79, p. 5). The Court also noted that, "**information taken from public sources** was cited to in footnotes in the slide deck" (*Id.*) That publicly available information, taken from "public sources" (*e.g.*, AM motor vehicle accident/bodily injury claims payout data from 2007 through 2010, contained within page 7 of both the May 2017 Signal slide deck and LGF's slide deck, respectively attached as Plaintiffs' Sealed Exhibits F and G to the Declaration of David Hough), is more than ten years old. In no way is that information "protectable" or valuable to Plaintiffs or any other rational actor within the pre-settlement funding industry.

10. The sole trade secret in the entire Signal slide deck, specifically identified by the Court as such, consisted of financial calculations performed by Juan Arciniegas.[2] The Court stated, "Arciniegas testified that he calculated potential returns under different market scenarios and included his results in the slide deck in an effort to entice potential investors to commit capital to Signal." (1/31/18 Order and Opinion, Dkt. 79, p. 5). Though Jafri knew that Arciniegas' financial analysis was included in the slide deck, she also knew that when the slide deck was created, Signal had no historical numbers on which to base any projections. Signal had only been a month old and

---

[2] Arciniegas relied primarily on Chodes' and Olsen's expertise from Oasis along with an Oasis model that Chodes had brought with him to Signal from Oasis. Arciniegas had no previous exposure to the field of pre-settlement funding. The projections he created were based on Oasis' numbers (Exhibit D hereto, August-September 2016 email thread between Chodes, Jafri, Olsen, Steve Pasko and Arciniegas). Chodes emailed Arciniegas the Oasis model, which Arciniegas used to build the Signal model. The Signal model was then used for Arciniegas' financial analysis. All of the data behind these calculations stemmed from Chodes and Olsen's former employer, Oasis.

did not even begin funding when the deck had been built. Arciniegas' financial analysis was derived from information that came from Oasis. In Arciniegas' email to Jafri, with the subject, "Re: Oasis (*not Signal*) Financial Model," Arciniegas asks Jafri,

> To use August as an example, there is a total of 238 applications, which at $1,700 per gets you to $404,549 of total fundings for the month. To make sure I get how this works, if the average length of collections is 18 months and the average multiple 2.3x, does this mean that 18 months from August you collect the $405,549 back and book revenue of $527,214 (=1.3 x $405,549)? If this is true does it mean we don't book any revenue for the first 18 months of the projection period? Any other revenues that are booked over the life of the funding?

(Exhibit D hereto, 9/3/16 Arciniegas email to Jafri).

11. Signal Funding had opened its doors for the first time ever on July 25, 2016. Signal did not start funding until September of that same year. Arciniegas' email refers to his use of Oasis data to form financial projections for Signal, a competitor in the legal funding arena. When Arciniegas uses "August as an example" in his email quoted above, his example is coming from Oasis, not Signal, a company in its nascent stages at the time. Oasis has existed for almost two full decades and is the 900-pound gorilla of the litigation pre-settlement funding industry. Signal used Oasis' data to get a head start on Signal's business in competition with Oasis. Although Arciniegas completed his financial analysis for Signal, he did so with "borrowed" data.

12. The Court found, in its interlocutory (and thus non-final) Order and Opinion (Dkt. 79), that Arciniegas' two-page analysis was a trade secret. However, if any of Plaintiffs' complaint against Jafri survives even to a motion for summary judgment, let alone a trial, Jafri will offer into evidence more emails to debunk Signal's claims that it has a true proprietary interest in its two-page financial analysis; the only component of the deck found by the Court to be proprietary at all. Arciniegas, testified that, "[t]here [are] definitely some, -- a lot of conclusions and observations that come from *your own judgment* that are not found in the public domain" (Exhibit E, p. 86; Tr., 1/18/18, Arciniegas' Direct) (emphasis added). Arciniegas stated that there is information not in the public

6

domain that he uses to create his financial analysis but did not once candidly disclose his use of Oasis' information as a basis for his numbers. And yet, it is clear from the emails back and forth between Chodes, Olsen, Arciniegas, Pasko and Jafri that Arciniegas was not purely drawing from his own judgment. Chodes addressed Arciniegas directly in his email on August 31, 2016, before Signal ever started funding (Exhibit D hereto). The email contains Oasis' financial model as an attachment from October 2012, a year before Chodes had been terminated by Oasis. There was no confusion as to Chodes' instruction to Arciniegas: build a Signal model that replicates Oasis' model.

13. At the time Jafri used the slide deck as a template in 2017, the Arciniegas-analyzed information was less than a year old. During a June 5, 2018 hearing before this Court, when the parties were only six months into the litigation, the Court stated,

> But if it's true that Ms. Jafri and her company are pretty much out of money, you know, then are we not over-litigating something? Besides that fact, you know, business plans and operations change very rapidly, and this is now six months old at least. So is it really that critical that you have all this information returned to you?

(Exhibit F hereto, Tr. 6/5/18 Proceedings, p. 6). The Court made the point that Signal's slide deck data was potentially starting to get stale *six months into the proceedings*. Now, the parties are <u>over two years into the proceedings</u>. The slide deck data is at least four years old, and could actually be eight years old (due to the fact that Arciniegas used Oasis' data from Oasis' 2012 financial model). Accordingly, the solitary two pages of Arciniegas' analysis that were specifically found by the Court to constitute a trade secret in January 2018, two years and four months ago, can no longer be properly treated as a trade secret. Accordingly, the preliminary injunction should be vacated.

> Chicago Attorneys Constantine Gekas and Mitchell Frazen Are Engaged in a Joint Effort to Mischaracterize and Misuse Judge Lefkow's Orders in this Case to Impact Another <u>Federal Court Case and Destroy Jafri's New Career as a Litigator</u>

14. Jafri has been engaged by two Jewish libel plaintiffs, metro Chicago-based attorneys, Mark Stang and Stuart Cohn, as second-chair counsel in Stang and Cohn's lawsuit in this Federal Court against the Union for Reform Judaism ("URJ") and the URJ's senior officers. The

7

case is pending before the Honorable Matthew Kennelly (*Stang et al. v. URJ et al.*, No. 20 C 757).

15. The complaint (Dkt. 1) in *Stang v. URJ, et al.* was filed on February 2, 2020 against the URJ and the URJ's president, Rabbi Richard "Rick" Jacobs, and vice-president, Rabbi Jonah Dov Pesner, for their group libel of American Jews, imputed to the plaintiffs, as racists and knowing exploiters of the "rewards of racism" and "white privilege," in the *Chicago Tribune* in December 2019 and continuously since that time on the URJ's own website.

16. In response to the complaint, on March 18, 2020 the URJ Defendants filed a Rule 12(b)(6) motion to dismiss for failure to state a claim. Defendants attached to their supporting memorandum, as an exhibit, an article from the *Chicago Daily Law Bulletin*, breaking the story of the filing of Stang and Cohn's group libel lawsuit (Dkt. 8, Exhibit D thereto). Defendants' memorandum in support of its motion to dismiss contained three Rule 3.3(a)(2) violations detected and brought to Stang's attention by Jafri. Jafri (who is a Shiite Muslim, not Jewish) entered her amended appearance in *Stang et al. v. URJ, et al.* on April 28, 2020 (Dkt. 15), to assist Plaintiffs in *Stang v. URJ*, including serving as Stang's second chair at the jury trial of the case.

17. On April 27, 2020, Plaintiffs in *Stang v. URJ* filed a memorandum in opposition to Defendants' motion to dismiss (Dkt. 13). The very next day, April 28, 2020, counsel for Defendants, Mitch Frazen, sent an email to Stang and Jafri, devoting seven of the email's eight paragraphs to insulting, derisive, and mocking assertions and comments about Jafri's role and actions in this case and an alleged episode in Jafri's personal life (Exhibit G hereto). Attorney Frazen unleashed this wild pack of defamatory assertions about and at Jafri just four days after she filed her appearance (and *prior* to Frazen learning that Jafri had spotted and reported Frazen's Rule 3.3(a)(2) violations to Stang). Frazen's insulting, hostile litany of written disparaging remarks about Jafri predominantly focused on orders entered by this Court in this *Signal v. Looking Glass* action. Jafri has never met or had any written or oral communications with attorney Frazen in her entire life. In

8

fact, she did not even sign the *Stang* plaintiffs' memorandum in opposition to Defendants' Rule 12(b)(6) motion to dismiss that purportedly "amused" Frazen (as Frazen stated in his email (Exhibit G hereto)); Stang himself signed the response. Like the Japanese attack on Pearl Harbor, Frazen's attack on Jafri was unprovoked, driven by malice, and intended to deliver a "knockout punch" to Jafri, at least to her now-intended career as a litigator.

18. But Frazen's April 28, 2020 email was not only hostile and disparaging, it contained a blatant misstatement about procedural events in this Court, to falsely defame Jafri in the *Stang v. URJ* case. In Frazen's email, he wrote, "she has been cited by the judge in that case [*i.e the Honorable Joan Lefkow*] for her own 'lack of candor with the court' on that issue (i.e. attorney Gekas' accusations that Jafri was using a "ghost writer" for her court papers in the *Signal v. Looking Glass* case) (Minute Entry January 28, 2020, Docket No. 311)." (Exhibit G hereto, second paragraph). In a glaring and misleading omission, Frazen does not disclose in his email that this very finding of purported "lack of candor" was the subject of an immediate motion to reconsider, vacate and strike by Jafri (Dkt. 340) which motion was granted by this Court and the finding of "lack of candor" vacated (Dkt. 344).

19. Frazen's unprovoked and vicious attack on Jafri gives rise to an important question. How and why did attorney Frazen get so up to speed (albeit not enough to avoid mischaracterizing and misrepresenting this Court's rulings) about this *Signal v. Looking Glass* action? Frazen launched his attack on Jafri just four days after he learned of her existence, through her appearance in the *Stang v. URJ* case. This case has over 400 docket entries, so it would have been a monumental task, akin to building Rome in a year, for Frazen to unilaterally immerse himself in this case and become conversant with its findings, rarely described in docket entries. Someone briefed Frazen about this Court's rulings adverse to Jafri (either briefed Frazen incompletely and misleadingly or he chose to reveal only part of the information received from his informant). Only one person was

9

in a position and had the motivation to lead attorney Mitch Frazen down the poison-oak strewn mud-path of repeatedly falsely-defaming Jafri; the pathologically vindictive Inspector Javert of this case: **Constantine "Chris" Gekas.**

20. On Friday, May 1, 2020, Mr. Stang responded to Frazen's email, criticizing Frazen for his meritless attacks on Jafri and his obvious collaboration with Gekas to attempt to force Jafri's withdrawal from the *Stang v. URJ* case and destroy her career as a litigation attorney at its inception. (Exhibit H hereto). Frazen responded on May 6, 2020 with an email directed solely to Stang (Exhibit I hereto), whose first sentence was a textbook example of evasion and obfuscation to avoid admitting or denying Stang's assertions about Frazen's brazen misconduct, including his misuse of this Court's orders in collaboration with Constantine Gekas to falsely defame Jafri.

21. Undersigned counsel is attempting to embark upon a career as a litigator. If successful in that effort, she has no present intention of ever again pursuing a career in litigation funding (which Jafri has discovered during the past 2 ½ years is not nearly as intellectually challenging as civil litigation and which industry does not require even its leaders to have a law degree). Gekas and Frazen have joined forces, like wild dogs cooperating in pursuit of their prey, to misuse this lawsuit not only as a vehicle to stalk and harass Jafri through her new career as a litigator, but also as a way to misrepresent this Court's rulings in a wholly false light in service of their malicious mission: the reputational destruction of Jafri and anyone who happens to affiliate with or befriend her.

22. The preliminary injunction is no longer necessary, if it ever was, for any legitimate purpose. Moreover, it is doing more harm to the Moving Defendants than good for the Plaintiffs, whose future need for a preliminary injunction to protect the sole identified trade secret in the slide deck – Juan Arciniegas' analysis of time-bound 2016 data, is indisputably **nil** <u>at this point and will never become valid with more passage of time</u>. Plaintiffs and their counsel will continue to misuse

the preliminary injunction order, displaying it like Jafri's scalp, in front of every court even in proceedings where it is irrelevant, like the *Stang v. URJ* case.

23. This case has inflicted grievous harm on Jafri's life and ability to earn a living. As an example, Jafri applied for a financial broker license from the New York State Department of Financial Services ("DFS") in October 2019. On May 6, 2020, the DFS declined to offer Jafri said license due to, "ongoing litigation involving serious allegations" (Exhibit J, second paragraph). Jafri had planned on offering annuities to lawyers' clients, a service that is wholly discrete and independent from the litigation settlement funding service. The DFS's indefinite tabling of Jafri's application constitutes concrete evidence of this lawsuit's negative impact on Jafri's life and her very ability to financially provide herself with life's necessities.

24. The preliminary injunction in and of itself is not the only order in this case that has potential for misuse by attorneys who seek to destroy the personal and professional lives of the individual Moving Defendants, Jafri and Olsen. The Court, in its interlocutory preliminary injunction opinion, stated, "the Court sees Jafri's credibility as impugned…" (Dkt. 79, 1/31/18 Order and Opinion, p. 6). During the preliminary injunction evidentiary hearing, Jafri stated that she did not recall drafting NDAs generally referred to on her LinkedIn page (*Id*). The Court likely was referring to Jafri's admitted lack of memory at that moment about the NDAs, rather than any purported perjury, as the reason for stating that Jafri's credibility had been self- "impugned." However, the Court's Order and Opinion did not delineate the nature – veracity vs. lack of recollection -- of the credibility impugnment.

25. In fact, there was never specific testimony throughout the entire evidentiary hearing that the NDAs that Jafri referenced on her LinkedIn work history page pertained in any way to the slide decks. In fact, Jafri's preparation and dispatch of NDAs was confined to *employee* NDAs sent only

11

to new Signal employees to execute, not *slide deck* NDAs sent to investors[3].

26. Frazen, Gekas and Plaintiffs have shown thus far that they are willing to go to any lengths to disrupt and destroy Farva Jafri's life, as the target of some kind of pathological sport. Gekas has already succeeded in destroying Jafri's career as a litigation funder. But Gekas has teamed up with a new-found ally, attorney Mitchell Frazen, who with Gekas' help is engaged in an ongoing effort to destroy Jafri's incipient career as a litigator. Unless the Court vacates the preliminary injunction and the accompanying opinion, Jafri and the other Moving Defendants will forever be subject to continuing misuse of the Opinion and Order by Frazen, Gekas and any other cynical, opportunistic lawyer who feels that he or she can enjoy an unfair litigation advantage by collaborating with Plaintiffs' counsel and adopting his malicious bullying tactics.

27. The Moving Defendants seek leave from the Court to file a memorandum in support of this motion and ask the Court to set a briefing schedule.

    /s/ Farva Jafri
Farva Jafri
farva@jafrilawfirm.com
Jafri Law Firm
1731 W. Pierce Ave, Suite 1
Chicago, Illinois 60622
Tel: (224) 267-0043
Fax: (224) 228-6721
*Attorney for Looking Glass Financial LLC, Looking Glass Legal LLC, Looking Glass Partners LLC, Pinnacle Disability LLC, Pinnacle Structures LLC, Michael Olsen and Farva Jafri*

---

[3] As the Court noted (Dkt. 79, Order and Opinion, p. 6), Jafri and Looking Glass' counsel, Mark Stang, did not cross examine Jafri on this point. Stang refrained from questioning because he had never seen Jafri's LinkedIn profile up to that point. Also, Stang had had no discussions with Jafri concerning any NDAs. Accordingly, Stang followed the time-honored trial lawyer's maxim, of not asking a witness a question to which Stang himself did not already know the answer. Jafri is prepared, in the interest of justice, should it please the Court, to be examined by the Court or Gekas about the fact that the only NDA she had worked on was a general template-type NDA for employees, not any slide deck NDAs for potential investors.

## CERTIFICATE OF SERVICE

This will certify that on May 7, 2020, a copy of the foregoing was served by the Court's electronic filing system upon:

Constantine Gekas
Gekas Law Ltd.
33 N. LaSalle Street
Suite 2220
Chicago, IL 60602
cjg@gekaslaw.com

*Attorney for Plaintiffs*

Thomas J. Long; Daniel F. Konicek; Amanda Hamilton; Michael J. Corsi, Amir R. Tahmassebi, Patrick T. Snyder
KONICEK & DILLON, P.C.
21 W. State Street
Geneva, IL 60134
tlong@konicekdillonlaw.com; dan@konicekdillonlaw.com;
amanda@konicekdillonlaw.com; mcorsi@konicekdillonlaw.com
amir@konicekdillonlaw.com; pat@konicekdillonlaw.com

*Attorneys for Sugar Felsenthal Grais & Helsinger LLP, Jonathan P. Friedland, Vanessa J. Schoenthaler, Etahn M. Cohen, and Elizabeth B. Vandesteeg*

Paul E. Slater; Matthew T. Slater; Martin V. Sinclair, Jr.
SPERLING & SLATER, P.C.
55 W. Monroe St., Ste 3200
Chicago, IL 60603
pes@sperling-law.com
mslater@sperling-law.com
msinclair@sperling-law.com

*Attorneys for Sugar Felsenthal Grais & Helsinger LLP*

/s/ Farva Jafri