**EXHIBIT 17**

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

SIGNAL FINANCIAL HOLDINGS LLC, *et al.,*   )
   )
     Plaintiffs,   )
   )   No. 1:17-cv-8816
-vs-   )
   )   Hon. Joan Humphrey Lefkow
LOOKING GLASS FINANCIAL LLC, *et al.,*   )
   )
     Defendants.   )

**EXPERT REPORT OF MARY ROBINSON**

1.   <u>Qualifications</u>

     See my Curriculum Vitae attached as <u>Exhibit A</u> for a complete summary of my qualifications.

    A.   Work History

     I have practiced law in the field of professional responsibility since my 1992 appointment as Administrator of the Illinois Attorney Registration and Disciplinary Commission ("ARDC"). During my 15-year tenure there, I was responsible for developing and implementing policies for enforcement of the Illinois Rules of Professional Conduct, including the conflict of interest rules which were frequent subjects of grievances submitted to ARDC each year during my tenure and disproportionately as compared to other allegations, the basis for formal discipline cases.

     Since leaving the ARDC in 2007, I have concentrated my practice in the field of attorney ethics and professional responsibility. I currently am a partner in Robinson, Stewart, Montgomery & Doppke, LLC, where I represent lawyers and law firms in matters involving ethics and professional responsibility issues. My practice includes defending lawyers and judges in disciplinary investigations and prosecutions, advising lawyers on appropriate responses to ethical concerns, assisting firms in structuring practices to conform to ethical principles, and providing expert consulting and witness services in connection with litigation. In the course of this practice, I have had occasion to

1

EXHIBIT
5

opine and/or advise concerning conflict of interest issues on numerous occasions.

B.     Publications in the Last 10 Years

Attorneys Legal Liability – 2018 Edition, Chapter 13, *"Disciplinary Liability,"* Illinois Institute of Continuing Legal Education

"*Mandating Civility: Wisdom or Folly?*" ABA The Professional Lawyer, Vol. 22, No. 2 (April 2014)

"*Discipline and Disability: When is Disease a Defense,*" ABA GP SOLO, p. 31 (October/November 2009)

*The Professional Cost of Untreated Addiction and Mental Illness in Practicing Attorneys*, The Professional Lawyer, 2009 Symposium Issue, p. 101 (ABA Center for Professional Responsibility 2009)

"*In the End, It's All About The Children: Chicago Attorneys Travel to Africa*," CBA Record, p. 40 (September 2008)

"*Colleagues in Crisis, Collateral Damage: Careers and Families,*" The Judges' Journal, American Bar Association, p. 37 (Spring 2008)

C.     Presentations

Lecturer and panelist on professional responsibility issues for, *inter alia*: ABA National Conference on Professional Responsibility; ABA Conference on the Role of the Court in Improving Lawyer Conduct and Professionalism; ABA Symposium on Teaching Professional Responsibility; CoLAP National Conference for Lawyers Assistance Programs; National Organization of Bar Counsel; Association of Professional Responsibility Lawyers; International Association of Defense Counsel; Federal Bar Association; Illinois Appellate Defender, Illinois Attorney General and City of Chicago Law Department in-house training programs; Illinois State Bar Association, Chicago Bar Association, Illinois Trial Lawyers Association, IICLE, PLI, ALI-ABA, Law Bulletin and various Inns of Court and county bar associations.

D.     Teaching

Northern Illinois University School of Law, Professional Responsibility Course, Spring Semester 1999 – 2004
Northwestern University Law School, Professional Responsibility Course, Spring Semester, 2005

E.    Education and Licensing

J. D. University of Southern California (1974)
B.A. University of Illinois, Chicago (1971)
Admitted to practice: Illinois (April 1975), California (January 1975)
Admitted to the bars of the: United States District Court, Northern and
Central Districts of Illinois, United States Court of Appeals for the
Seventh Circuit, United States Supreme Court

F.    Awards

October 2006, Illinois Lawyers Assistance Program Carl H. Rolewick
Award

June 2007, John Marshall Law School Corporate Law Association
Francis D. Morrissey Lifetime Achievement Award

F.    Other

ABA/BNA Lawyer's Manual on Professional Conduct Editorial Board,
2012 to 2015

ABA Standing Committee on Ethics and Professional Responsibility,
Member 2007 – 2010

ABA National Conference on Professional Responsibility, Planning
Committee, Member 2007 - 2011, Chair 2008 - 2010

ABA Standing Committee on Professional Discipline, Member 1995 –
1997

Illinois Judicial Ethics Committee (2015-present)

Chicago Bar Association Board of Governors (2017 – 2019)

Chicago Bar Association/Chicago Bar Foundation Task Force on the
Sustainable Practice of Law and Innovation (2019 – present)

Illinois State Bar Association Task Force on the Future of Legal Services
(2015-2016)

Illinois Supreme Court Special Committee on Professionalism (2001-
2004)

Illinois Supreme Court Commission on Professionalism, ex officio
member (2004-2007)

3

Commissioner, Attorney Registration and Disciplinary Commission of the Illinois Supreme Court (1989-1992)

Illinois Supreme Court Committee on Pattern Jury Instructions in Criminal Cases, Member (1988-1991)

Illinois State Bar Association: Special Committee on Ancillary Businesses, Task Force on Multi-Disciplinary Practice, Coordinating Committee for Conclave on Legal Education, Criminal Justice Section Council, Committee on Mental Health

II.    <u>Other Expert Testimony in the Past Four Years</u>

A.    *E&M Investments v. Katten Muchin Rosenman LLP,* 09 L 3572, Circuit Court, Cook County, Illinois

B.    *In Re Williams*, Nos. 15-71767 16-07024, U.S. Bankruptcy Court, Western Dist. Of Va

C.    *Devivo v. Fiumetto*, et al., No. 14 CH 16744, Circuit Court of Cook County

D.    *Ring v. Schenker*, No 2015 L 005404, Circuit Court of Cook County

E.    *Barnard Knox v. Berke et al.*, No. 13 CH 00914, Circuit Court of Cook County

F.    *Rabine POC, Inc. v. Lawrence Mishkin, et al.*, No. 2014 L 002765, Circuit Court of Cook County

G.    *Chicago Capital Management, LP v. Katten Muchin Rosenman LLP,* 2017 L 003321, Circuit Court of Cook County

H.    *Leydig, Voit & Mayer, Ltd. v. SL Pru, LLC, et al.,* 2016 CH 02697, Circuit Court of Cook County

I.    *Kormi v. Choate, et al.,* No. 1 :16-CV-09415, U.S. Dist. Ct., Northern District, Illinois

J.    *Tadros v. Newland & Newland, LLP., et al.,* No. 16 L 1191, Circuit Court of Cook County

K.    *Paul Gremillion, et al. V. Nixon Peabody, LLP.,* No. 16 L 008792, Circuit Court of Cook County

4

L. *Hermansen v. Riebandt, et al.,* No. 2016 L 7654, Circuit Court of Cook County

M. *Michael C. Kim v. Hemingway House Condominium Association,* No. 13 M1 131645, Circuit Court of Cook County

N. *GoGo LLC v. Squire Patton*, No. 2016 L 007789, Circuit Court of Cook County

O. *Newmark Group, Inc. et al. v. Avison Young (Canada), Inc. et al.* No. 2015 L 2186

P. *A. Clay Cox, as Trustee for the Estate of Central Illinois Energy Cooperative v. Michael E. Evans, et al.,* No. 1:18-cv-01105, U.S. District Court, Central District of Illinois, Peoria Division

Q. *Jorie, LP et al. v. Roberts McGivney Zagotta,* No. 17 L 000728, Circuit Court of DuPage County

R. *Wiczer & Sheldon, LLC, et al. v. Eriem Surgical, et al.,* No. 17 M2 3772

III.  Matters Reviewed

Second Amended Complaint for Injunctive Relief and Damages

SFGH Defendants' Amended Answer to Second Amended Complaint for Injunctive Relief and Damages

Memorandum in Support of SFGH's Motion to Strike Plaintiffs' Request For Punitive Damages and Dismiss Counts 8, 9, 10 and 11 of the Second Amended Complaint Pursuant to Rule 12

Plaintiffs' Opposition to the SFGH Defendants' Motion to Strike Plaintiffs' Request For Punitive Damages and Dismiss Counts 8, 9, 10 and 11 of the Second Amended Complaint Pursuant to Rule 12

Reply in Support of SFGH's Motion to Strike Plaintiffs' Request For Punitive Damages and Dismiss Counts 8, 9, 10 and 11 of the Second Amended Complaint Pursuant to Rule 12

Order and Opinion (January 31, 2018)

Deposition Transcript: Edward Gehres

Exhibits:
- "NewCo" Slide Deck.
- September 28, 2017 Resignation Email & Letter

5

- October 2, 2017 Jafri Email to Dylan Beynon.
- Email Chain – Farva Jafri & Mighty Inc.
- Defendants' Response to Plaintiffs' Admission Requests & Interrogatory.
- July 16, 2016 Engagement Letter between Sugar Felsenthal Firm and Signal Funding LLC.
- January & February 2017 Conflict Waiver Letters.
- September 2017 email exchange – Jafri and GPC.
- Pre-October 2017 SFGH Bills (June to September).
- October 5, 2017 texts between Jafri and D. Gramenos
- October 13, 2017 Jonathan Friedland Status Email to Ed Gehres.
- October 2017 email chain between Jonathan Friedland and Ed Gehres.
- DocuSign Records – September 28, 2017.
- October 2017 SFGH Bills.
- October 3: Pinnacle Structures LLC – Organization document filed in Delaware.
- October 4: PreSF LLC (later renamed to Looking Glass Legal LLC) – Organization document filed in Delaware.
- October 6: Pinnacle Disability LLC – Organization document filed in Delaware.
- October 12: Looking Glass Financial LLC – Organization document filed in Delaware.
- October 16: Looking Glass Legal LLC – Name Change filed in Delaware – PreSF LLC to Looking Glass Legal LLC.
- October 19: Looking Glass Financial LLC – Application as Foreign LLC filed in Illinois.
- October 20: Looking Glass Financial LLC – Application as Foreign LLC filed in New Jersey.
- October 16, 2017 Jafri Email to Vanessa Schoenthaler re Olsen/Signal Employment Agreement.
- Illinois Registrations filed with Secretary of State showing Jonathan Friedland as Registered Agent for three Jafri entities/
- Resignations of Jonathan Friedland as Registered Agent.
- December 8, 2017 Letter of Chris Gekas to Lisa Vandesteeg.
- December 12, 2017 email from Jonathan Friedland to Ed Gehres asking for payment of October Bills.
- October 4, 2018 Letter of Chris Gekas to Lisa Vandesteeg.
- November 1, 2018 Letter of Tom Long of Honicek & Dillon P.C. to Chris Gekas.
- SFGH engagement and disengagement letters for Jafri entities (SFGH Second Supp 004154-004226)
- SFGH invoices to Jafri and Jafri entities (Supp. SFGH 000001-000085)

IV.     <u>Statement of Compensation</u>
I am being compensated for my services in this matter at the rate of $500 per hour.

V.     <u>Opinion</u>

<u>Factual Background</u>

For purposes of this opinion, I have assumed the facts alleged in the Second Amended Complaint along with inferences which Judge Lefkow found to be reasonably supported by those allegations and information available from the materials reviewed. I reserve the right to expand, amplify and/or amend this opinion based upon information that becomes available hereafter as document discovery and depositions are completed.

In sum, I have considered the following allegations:

Plaintiff Signal Funding LLC ("Signal") operates a pre-settlement legal funding business, advancing nonrecourse loans to persons with potential legal claims. Beginning in 2016, Defendant Sugar Felsenthal Grais & Helsinger LLP ("SFGH") represented Signal in all general corporate matters.

Defendant Farva Jafri joined Signal in July 2016 as Vice-President of Operations, and was later named Chief Operating Officer. Jafri was SFGH's main contact at Signal. By summer of 2017, Jafri surreptitiously began preparing to compete with Signal. In furtherance of her plans, Jafri took confidential Signal documents, including a presentation for potential investors that incorporated significant proprietary information.

In September 2017, Jafri continued to purport to work for Signal, but stopped showing up at the office and began soliciting investors for her own business. In one instance, she responded to an email from Matt Eager of OTRA Investments looking for information about investing in Signal by misleadingly suggesting that Signal was one of her investors rather than her employer and by indicating that an investment would likely be with a related entity she referred to as NewCo, intending to secure OTRA as an investor in her own competing entity. Also, during September, Jafri exchanged emails with and made a presentation to Great Point Capital LLC (GPC) with the goal of securing funding for her own business. In a September 26, 2017 email to GPC she indicated that Michael Olsen, represented to be the current CMO of Signal, was working with her to adjust some numbers.

Jafri resigned from Signal on September 28, 2017, the day after she received an email demanding that she appear at the office. Prior to tendering her resignation, Jafri arranged to have Signal pay outstanding SFGH invoices for services rendered in August and September, 2017, totaling $32,988.28. On September 29, 2017, Jafri came to the Signal office in Miami and spoke with one of the principals. She offered to cooperate in a transition and was allowed to keep her Signal email to facilitate that cooperation.

Prior to Jafri's resignation from Signal and while continuing to represent Signal, beginning no later than August 15, 2017, SFGH began representing Jafri in connection with businesses she was developing or operating independent of Signal, including mydotcomdoc.com and VirgCoin. Neither of those entities engaged in pre-settlement litigation funding. However, on September 29, 2017, the day Jafri agreed with Signal to cooperate in a transition, she had an hour-long conversation with four attorneys from SFGH about pre-settlement v. post-settlement litigation financing. The consult was billed to Signal.

Thereafter, between October 3 and October 5, 2017, while SFGH continued to represent Signal and while Jafri was purporting to cooperate with Signal in a transition, SFGH assisted Jafri in forming three entities which Jafri intended to operate in competition with Signal using Signal information, employees and business leads. The three entities were NewCo, later renamed Looking Glass Legal, LLC, which was organized to provide pre-settlement litigation funding (the same business as Signal), and Pinnacle Structures LLC and Pinnacle Disability LLC which were organized to provide funding in connection with disability claims (an undertaking which Jafri knew Signal to be exploring at the time).

On October 3, 2017, the day before SFGH did the work to form NewCo, Jafri was communicating with Matt Eager of OTRA and told him that her lawyers (presumably SFGH) had advised that there was no realistic probability of success should a "former investor" (presumably Signal) contemplate litigation challenging an OTRA investment with NewCo. An SFGH invoice to Looking Glass Legal shows that on the same day, Jafri had a half hour call with SFGH attorney, Jonathan Friedland, the subject of which has been redacted from the invoice entry. That same invoice shows another 4.5 hours of SFGH calls and emails with Jafri on October 5 and 6, 2017, similarly, with information about the matters discussed redacted. On October 5, 2017, Jafri texted with Diane Gramenos, a former employee of a Signal related entity who had been working on developing the disability claims funding business, about a likely deal with GPC, indicating that she expected GPC to send term sheets and would have "our lawyers" look them over. Per Gramenos' inquiry, Jafri identified her lawyers as SFGH.

On October 7, 2017, while still purporting to negotiate a transition agreement with Signal, Jafri used her Signal email to transfer additional Signal documents containing trade secrets and other confidential information to her personal account. Thereafter, she told Signal that she was no longer interested in a transition agreement and she declined to provide any further assistance.

Between October 9 and 12, 2017, while continuing to represent Signal, SFGH assisted Jafri in forming and registering Looking Glass Financial LLC as a Delaware Limited Liability Company, and in negotiating a contract between NewCo and Mighty Group, a client funding administration software vendor whose services were necessary to NewCo conducting its litigation funding business, and SFGH lawyers billed time for calls and emails with Jafri on each of those four days. On October 13, 2017, SFGH addressed tax issues and reviewed a term sheet concerning a redacted transaction apparently involving NewCo. That same day, SFGH attorney Jonathan Friedland sent a letter to Signal GC, Edward Gehres, reporting on the status of Signal matters in light of Farva's departure and expressing the hope that SFGH could remain counsel for Signal and perhaps expand the relationship to related entities.

On October 16, 2017, SFGH took steps to change NewCo's name to Looking Glass Legal, LLC, and on behalf of Looking Glass, reviewed Signal CMO Michael Olsen's employment agreement with Signal, presumably for purposes of advising Jafri of any legal issues that could arise from her poaching Olsen. Either as part of that review or for some unrelated reason, an SFGH attorney took part in an October 16th phone call concerning Looking Glass with Jafri and Michael Walker, who at the time served as Signal's Chief Technology Officer. SFGH lawyers billed the Looking Glass file for 3.3 hours of phone calls and emails with Jafri on October 17, October 18 and October 19, 2017.

On October 19, 2017, Signal asked SFGH if the firm was representing Jafri. On October 20, 2017, SFGH attorney Jonathan Friedland (who was identified as the primary attorney for Looking Glass and other Jafri entities in engagement letters subsequently executed) replied that there was "no point in time where we represented Farva in a matter adverse to Signal" but if Signal was asking "the broader question of whether we represent Farva on other matters, I cannot answer that." (Par 157) By that date, Looking Glass had begun funding cases and operating as a going concern. That same day, an SFGH paralegal billed Looking Glass Financial for reviewing file-stamped documentation authorizing Looking Glass Financial to do business in Illinois and New Jersey, and SFGH lawyers collaborated on a draft purchase agreement attributed to the Looking Glass Legal and the Looking Glass Financial files. On October 25, 2017, SFGH took steps to form Looking Glass Partners, LLC.

On October 27, 2017, Friedland announced that SFGH was terminating its representation of Signal by email addressed to Signal General Counsel Edward Gehres, stating:

> Farva has asked us to represent her in matters unrelated to Signal (and, at my request, has given the ok to disclose this to you). Because I anticipate that her future endeavors may not be completely unrelated to the space in which Signal operates, I feel it necessary to choose between Signal and Farva. While not an ethical conflict, it is a business conflict which would trouble me if I were either client. In short, and with nothing but the utmost respect for you and Signal, I choose Farva. (157)

Thereafter, over the next month to six weeks, Gehres sought to transition Signal files from SFGH. SFGH was largely unresponsive for most of that period of time and refused to answer any of Gehres' inquiries seeking to determine whether the work SFGH was doing for Jafri was adverse to Signal's interests. During that period, SFGH performed over 40 hours of work for Looking Glass and Pinnacle entities, including work on terms sheets and a note for an investment by OTRA in Looking Glass Legal, as well as calls and emails with former Signal employees Michael Olsen and Tiffany Brown, and attorney Diane Gramenos, who had collaborated with Signal on the potential of developing a funding business related to disability claims.

In subsequent months, SFGH provided legal work to Looking Glass and Pinnacle entities which included communications and drafting documents in support of investments in Looking

9

Glass and Pinnacle by Brijesh Shah, Bryan Belcher and OTRA, investment opportunities which Jafri diverted from Signal. In the course of that work, SFGH lawyers communicated with multiple former Signal employees who Jafri had persuaded to join her ventures, including James Habel (former Signal Senior VP of Business Development), Michael Walker (former Signal Chief Technology Officer) and Neyda Gonzales (former Signal Executive Assistant to Jafri), in addition to Michael Olsen and Tiffany Brown.

<u>Analysis</u>

A lawyer's duties to clients include the obligation to represent clients' interests with undivided loyalty and to protect a client's confidential information, the two most important underpinnings of the conflict of interest rules. As relevant here, Rule 1.7 of the Illinois Rules of Professional Conduct precludes lawyers from engaging in representations where clients are directly adverse or where the representation of one client might be materially limited by obligations to another, and Rule 1.9 prohibits lawyers from representing a client whose interests are materially adverse to those of a former client in matters substantially related to the matters upon which the former client was represented. Where clients are directly adverse, a lawyer cannot serve both without sacrificing the interests of one, either by taking action detrimental to one of the clients or by using one client's information to further the interests of the other.

A lawyer's duties also include the obligation to be fully honest and forthcoming with clients, providing them the information they need in order to make reasonably informed decisions about their matters and never stating falsehoods or otherwise misleading them. That duty is so basic to effective and loyal representation that it is incorporated through multiple rules. Those include Rule 1.4 which requires that a lawyer promptly inform a client of any decision or circumstance requiring the client's informed consent, keep the client reasonably informed of the status of a matter, comply with reasonable requests for information, and explain matters to the extent reasonably necessary to allow the client to make informed decisions, as well as Rule 8.4(c) which sets forth the general prohibition on engaging in conduct involving dishonesty or misrepresentation. Continuing representation of a client after taking on an adverse representation or one that might limit the lawyer's diligence and ardor on behalf of the first client is a circumstance requiring the first client's informed consent, and hence, a circumstance that must be disclosed to that first client. *A priori*, the circumstance must be described accurately.

The factual background set forth above demonstrates violations of those duties by the defendant lawyers whose conduct thereby fell well below the standard of care required of lawyers in this state or any United States jurisdiction.

While Signal was a client to which SFGH owed full loyalty, SFGH lawyers assisted Signal's unfaithful COO in developing a competing business making use of Signal trade secrets and other proprietary information, business leads, and employees. SFGH's assistance to Farva Jafri was not limited to neutral ministerial support, but instead included activities directly antagonistic to the interests of Signal under circumstances where SFGH could not have believed otherwise. That assistance included advising Jafri as to the likelihood of Signal

10

having or pursuing legal recourse were she successful in diverting the OTRA investment to her own business, as well as reviewing the employment contract of Signal's CMO and advising Jafri as to whether Signal could mount legal challenges if Olsen formalized his then clandestine association with her. SFGH's advice to Jafri on those matters was directly adverse to the interests of Signal, who remained SFGH's client, unaware that SFGH was providing legal guidance and assistance to Jafri to Signal's detriment.

Other assistance provided to Jafri by SFGH while it stalled in transitioning Signal files included drafting of documents to facilitate OTRA's investment in Looking Glass and communicating with former Signal employee, Diane Gramenos, to support the development of the Pinnacle disability claims funding business which Signal was similarly seeking to develop. That, too, was representation directly adverse to Signal's interests.

The conduct at issue here does not support an argument that SFGH's representation of Jafri was permissible under Comment [6] to Rule 1.7 which explains that simultaneous representation of clients with competing economic interests may be permissible. The Comment and cases implementing that proposition make clear that such simultaneous representation may be permissible when the clients are being represented by the same counsel *on unrelated matters*. For example, SFGH could represent Signal on all general corporate matters and simultaneously represent a Signal competitor in litigation with an unhappy investor. The competitor's economic interests would presumably be improved if the litigation were successfully defended, so that Signal would have an indirect interest in the competitor losing, but that indirect interest is not one protected by the conflict rules.

In this case, SFGH's representation of Jafri was clearly not limited to matters unrelated to its representation of Signal. Providing Jafri advice on diverting Signal business opportunities and poaching Signal employees was clearly directly related to the matters upon which SFGH owed Signal its loyalty. SFGH duties to Signal were coextensive with the scope of the representation it had agreed to provide, which included all general corporate matters. As such, SFGH was responsible for representing Signal's interests in preserving investor opportunities and in enforcing its employment agreements, representation which included assisting Signal in enforcing its rights if an employee misappropriated proprietary information, violated the terms of an employment agreement, or diverted a business opportunity. Jafri was obviously directly adverse to Signal on such matters. Rather than fulfill its commitment to Signal, SFGH undertook representation of Signal's opponent, assisting her in working against Signal's interests with no notice to Signal that the issues were on the table, much less that SFGH would not protect Signal's interests in those matters.

Because it was not reasonable for SFGH attorneys to believe they could competently and diligently represent both Signal and Jafri on matters where their interests were directly adverse, it is doubtful that this was a waivable conflict. See Rule 1.7(b)(1). But even if SFGH believed waiver possible, it is clear that such an adverse representation could not be undertaken without Signal's informed consent, thus triggering the mandate of Rule 1.4(a)(1) that SFGH inform Signal that a circumstance requiring its consent had arisen. Independently, Signal could not make informed decisions about preserving its business opportunities and assets without being informed of Jafri's adverse activities and SFGH's assistance to her in

11

those matters. Instead of fulfilling its duty of candor to Signal, SFGH concealed its adverse representation of Jafri, going to such lengths as to falsely deny that it had at any point represented Jafri in a matter adverse to Signal. That assertion occurred after SFGH had advised Jafri with regard to potential litigation with Signal over the diverted investor and after the firm advised Jafri of the likely impact of Olsen's employment contract with Signal. Even if SFGH believed that it could justify representation of Jafri on the theory that lawyers can represent business competitors, it is inconceivable that SFGH would not have recognized that it was advising Jafri on matters directly adverse to Signal.

SFGH's attempt to legitimize its representation of Jafri and her competing entities by announcing its withdrawal from representation of Signal could not be effective. Where a law firm drops a client (like a "hot potato") in order to represent another client who is adverse to the first client, the first client will continue to be treated as a current client for purposes of the conflict rules, so that the law firm's duties to remain loyal to that client and decline representation of clients whose interests are adverse continue. Even if that were not true and Signal could be treated as a former client, SFGH's representation of Looking Glass and Pinnacle entities was precluded under Rule 1.9 because it was substantially related to the representation of Signal and materially adverse to Signal's interests. SFGH's continued representation of Jafri entities presented a danger that SFGH would be able to use information it had learned in its general corporate representation of Signal to Jafri's benefit and Signal's detriment. By way of example, SFGH had information about Signal's employment policies and practices, clearly useful in advising Jafri as she proceeded to recruit multiple Signal employees to abandon Signal and join her enterprise. As a result, even if Signal could be treated as a former client, under Rule 1.9, SFGH was precluded from representing Jafri and her entities after the representation of Signal was terminated without Signal's informed consent.

But again, rather than seek informed consent which would have required accurately describing the nature of the work SFGH was doing for Jafri, SFGH misrepresented what that representation involved by asserting that it was "unrelated to Signal," involving only a "business conflict," and by then ignoring or rebuffing Signal's requests for information that would allow it to make its own assessment.

Conclusion

SFGH's representation of Farva Jafri, Looking Glass entities and Pinnacle entities while continuing to represent Signal presented a classic case of a materially adverse conflict prohibited by Rule 1.7(a)(1). SFGH's assertion that the conflict was not an ethical conflict, and instead, constituted only a business conflict was both wrong-headed and disingenuous, dependent on distorting the legal requirement that matters upon which a law firm represents business competitors must be unrelated to evade application of the conflict rules and misrepresenting what work it was doing for Jafri. SFGH's representation of Jafri included assisting her in diverting Signal employees and business opportunities, activities that were obviously adverse to Signal. SFGH could not legitimize the Jafri representation by dropping Signal like a hot potato. Under the conflict rules, Signal would continue to be treated as a current client, and even if Signal were treated as a former client, the representation was

12

precluded under Rule 1.9, unless Signal gave informed consent, which SFGH made impossible because of its refusal to provide an accurate accounting of the work being done on behalf of Jafri.

Mary Robinson

Robinson, Stewart, Montgomery & Doppke, LLC
321 S. Plymouth Court, 14th Floor
Chicago, IL 60604
(312) 676-9875

13